# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

ASI, INC.,

    Plaintiff,

    v.

AQUAWOOD, LLC; BANZAI INTERNATIONAL LTD.; CHAN MING YIU a/k/a Samson Chan; CHAN SIU LUN a/k/a Alan Chan; DOLLAR EMPIRE LLC; BRIAN DUBINSKY; JUN TAI CO LTD.; JOHN ROBERT LEES, in his official capacity as Liquidator of and successor to Manley Toys Ltd.; LIU YI MAN a/k/a LISA LIU; PETER MAGALHAES; MANLEY TOY DIRECT, LLC a/k/a Worldwide Toy Direct; MANLEY TOYS LIMITED; MGS INTERNATIONAL, LLC; MAT NG, in his official capacity as Liquidator of and successor to Manley Toys Ltd.; PARK LANE SOLUTIONS LTD; RICHARD TOTH; TOY NETWORK, LLC;  TOY QUEST LTD.; WELLMAX TRADING LTD.; WINNING INDUSTRIAL LTD., and; MICHAEL WU.

    Defendants,

Case No. ⸺⸺⸺⸺ 0:19-cv-00763

**AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

JURISDICTION AND VENUE ...................................................................................... ~~4~~5

PARTIES ...................................................................................................................... ~~5~~

~~The Principals .............................................................................................................. 5~~

~~The Executives ............................................................................................................ 5~~

~~The Corporate Shell Defendants ................................................................................ 6~~

~~The Civil Fraud, Sham Litigation, Civil Conspiracy and RICO Defendants ............ 7~~

~~FACTUAL ALLEGATIONS COMMON TO ALL COUNTS ...................................... 9~~

Factual allegations ...................................................................................................... 12

I.    ~~The RICO Defendants Conduct Business through an "~~Overview of the
      Enterprise.~~" .................................................................................................... 9~~ 12

        A.    ~~The SLB Enterprise is an Ongoing and Continuing Association in Fact~~
              ~~that Pursues a Common Purpose, Engages in Commercial Activities, and~~
              ~~is Distinct from the RICO Defendants and Their Pattern of Racketeering. ...... 9~~

        ~~B.    The~~

        A.    The SLB Enterprise Spans Continents, Using a Network of
              Companies and Affiliates Built Up Over Decades. ............................ 12

        B.    Unpaid Judgments Obtained by Aviva and the Iowa Claimants
              against SLB Companies ..................................................................... 18

                1.    Aviva ........................................................................................ 18

                2.    Iowa Claimants ......................................................................... 19

        C.    Who's Who in the SLB Enterprise ~~is Comprised of Interpersonal~~
              ~~Relationships Between the Principals and Other RICO Defendants. ...... 10~~ 21

                1.    ~~The Principals and Executives Have Close Working and Personal~~
                      ~~Relationships with Each Other. 11~~. The Chan Defendants: Samson Chan, Lisa Liu, A

                2.    ~~The Principals and Executives Treat Certain SLB Companies as~~
                      ~~Fungible. .................................................................................... 12~~

2.     The Dubinsky Defendants: Brian Dubinsky, Peter Magalhaes, and Aquawood ................................................................. 33

3.     ~~Even Its Most Prominent Company was Expendable in Order for the Enterprise to Continue Its Purpose.13~~The Toth Defendants: Richard Toth and MGS

4.     ~~With Chan's Approval, the Other RICO~~

4.     The Wu Defendants: Michael Wu, Dollar Empire, and Wellmax ................................................................................. 48

5.     Manley and the Liquidators ........................................... 49

6.     MTD and Toy Network ................................................... 51

7.     Jun Tai and Winning ...................................................... 53

II.     Defendants Have Cheated Aviva and Other Judgment Creditors through a Massive Web of Lies, Deceptions, and Corporate Abuses. ............ 54

A.     Defendants Have Concealed and ~~their Related Entities Work Closely Together~~Destroyed Evidence to Keep ~~Money Flowing into the SLB Enterprise and~~It Away from ~~American~~Judgment Creditors Like Aviva. ~~14~~54

a.     ~~The Principals Conduct the SLB Enterprise's International Business by Coordinating the Control of Closely Related SLB Companies that Are Based in Hong Kong. ................... 14~~

b.     ~~The Principals and Executives Direct the SLB Enterprise's Business in the United States Through Interdependent American Companies. ................................................. 16~~

i.     ~~The Enterprise Has Conducted Business in California through MTD and Aquawood/Epic ......................... 17~~

ii.     ~~The Enterprise Has Anchored Certain Operations in Iowa, Where It Has Conducted Business through MTD, MGS and Related Entities. ................................................ 18~~

iii.     ~~The Executives Have Helped the Enterprise Import, Store, and Distribute SLB Products. ................................. 19~~

iv.     ~~Lawyers and Law Firms Have Protected the Enterprise through Sham Litigation. .......................................... 20~~

C.   Thanks to the Principals' Unethical Business Practices and the SLB Companies' Flexible Corporate Structures, the SLB Enterprise Has Escaped Liability in U.S. Courts for Many Years. .................... 21

1.   To Evade Creditors, the Enterprise Plays What Courts Have Termed "Corporate Entity Three Card Monte" and a "Shell Game." .................... 22

a.   The Enterprise Has a Modus Operandi of Replacing One SLB Company with Another in Name Only. .................... 22

b.   The Enterprise Conceals, Falsifies and Destroys Evidence in Order to Avoid Lawsuits. .................... 23

c.   Courts in At Least Four Jurisdictions Have Seen through the Enterprise's Charade. .................... 23

2.   The SLB Enterprise Is at Risk of Losing Millions of Dollars Due to Judgments Against

1.   Courts in Minnesota and Elsewhere Have Concluded that Defendants Hide Information to Evade U.S. Judgments. .................... 54

2.   Aviva's Efforts to Obtain Information about SLB Companies. .................... 25

a.   SLB Companies Have Been Found Liable for Deceptive Trade Practices and Unfair Competition. .................... 25

b.   SLB Companies Have Been Found Liable for Sexual Harassment and Sex Discrimination. .................... 26

c.   The Principals Keep the Enterprise 60

3.   Dubinsky, Liu, and Samson Chan Falsified and Destroyed Documents to Avoid Liability. .................... 64

B.   Defendants Play Corporate Shell Games to Stay "One Step Ahead" of the SLB Companies' Judgment Creditors. .................... 28

II.   Defendants' Illegal Conduct Has Sustained the SLB Enterprise. .................... 29

A.   Defendants' Misconduct Has Enriched the SLB Enterprise while Injuring Aviva and Others. .................... 29

B.   Defendants Have Conspired to Keep Assets from Independent Creditors by Propagating Lies, Material Omissions and False Narratives about the Assets and Operations of SLB Companies. .................... 29

~~1~~65

  1. As Judgments Piled up, the Principals Shifted Business from One Hong Kong Company to Another.  66

  2. As Judgments Piled up, the Principals Shifted Business from One Iowa Company to Another.  72

  3. The Principals Changed the Ownership of SLB Toys and then Replaced It with Aquawood.  75

  4. The Principals and Hong Kong Entities Have Admitted that the Purpose of Their Shell Games Is to Evade Creditors.  76

C. Defendants ~~Have Coordinated to Help the SLB Enterprise~~Repeatedly Lied to Retailers to Evade ~~Liabilities~~Judgments and ~~Cheat Independent Creditors Like Aviva.~~  29

  ~~2.~~ ~~Various Members of the SLB Enterprise Conspired Together to Maintain the SLB Enterprise's Control of Manley's Assets and Business Using Defendant Toy Quest Ltd.~~  30

~~a.~~ ~~Members of the SLB Enterprise~~Fraudulently Transfer Manley's Assets. 78

  1. The Principals and Hong Kong Entities Instructed Retailers to Stop Using the "Manley" Name and to Use the "Toy Quest Ltd." Trade Name Instead.  ~~32~~79

  ~~b~~2. Despite the Vendor Name Changes, the SLB Enterprise Retained the Same Employees, Products, Contact Information and Customers.  ~~33~~83

   ~~c.~~ ~~Members of the SLB Enterprise Deceived Retailers to Generate a False Paper Trail.~~  36

   ~~d~~

D. Defendants ~~Fraudulently Recorded Manley Sales as Toy Quest Ltd. Sales~~Falsified Financial Records to ~~Mislead~~Deceive Creditors, the Courts, and Manley's Liquidators.  ~~38~~89

  ~~3.~~ ~~The Principals Established Park Lane to Defraud Manley's Independent Creditors.~~  39

4.      The SLB Enterprise Continues to Conduct Business with the Same
        U.S. Retailers While Avoiding the Judgments of U.S. Courts._____40

        a.      In 2016, the SLB Enterprise Began Selling Manley
                Products Through Banzai International._____40

        b.      The SLB Enterprise Now Sells Manley Products Through
                Additional Trade Names Such as Genesis._____42

5.      The SLB Enterprise Has Cheated Independent Creditors by Hiding
        Behind the Names of SLB Companies Run by Toth._____43

        a.      The SLB Enterprise Has Evaded Judgments against MTD
                Held by Aviva and the Iowa Victims._____43

        b.      The SLB Enterprise Tricked Toys R Us, Inc. into Buying
                Its Products._____44

6.      To Stay "One Step Ahead" of Creditors, the Principals Continue to
        Strip Corporate Shell Defendants of Assets That Could be Used to
        Satisfy Judgments Against Them._____45

C.      The SLB Enterprise Allows

E.      Defendants Lied to Courts._____90

        1.      Toy Quest Ltd. and Samson Chan Submitted Fabricated
                Evidence and an Affirmation from a Fictitious Person in
                Hong Kong Litigation._____91

        2.      The Principals Have Directed SLB Companies to Mistreat
                Their Employees and Customers._____47

        1.      The SLB Enterprise Hired and Enabled Sadistic Managers in
                Indianola._____47

        2.      SLB Companies Subjected the Iowa Victims to a Sexually Hostile
                Work Environment._____49

        a.      The Iowa Victims Suffered and Were Forced to Bear
                Witness to Extreme Sexual Harassment._____49

        b.      The Iowa Victims Were Targeted Because of Their Sex._____51

        3.      The Iowa Victims Filed Complaints Because the Sexual
                Harassment Debtors Refused to Protect Them._____52

D.    The Principals and Interfere with Garnishment Proceedings on False Pretenses. 93

3.    Alan Chan Lied to the Iowa Federal and State Courts.    94

4.    Other False Statements to Courts    95

F.    Defendants Abused Legal Process around the World to Protect the SLB Enterprise's Assets.    53

1.    The SLB Enterprise Attacked Independent Creditors with Sham Litigation in Hong Kong.    54

2.    To Protect the SLB Enterprise from Garnishment Actions, the Principals Directed Sham Litigation Defendants and Corporate Shell Defendants to Lie to U.S. Courts.    56

3.    Faced with the Likelihood that the Have Deceived Creditors, Manley's Liquidators, and the Courts in Connection with Manley's Bankruptcy Case.    100

1.    Prior to Manley's Bankruptcy Filing, the District of Minnesota Federal Court Would Was Poised to Impose Crippling Import Sanctions on the SLB Enterprise, the Principals Used Sham Intervenors to Escape the Court's Authority. 58101

a2.    The Principals, Toy Quest Ltd., and Novack Concealed Their Collusion from the Court.    59

b.    The Motion to Intervene Was a Sham.    60

c.    The Delay the Sham Motion Caused Bought the Principals Enough Time to Commence Bankruptcy Proceedings that Stripped the Minnesota Federal Court of Its Ability to Sanction Manley.    61

4.    The SLB Enterprise Protected its Assets through Sham Orchestrated Fraudulent Liquidation and Bankruptcy Proceedings Designed to Escape Liability in the U.S. and Cheat Independent Creditors like Aviva.    62102

a.    The Principals Maintained Control over the Liquidation Process by Stacking Manley's Creditor List with Sham "Creditors."    63

b.      Manley's Creditors' Meeting Was Timed to Prevent
        Independent Creditors from Receiving Adequate Notice. ............ 64

c.      The Meeting Was Dominated by Sham Creditors Who
        Commissioned a COI Controlled by the Principals. ............ 65

d

3.      The Principals Used Sham Intervenors to Circumvent the
        Authority of the District of Minnesota. ............ 106

4.      The Principals Have Arranged forPaid the Liquidators to Shut
        Down U.S. Litigation against Manley but Have Prevented the
        Liquidatorsin the U.S. While Preventing Them from Pursuing
        Alter Ego or Fraudulent Transfer Claims. ............ 66108

e

5.      Toy Quest Ltd. and the Liquidators Were on the Verge of
        Entering into a Collusive Settlement, Which Was Rejected by
        the Hong Kong Court. ............ 111

6.      The Liquidators Have Abandoned All Fraudulent Transfer
        and Alter Ego Claims and Intend to Close the Hong Kong
        Liquidation without a Distribution to Independent Creditors. ............ 113

7.      At Toy Quest Ltd.'s Insistence, Manley's Liquidators Sought
        to Destroy All Manley Documents in Their Possession. ............ 114

8.      The Bankruptcy Court Ordered the Liquidators to Preserve
        Manley's Documents and Granted Stay Relief to Aviva. ............ 114

9.      While Independent Creditors Have Been Stayed from Seeking
        Manley Assets, SLB Companies Like Toy Quest Ltd. Have
        Sought Those Assets Illegally. ............ 67115

f10.    Toy Quest Ltd. and the Liquidators Are on the Verge of Entering
        into a Collusive SettlementOther SLB Companies Submitted
        False Proofs of Claim. ............ 69117

5.      The SLB Enterprise Has Attempted to Mislead Courts in Iowa. ............ 70

E.      Defendants Have Committed Customs Fraud and Money Laundering to
        Keep SLB Products Flowing into the United States and Money Streaming
        to the SLB Enterprise in Hong Kong. ............ 71

1.    Defendants Have Used the SLB Enterprise to Continue Importing SLB Products Illegally Without Being Vulnerable to Garnishments. .......................................................... 72

2.    Wu Directed Dollar Empire to Become a Sham Consignee for the SLB Enterprise to Generate False Import Records and Obstruct Judgment Enforcement Efforts. ..................... 73

    a.    The SLB Enterprise Used Dollar Empire to Disguise the Destination of Its Products and the Source of Its Payments. .... 73

    b.    To Prevent Aviva from Obtaining Evidence of these Crimes, Wu Lied to a Federal Court about Dollar Empire's Relationship with Banzai International. ...................... 75

III.    The RICO Defendants Have Conducted and Conspired to Conduct the Affairs of the SLB Enterprise through a Pattern of Racketeering that Victimized Independent Creditors. .................................................................. 79

    A.    The RICO Defendants Are Committing Federal Criminal Offenses. ......... 79

        1.    The SLB Enterprise Has Obtained Money through the Commission of Wire Fraud. ............................................ 79

        2.    The SLB Enterprise Obtained and Retained Money through the Commission of Bankruptcy Crimes. ........................... 88

            a.    The Sham Bankruptcy Conspirators Fraudulently Concealed Property. ............................. 88

            b.    The Sham Bankruptcy Conspirators

        11.    Dubinsky and Others Made False Oaths in Connection with Manley's Bankruptcy Case. ..................................... 89

            c.    The Sham Bankruptcy Conspirators Made Falseand Declarations in Connection with Manley's Bankruptcy Case. ................ 90118

            d.    The Sham Bankruptcy Conspirators Made False Claims for Proof. ............................................ 92

            e.    The Sham Bankruptcy Conspirators Fraudulently Received Property. ............................................. 94

            f.    The Sham Bankruptcy Conspirators Made Fraudulent Payments for Acting or Forbearing to Act in a Case under Title 11. ................................................ 94

        g.     The Sham Bankruptcy Conspirators Fraudulently Transferred and Concealed Property. ............ 95

        h.     The Sham Bankruptcy Conspirators Fraudulently Concealed and Withheld Information. ............ 98

    3.     The SLB Enterprise Has Illegally Concealed Evidence and Assets. ............ 99

        a.     The RICO Defendants Obstructed Justice by Concealing Evidence. ............ 99

        b

G.     Defendants Lied about the Importation and Distribution of SLB Products. ............ 119

    1.     Defendants Falsely Identified Toy Quest Ltd. as the Seller of Goods on Customs and Shipping Records. ............ 120

    2.     RICO Defendants Concealed Assets by Falsely Listing MTD and Listed Dollar Empire as Consignees of Other SLB Companies the "Importer of Record" on Customs Documents and Lied to Courts about It. ............ 99 121

    4.     Defendants Have Transferred Millions of Dollars between the United States and Hong Kong, in Violation of Federal Criminal Laws. ............ 100

        a.     The RICO Defendants Illegally Transferred Money from the United States to Hong Kong. ............ 100

        b.     The RICO Defendants Transferred Money from Hong Kong to the United States. ............ 103

        c.     The RICO Defendants Have Laundered Millions of Dollars by Transferring Criminal Proceeds Between the United States and Hong Kong. ............ 104

B.     The RICO Defendants Have Conducted the Affairs of an Enterprise Through a Pattern of Racketeering That Victimized Aviva. ............ 105

CAUSES OF ACTION ............ 109 131

COUNT I : FRAUD ............ 109 131

COUNT II : ABUSE OF PROCESS ............ 120 142

COUNT III : CIVIL CONSPIRACY ................................................................ ~~124~~146

COUNT IV ——————————————————————————————— ~~125~~

: RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ,
    18 U.S.C. § ~~1961~~ 1962(~~e~~C) ....................................... ~~125~~147

COUNT V ——————————————————————————————— ~~127~~

: RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT , 18
    U.S.C. § ~~1961~~ 1962(~~d~~D) ....................................... ~~127~~173

~~DAMAGES~~ ................................................................................ ~~129~~

COUNT VI: ALTER EGO .......................................................... 175

COUNT VII: FRAUDULENT TRANSFER .................................. 182

COUNT VIII: AIDING AND ABETTING FRAUDULENT TRANSFER .......... 188

REQUEST FOR RELIEF ........................................................ ~~129~~190

*

.

**INTRODUCTION** Plaintiff ASI, Inc. ("Aviva") alleges as follows against Defendants Aquawood, LLC ("Aquawood"), Banzai International Limited ("Banzai International"), Chan Ming Yiu, a/k/a Samson Chan ("Samson Chan"), Chan Siu Lun, a/k/a Alan Chan ("Alan Chan"), Dollar Empire LLC ("Dollar Empire"), Brian Dubinsky ("Dubinsky"), Jun Tai Co. Ltd. ("Jun Tai"), John Robert Lees ("Lees"), in his official capacity as Liquidator of and successor to Manley Toys Ltd., Liu Yi Man, a/k/a Lisa Liu ("Liu"), Peter Magalhaes ("Magalhaes"), Manley Toy Direct a/k/a Worldwide Toy Direct, LLC ("MTD"), Manley Toys Limited ("Manley"), MGS International, LLC ("MGS"), Mat Ng ("Ng"), in his official capacity as Liquidator of and successor to Manley Toys Ltd., Park Lane Solutions Ltd. ("Park Lane"), Richard Toth ("Toth"), Toy Network, LLC ("Toy Network"), Toy Quest Ltd., Wellmax Trading Ltd. ("Wellmax"), Winning Industrial Ltd. ("Winning"), and Michael Wu ("Wu") (collectively, "Defendants").

## INTRODUCTION

1. ~~Plaintiff ASI, Inc. ("Aviva") brings this action against Defendants to stop an international network of fraudsters, cheaters, and money launderers from committing crimes against the United States with impunity.~~ In 2013, Aviva obtained an $8.5 million default judgment in this Court against Manley on a Lanham Act false advertising claim.  In the Lanham Act case, Aviva alleged that it competed against Manley in the water toy market and that Manley engaged in false advertising by shrinking images of children depicted in promotional materials to make "Banzai" brand water slides appear larger than they were.

2.   ~~Working together as an association-in-fact enterprise (the "SLB Enterprise") that uses a shifting web of interchangeable trade names and companies with shared addresses, accounts, personnel, and other resources (the "SLB Companies"),  the Defendants have made millions of dollars by manufacturing, importing, marketing, and selling electronics, seasonal play things, and other toys (the "SLB Products") for children.~~ The Court entered a default judgment as a sanction for Manley's repeated violations of Court orders, describing Manley's misconduct as a "cautionary tale" about a company that "has intentionally disobeyed every Order, has never offered any viable excuse for its willful conduct, and … very clearly believes that compliance with the Orders of this Court is optional."

3.   ~~But the Defendants' corrupt business practices have been anything but fun and games for their victims.  Litigation in courts across the United States has established that SLB Companies such as Manley Toys Ltd. ("Manley") and Manley Toy Direct LLC ("MTD") have, inter alia:~~ Aviva has collected almost nothing on that judgment, even though the same individuals who owned and worked for Manley (including several Defendants here) are still selling the same toys from the same facilities to the same retailers.  Thanks to an extraordinarily brazen judgment evasion scheme involving the commission of numerous federal crimes by the Defendants, they are still selling thousands of tons of toys in the U.S. and still earning millions of dollars in profits per year.

~~a)   cheated Aviva and other competitors by falsely advertising SLB Products through fraudulently altered images of children;~~

4.   ~~b) subjected female employees, including Tammy~~ Aviva is not the only victim of Defendants' judgment evasion scheme.  In Iowa, Tammie Ackelson, Robin ~~Lynn~~

Drake, Heather Miller, Danielle Rennenger, and Ammee Roush (collectively, the "Iowa victims") to extensive sexual harassment and discrimination when they worked for SLB Companies;Claimants") obtained judgments totaling over $2.4 million against MTD, Aquawood, and Toy Network.  The Iowa Claimants won their judgments after proving that they had endured years of horrifying physical and verbal sexual harassment.  They have not collected a single dollar on their judgments.

    c)  scammed designer Mitch August by failing to pay him as promised for his design and sale of SLB Products, and;

    d)  sold Toys "R" Us ("TRU") a defective water slide that caused the death of a 29-year old Massachusetts woman after she used it while her 15-month old daughter bore witness.

  4. Even though the misconduct described above has resulted in millions of dollars in U.S. judgments, the plaintiffs in those cases have been unable to collect much if anything from the SLB Enterprise, one of the most lucrative toy-selling enterprises in the world.

  5. This is because

  5. The efforts of Aviva and the Iowa Claimants to enforce their judgments have been stymied because Defendants are part of an international network of fraudsters and money launderers that has prevented creditors from identifying and seizing judgment debtors' assets.

  6. Aviva refers to that criminal network as the "SLB Enterprise."  The acronym "SLB" corresponds to the first names of the enterprise's founders, Samson Chan, Lisa Liu, and Brian Dubinsky, and hearkens back to one of their first companies.

13

.

That company—SLB Toys—was shut down and replaced with Aquawood after SLB Toys lost a lawsuit.

7.     As detailed in this Complaint, the SLB Enterprise ~~thrives on its ability to tap into its common resources, including its confusing tangle~~is an association of several individuals and several formally distinct entities.  The SLB Enterprise uses a shifting web of interchangeable ~~names and~~ companies~~, to sell~~ (the "SLB Companies") with shared trade names, addresses, accounts, personnel, and other resources to manufacture, import, market, distribute, and sell toys, electronics, and other products ~~in~~ (the ~~United States continuously while evading American creditors.~~

~~6.     Rather than comply with U.S. judgments against them, the principals of Manley and MTD hatched a criminal judgment evasion scheme that would allow them to keep profits captured by the SLB Enterprise while depriving Aviva and other creditors of money they rightfully deserved.~~

~~7.     To carry out this scheme, the Defendants have repeatedly committed bankruptcy offenses, customs fraud, wire fraud, obstruction of justice, and money laundering.~~

~~a)  Through elaborate trickery, the principals of Manley and MTD artificially forced these companies into dissolution or bankruptcy while keeping actual control of each company's business and assets.~~

~~b)  With the help of lawyers, wholesalers, and others, the principals of Manley and MTD deceived courts, U.S. Customs, and their own customers in order to keep money flowing into the SLB Enterprise and out of the hands of creditors.~~

c) The principals of Manley and MTD conspired with others to launder the proceeds of their crimes by transferring revenue from the United States to Hong Kong, concealing assets, and funding their ongoing efforts to defraud creditors.

8. The SLB Enterprise's use of artifice and sleight of hand have confounded creditors and courts alike, making it easy for the enterprise to victimize Americans and impossible (thus far) for creditors to receive justice through the American legal system.

9. Some courts have recognized this scheme for what it is. Federal judges in California and Iowa recognized the enterprise's use of shifting corporate entities as a "shell game."

10. Similarly, in a civil rights case arising out of a pervasive culture of sexual harassment at a call center in Iowa, an appeals court described the chicanery of Manley, MTD, and other members of the enterprise as a game of "corporate entity three-card monte" for the purpose of evading liability.

11. In awarding a default judgment in favor of Aviva against Manley (the "Minnesota judgment"), a United States District Court judge in the District of Minnesota (the "Minnesota Federal Court") stated in 2013:

> What has transpired should serve as a cautionary tale regarding the difficulties American lawyers may face when working with clients who do not operate within a system of jurisprudence that approximates the American system and who apparently have no fear about disregarding court orders . . . .

Manley has intentionally disobeyed every Order, has never offered any viable excuse for its willful conduct, and Aviva has been irreparably prejudiced in its ability to prepare for trial . . . . Manley very clearly believes that compliance with the Orders of this Court is optional and that

the Court is powerless to compel it to comply. . . . The Court suspects that Manley believes that . . . [it is] immune to entry of default judgment. Manley is wrong."SLB Products").

8.     SLB Companies come and go, but the principal beneficial owners of the SLB Enterprise—Samson Chan, Liu, Dubinsky, and Alan Chan (collectively, the "Principals")—have continued to sell the same SLB Products to the same customers using largely the same employees, facilities, and distribution channels, and the Principals have continued to earn enormous profits while paying virtually nothing to Aviva and the Iowa Claimants.

9.     The rapid dissolution and substitution of companies is a hallmark of the SLB Enterprise—it happened in 2016 with both Manley and MTD, putting those companies' assets out of reach.  Dubinsky bragged after a deposition in 2017 that he and his confederates always stay "one step ahead of" their creditors.

10.     Evading judgments in this manner takes serious effort and planning.  For Defendants' judgment evasion scheme to work, they had to commit or conspire to commit numerous federal crimes, including wire fraud, bankruptcy crimes, obstruction of justice, and money laundering.  As detailed below, Defendants' commission and conspiracy to commit those federal crimes violated the Racketeer Influenced and Corrupt Organizations Act, 18 USC § 1961, et seq. (the "RICO Act").  Defendants have succeeded in evading Aviva's and the Iowa Claimants' judgments by, among other things, hiding assets, lying about specific transactions, and concealing business activities.

11.     In addition to committing and conspiring to commit fraud and obstruct justice, the Defendants abused the corporate form of many companies, shifting, hiding, and mislabeling assets so that Aviva and other judgment creditors would be unable to collect anything of value.  As alleged below, the entity Defendants are really the alter egos of their ultimate beneficial owners, i.e., the Principals.  The entity Defendants also are alter egos of each other.  Corporate formalities have not been observed, companies have been undercapitalized or looted, and the corporate form has been used primarily to defraud judgment creditors.

12.     ~~The United States District Court for the Southern District of Iowa subsequently issued a ruling finding MTD jointly and severally liable for Aviva's Minnesota judgment against Manley (the "Iowa judgment") after MTD failed to appear at a show-cause hearing in that district.~~ Defendants also have made or caused to be made a massive number of fraudulent transfers to divert assets away from Manley to various other Defendants and, ultimately, the Principals.

13.     ~~For years, however, Aviva has been unable to enforce either the Minnesota or Iowa judgments because of the Defendants' continued defiance of U.S. courts.~~ Accordingly, Aviva seeks damages and injunctive relief against the Defendants for their violations of Section 1962(c) of the RICO Act, which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such

enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

14.    ~~Rather than being deterred by U.S. courts, the Defendants have been emboldened by their success in generating hundreds of millions of dollars in revenue while blocking American creditors from enforcing judgments or even investigating this criminal scheme.~~Aviva also seeks damages and injunctive relief against the Defendants for their violations of Section 1962(d) of the RICO Act, which makes it "unlawful for any person to conspire to violate" section 1962(c).

15.    ~~After a deposition in California in 2017, one of these Defendants boasted about the success of this scheme, insisting that he and his confederates would always stay "at least one step ahead" of Aviva's efforts to collect on its judgments.~~Aviva also has asserted claims for fraud, abuse of process, and conspiracy to commit fraud and abuse of process.

16.    In addition, Aviva also seeks declaratory relief in the form of an order holding various Defendants liable by virtue of their alter ego relationships.  Aviva likewise seeks a judgment for the value of all assets fraudulently transferred until Aviva's judgment is fully paid.

17.    ~~16. The~~Aviva should be made whole for the damage to its property (its judgment) caused by Defendants' brazen corruption ~~must~~and criminality, which should be stopped once and for all.

**JURISDICTION AND VENUE**

18.   ~~17.~~ This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964~~,~~ and 28 U.S.C. § 1331 because Plaintiff is asserting federal RICO Act claims.

19.   This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the action is between citizens of different States and is an action in which citizens or subjects of a foreign state are additional parties.

20.   ~~18.~~ This Court also has supplemental jurisdiction over Aviva's state law claims pursuant to 28 U.S.C. § 1367 because ~~those~~the claims are so related to Aviva's federal claims that they form part of the same case or controversy.

21.   A substantial part of the events or omissions giving rise to the claims alleged in this action occurred in Minnesota.

22.   ~~19.~~ Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in this judicial district, there is no district where all Defendants reside, and at least one Defendant resides, is found, has an agent, or transacts its affairs in this judicial district.

~~20.   Pursuant to the United State District Court for the District of Minnesota's Rules Governing Reassignment of Related Civil Cases, this matter should be deemed "related to" *Aviva Sports Inc. v. Fingerhut Direct Marketing Inc.*, No. 0:09-cv-1091, an open civil case before the Honorable Joan N. Ericksen, because a) these cases share common parties, b) these cases share common issues of law, fact, and other common factors, and c) the interests of justice and judicial economy would be best served if a single judge handed both actions.~~

19

**PARTIES**

23. ~~21.~~ Plaintiff ASI, Inc., f/k/a Aviva Sports, Inc. ("Aviva") is a Minnesota corporation with its principal place of business in Minnesota.

~~The Principals~~

**THE PRINCIPALS**

24. ~~22.~~ Defendant ~~Chan Ming Yiu, a/k/a~~ Samson Chan ~~("Chan"),~~ is a natural person and a resident of Hong Kong.  He has done significant business in and/or directed significant activity toward Minnesota.

25. ~~23.~~ Defendant ~~Liu Yi Man, a/k/a~~ Lisa Liu ~~("Liu")~~ is a natural person and a resident of Hong Kong. She has done significant business in and/or directed significant activity toward Minnesota.

26. ~~24.~~ Defendant Brian Dubinsky ~~("Dubinsky")~~ is a natural person and a resident of California.  He has done significant business in and/or directed significant activity toward Minnesota.

27. ~~25.~~ Defendant ~~Chan Siu Lun, a/k/a Alan Chan ("Alan Chan")~~,Alan Chan is a natural person and a resident of Hong Kong. He has done significant business in and/or directed significant activity toward Minnesota.

28. ~~26.~~ Defendants Samson Chan, Liu, Dubinsky, and Alan Chan collectively are referred to in this Complaint as the "Principals."

~~The Executives~~

20

## THE EXECUTIVES

29. 27. Defendant Richard Toth ("Toth") is a natural person and a resident of Iowa. He has done significant business in and/or directed significant activity toward Minnesota.

30. 28. Defendant Michael Wu ("Wu") is a natural person and resident of California. He has done significant business in and/or directed significant activity toward Minnesota.

31. 29. Defendants Toth and Wu collectively are referred to in this Complaint as the "Executives."

## THE LIQUIDATORS

32. Defendant Ng is a natural person and a resident of Hong Kong, and is sued in his official capacity as Liquidator of and successor to Manley.

33. Defendant Lees is a natural person and a resident of Hong Kong, and is sued in his official capacity as Liquidator of and successor to Manley.

34. The Corporate Shell Defendants Ng and Lees collectively are referred to in this Complaint as the "Liquidators."

## THE ENTITIES

35. Defendant Manley is a Hong Kong corporation with its principal place of business in Hong Kong. Manley also has done significant business in and/or directed significant activity toward Minnesota.

36. ~~30.~~ Defendant Toy Quest Ltd. is a Hong Kong corporation with its principal place of business in Hong Kong.

~~31.     Defendant MTD~~ a/k/a Worldwide Toy Direct, LLC ~~is a Hong Kong corporation with its principal place of business in Hong Kong.~~

~~32.     Defendant Toy Network, LLC ("Toy Network") is an Iowa company with its principal place of~~ Toy Quest Ltd. also has done significant business in ~~Iowa~~and/or directed significant activity toward Minnesota.

~~33.     Defendant MGS International, LLC ("MGS") is an Iowa company with its principal place of business in Iowa.~~

~~34.     Defendant Aquawood, LLC ("Aquawood") a/k/a Epic Studios is a California limited liability corporation with its principal place of business in California.~~

~~35.     Defendant Dollar Empire LLC ("Dollar Empire") is a California corporation with its principal place of business in California.~~

37. ~~36.~~ Defendant Banzai International ~~Limited ("Banzai International")~~ is a Hong Kong corporation with its principal place of business in Hong Kong.

~~37.     Defendant Park Lane Solutions Ltd. ("Park Lane") is a Hong Kong corporation with its principal place of~~ Banzai International also has done significant business in ~~Hong Kong~~and/or directed significant activity toward Minnesota.

38.     Defendant ~~Jun Tai Co. Ltd. ("Jun Tai")~~Park Lane is a Hong Kong corporation with its principal place of business in Hong Kong.

~~39.     Defendant Winning Industrial Ltd. ("Winning") is a Hong Kong corporation with its principal place of business in Hong Kong.~~

40.    ~~Defendant Wellmax Trading Ltd. ("Wellmax") is a Hong Kong corporation with its principal place of business in Hong Kong~~ Park Lane also has done significant business in and/or directed significant activity toward Minnesota.

<u>39.</u>    ~~41.~~ Defendants Toy Quest Ltd., ~~MTD, Toy Network, MGS, Aquawood, Dollar Empire,~~ Banzai International, <u>and</u> Park Lane, ~~Jun Tai, Winning, and Wellmax~~ collectively are referred to in this Complaint as the "~~Corporate Shell Defendants~~<u>Hong Kong Entities</u>."

**~~The Civil Fraud, Sham Litigation, Civil Conspiracy and RICO Defendants~~**

<u>40.</u>    <u>Defendant MTD is an Iowa company with its principal place of business in Iowa.  MTD also has done significant business in and/or directed significant activity toward Minnesota.</u>

<u>41.</u>    <u>Defendant Toy Network is an Iowa company with its principal place of business in Iowa.  Toy Network also has done significant business in and/or directed significant activity toward Minnesota.  Toy Network did not respond to the original complaint and is in default (*see* ECF 153).</u>

42.    ~~Defendant Peter Magalhaes ("Magalhaes") is a natural person and resident of California.~~<u>Defendant MGS is an Iowa company with its principal place of business in Iowa.  MGS also has done significant business in and/or directed significant activity toward Minnesota.</u>

43.    ~~The Principals, the Executives, Toy Quest Ltd., MTD, Aquawood, Dollar Empire, Banzai International, Park Lane~~<u>Defendants MTD, Toy Network</u>, and ~~Magalhaes are~~<u>MGS</u> collectively <u>are</u> referred to in this Complaint as the "~~Civil Fraud Defendants~~<u>Iowa Entities</u>."

44. ~~The Principals and Toy Quest Ltd., Jun Tai, Winning, and Wellmax are collectively referred to in this Complaint as the "Sham Litigation Defendants."~~Defendant Aquawood is a California limited liability corporation with its principal place of business in California.  Aquawood also has done significant business in and/or directed significant activity toward Minnesota.

45. ~~The Civil Fraud Defendants and the Sham Litigation Defendants are collectively referred to in this Complaint as the "Civil Conspiracy Defendants."~~ Defendant Dollar Empire is a California corporation with its principal place of business in California.  Dollar Empire also has done significant business in and/or directed significant activity toward Minnesota.

46. The Principals, the Executives, the Hong Kong Entities, the Iowa Entities, Aquawood, and Dollar Empire are collectively referred to in this Complaint as the "RICO Defendants."

## THE CIVIL FRAUD, SHAM LITIGATION, AND CIVIL CONSPIRACY DEFENDANTS

47. Defendant Magalhaes is a natural person and resident of California.  He has done significant business in and/or directed significant activity toward Minnesota.

48. Defendant Jun Tai is a Hong Kong corporation with its principal place of business in Hong Kong.  Jun Tai also has done significant business in and/or directed significant activity toward Minnesota.

24

49.     Defendant Winning is a Hong Kong corporation with its principal place of business in Hong Kong.  Winning also has done significant business in and/or directed significant activity toward Minnesota.

50.     Defendant Wellmax is a Hong Kong corporation with its principal place of business in Hong Kong.  Wellmax also has done significant business in and/or directed significant activity toward Minnesota.

51.     The Principals, the Executives, the Hong Kong Entities, MTD, Aquawood, Dollar Empire, and Magalhaes collectively are referred to in this Complaint as the "Civil Fraud Defendants."

52.     The Principals, Toy Quest Ltd., ~~MTD~~Jun Tai, Winning, and Wellmax collectively are referred to in this Complaint as the "Sham Litigation Defendants."

**THE FRAUDULENT TRANSFER AND ALTER EGO DEFENDANTS**

53.     The Principals, the Hong Kong Entities, the Iowa Entities, Aquawood, Manley, and the Liquidators collectively are referred to in this Complaint as the "Alter Ego Defendants."

54.     The Principals, the Executives, the Hong Kong Entities, the Iowa Entities, Aquawood, Dollar Empire, ~~Banzai International, Park Lane, Toy Network~~Wellmax, Magalhaes, Manley, and ~~MGS are~~the Liquidators collectively are referred to in this Complaint as the "~~RICO~~Fraudulent Transfer Defendants."

~~47.     The diagram on the following page illustrates the overlap between these four groups of Defendants.  As depicted below, for example, Toy Quest Ltd. and each of the~~

.

Principals are all included as RICO Defendants, Civil Conspiracy Defendants, Civil Fraud Defendants, and Sham Litigation Defendants in this Complaint.

55.   The following table identifies the claims being brought against each Defendant.

| | Defendant | RICO | Civil Fraud | Sham Litigation/ Abuse of Process | Civil Conspiracy | Alter Ego | Fraudulent Transfer/ Aiding and Abetting Fraudulent Transfer |
|---|---|---|---|---|---|---|---|
| Principals | Samson Chan | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| | Liu | ✓ | ✓ | | ✓ | ✓ | ✓ |
| | Dubinsky | ✓ | ✓ | | ✓ | ✓ | ✓ |
| | Alan Chan | ✓ | ✓ | | ✓ | ✓ | ✓ |
| Executives | Toth | ✓ | ✓ | | ✓ | | |
| | Wu | ✓ | ✓ | | ✓ | | |
| Liquidators | Ng | | | | ✓ | ✓ | |
| | Lees | | | | ✓ | ✓ | |
| | Manley | | | | ✓ | | |
| Hong Kong Entities | Toy Quest Ltd. | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| | Banzai International | ✓ | ✓ | | ✓ | ✓ | ✓ |
| | Park Lane | ✓ | ✓ | | ✓ | ✓ | ✓ |
| Iowa Entities | MTD | ✓ | ✓ | | ✓ | ✓ | ✓ |
| | Toy Network | ✓ | ✓ | | ✓ | ✓ | ✓ |
| | MGS | ✓ | | | ✓ | ✓ | ✓ |
| | Aquawood | ✓ | ✓ | | ✓ | ✓ | ✓ |
| | Dollar Empire | ✓ | ✓ | | ✓ | ✓ | ✓ |

27

| | | | | | | |
|---|---|---|---|---|---|---|
| Magalhaes | | ✓ | | ✓ | | ✓ |
| Jun Tai | | | ✓ | ✓ | | |
| Winning | | | ✓ | ✓ | | |
| Wellmax | | | ✓ | ✓ | | ✓ |

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

I.    The RICO Defendants Conduct Business through an "

**I.    Overview of the Enterprise."**

A.    The SLB Enterprise is an Ongoing and Continuing Association in Fact that Pursues a Common Purpose, Engages in Commercial Activities, and is Distinct from the RICO Defendants and Their Pattern of Racketeering.

48.    Under the Racketeer Influenced and Corrupt Organizations Act (RICO) an "enterprise" is defined as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *U.S. v. Turkette*, 452 U.S. 576, 580 (1981); *Boyle v. U.S.*, 556 U.S. 938, 944 (2009). The SLB Enterprise is such an enterprise.

49.    At all relevant times, the SLB Enterprise was an enterprise which (a) had an existence separate and distinct from each RICO Defendant; (b) was separate and distinct from the pattern of racketeering described in Counts I and II; (c) was an ongoing and continuing association in fact consisting of legal entities and individuals, including each of the RICO Defendants, (d) was characterized by interpersonal relationships among the RICO Defendants; (e) had sufficient longevity for the enterprise to pursue its purpose; and (f) functioned as a continuing unit. *Turkette*, 452 U.S. at 580; *Boyle*, 556 U.S. at 944 (2009). While each RICO Defendant has participated in the conduct of the SLB Enterprise (including patterns of racketeering activity), and shared in the flow of wrongfully obtained money at the expense of creditors, each has a separate existence from the enterprise.

50.    The SLB Enterprise has engaged in, and its activities affected, interstate and foreign commerce because it conducted commercial activities across state and international

lines, including the manufacture, export, import, sale, distribution, and shipment of the SLB Products from Asia to and throughout the U.S., and the corresponding payment and/or receipt of money from the sale of the same.

51.   As described below, several of the RICO Defendants have worked together for years to promote the common purpose of making money from American buyers while minimizing or evading U.S. court judgments and other liabilities. All of the RICO Defendants now work together as an ongoing and continuous organization, sustaining the enterprise through a pattern of racketeering activity.

**B.   The SLB Enterprise is Comprised of Interpersonal Relationships Between the Principals and Other RICO Defendants.**

52.   For over 30 years, the SLB Enterprise has sold

**A.   The SLB Enterprise Spans Continents, Using a Network of Companies and Affiliates Built Up Over Decades.**

56.   Samson Chan, Lisa Liu, and Brian Dubinsky ran what they once described as the seventh-largest toy business in the world.

57.   Beginning no later than 2006, Samson Chan's son Alan Chan also has helped run the business.

58.    Those individuals and their companies manufacture, import, market, and sell seasonal play equipment (including "Banzai" brand water toys), electronics, and other SLB Products in the United States through a variety of corporate entities.

59.   53. While the names of the SLB Companies have changed, the brand names of the SLB Products, including "Toy Quest," "Banzai International," and "Tekno," generally have remained the same.  Over the years, theseThose products have generated hundreds of

millions of dollars in revenue from U.S. sales.  In some years, U.S. sales have totaled almost $100 million, with more than 11,000 tons of imports.  U.S. sales have accounted for the vast majority of sales of SLB Products.

54.    The SLB Enterprise's highly flexible corporate framework has helped it keep much of this revenue by avoiding debts and other liabilities for years.

55.    Rather than centralize its operations within a rigid and static corporate structure, the SLB Enterprise is organized and governed by the interpersonal relationships between the Principals and other RICO Defendants. Each of the RICO Defendants has had a systematic link to the others through business relationships, contractual relationships and continuing coordination of activities.  Through these relationships and common communications, the RICO Defendants share information on a regular basis.

56.    As described herein, the interaction and length of the relationships between and among the RICO Defendants reflects a deep level of interaction and cooperation of individuals and corporate entities working towards shared goals.  The RICO Defendants have not pursued these goals in isolation but rather as a united entity, working together on multiple fronts for their mutual benefit.

57.    Motivated by financial gain, the RICO Defendants coordinate to keep revenue flowing into the SLB Enterprise by cooperating to achieve three interrelated goals: (1) the continued movement of SLB Products into the United States; (2) a steady stream of proceeds from the United States to Hong Kong, and; (3) the vigilant protection of the enterprise from liabilities such as American creditors.

58. By virtue of payments and other consideration of value from SLB Companies, each of the RICO Defendants stands to gain financially by maximizing the amount of money that the enterprise can generate and keep from American creditors.

**1. The Principals and Executives Have Close Working and Personal Relationships with Each Other.**

59. Chan is widely understood to be the "big boss" of the SLB Enterprise.

60. Chan's son Alan Chan is close to his father and follows his orders.

61. The term "SLB" is often understood to refer to the close relationship between Samson Chan, Lisa Liu, and Brian Dubinsky, whose first initials are "S," "L.," and "B" respectively.

62. Liu is personally close to Chan and has worked for him at SLB Companies for many years.

63. Dubinsky and the Chans have closely collaborated in the operation of the SLB Enterprise for decades.

60. Most SLB Products are manufactured in mainland China.

61. The financial affairs of the companies are handled primarily out of Hong Kong and Los Angeles, at the direction of the Chans, Liu and Dubinsky.

62. Toy design, marketing, and promotions have been handled primarily out of Los Angeles under Dubinsky's supervision. He also has coordinated litigation for the companies.

63. Product distribution, warehousing, order fulfillment, customer service, and call center operations have been handled primarily out of Iowa, at the direction of the

Chans, Liu, Dubinsky, and the Hong Kong Entities.  Toth oversees Iowa operations on a day-to-day basis.

64.    ~~Dubinsky has worked closely with Liu and Toth for more than a decade.~~  The Chans, Liu, Dubinsky, Aquawood, the Hong Kong Entities, Toth, MTD, Toy Network, and later MGS oversaw, controlled and/or owned warehouses and call centers in Indianola and Des Moines, Iowa.

65.    ~~Toth was hired by Chan and has reported to him since 2000.~~  SLB Products were shipped from those Iowa facilities to retailers in many states, including Minnesota.

66.    ~~In addition to his business relationship within the Principals, Toth has a close personal relationship with Chan and Liu.~~ In the United States, SLB Products and associated revenue have flowed through a shifting series of companies that have been abruptly shut down and replaced as judgments have been entered against them.

67.    ~~For a period of time, Toth's wife worked for an SLB Company and reported to Dubinsky.~~ In Hong Kong, the Chans, Liu, and occasionally Dubinsky operated for decades primarily through Manley, although they also directed the operations of companies in Iowa and California.  More recently, they have used (among other Hong Kong entities) Toy Quest Ltd., Park Lane, and Banzai International.  Manley stated in an insurance application that "Manley Toy Direct" was a trade name used by Manley and various Hong Kong affiliates.

68.    Other affiliated companies in Hong Kong include Toy Box Ltd., Toy Network Hong Kong, Genesis Industries Ltd. ("Genesis"), Echo Technologies Asia

Limited ("Echo Technologies"), Manley Fashion Direct Ltd. ("Manley Fashion"), and Defendant Wellmax.  While those companies are organized under the laws of Hong Kong, each has played a major role in business operations occurring in Iowa and California.

69.     In Iowa, the companies have included Defendants MTD and Toy Network, which were replaced with Defendant MGS, as well as The Toy Warehouse LLC ("Toy Warehouse") and Toybox Unlimited LLC ("Toybox").

70.     In California, the companies have included SLB Toys, which was replaced with Defendant Aquawood.

71.     One or more of the Principals are believed to be the ultimate owners or financial beneficiaries of all of those companies.

72.     The Chans, Liu, Dubinsky, Aquawood and the Hong Kong Entities have been involved in establishing, operating, overseeing, and using those operations and companies in Iowa and California.

73.     The Chans, Liu, Dubinsky, Aquawood, and the Hong Kong Entities have sold or participated in the sale of SLB Products to customers specifically in Minnesota. For example, Target has been a major customer.  When Manley procured liability insurance for itself and its various Hong Kong and U.S. affiliates, at least one policy named Target Corporation and Target.com as additional insureds, listing addresses in Minneapolis.

74.    All of those U.S. and Hong Kong entity Defendants, along with others, have been used in furtherance of the SLB Enterprise.

75.    Those companies also have failed to observe basic corporate formalities and have commingled funds.  The finances of the companies are not kept, and have not been kept, separate from those of the Principals or Manley.

76.    As lawsuits and judgments against the various companies mounted, new corporate entities emerged.

77.    Manley began using the trade name "Toy Quest Ltd." when conducting Manley business.  A separate company called Toy Quest Ltd. then existed and still exists. (It is a Defendant here.)  But for a period of time, Manley continued to operate, Manley employees continued to sell the same products to the same customers from the same offices, and Manley continued to receive payments from customers, even as Manley conducted most of its business using the trade name "Toy Quest Ltd."

78.    That business practice changed in early 2016, when the Chans, Liu, and Dubinsky caused Manley to enter voluntary liquidation and shifted Manley's business almost completely to the company formally known as Toy Quest Ltd.

79.    Soon thereafter, they shifted that business again, from Toy Quest Ltd. to the newly formed company Banzai International.  While most of Manley's business ended up with Toy Quest Ltd. and then Banzai International, most of Manley's employees ended up working for Park Lane.

80.     Similarly, in Iowa, as a result of the Iowa Claimants' sexual harassment judgments totaling over $2.4 million, MTD and Toy Network were cast aside and replaced with MGS.

81.     Those various changes had little effect on the retailers that buy products from the SLB Enterprise.  The same people in Hong Kong, Iowa, and California are still selling and distributing the same toys, which still bear the same brand names, including "Toy Quest," "Banzai," and "Tekno."  But for judgment creditors, the changes and related deceptions have made it virtually impossible to collect any money.

82.     The SLB Enterprise's use of artifice, trickery, and shifting corporate entities have confounded creditors and courts alike.  In Dubinsky's own self-incriminating words, the Chans, Liu, and Dubinsky have managed to stay "one step ahead" of the judgment creditors.

83.     By 2016, enforcing judgments against Manley through ordinary judgment enforcement mechanisms (e.g., identifying assets and attaching them) had become impossible.

84.     Staying "one step ahead" of judgment creditors requires substantial coordination—and criminal activity—by a network of individuals and companies located in Hong Kong, Iowa, and California.  This Complaint refers to that network as the "SLB Enterprise" because, as noted, a company previously used by Defendants was SLB Toys, and the letters "S," "L," and "B" correspond to the first names of the individuals who got the enterprise up and running: Samson, Lisa, and Brian.

85.     Using a shifting web of interchangeable trade names and companies with shared addresses, accounts, personnel, and other resources, the SLB Enterprise has made—and continues to make—millions of dollars a year, even as millions of dollars in judgments against SLB Companies go unpaid.

86.     The SLB Enterprise consists of the "Principals," who are the individuals who control the SLB Enterprise; "Executives," who are individuals who play major roles in the SLB Enterprise; and various companies run by the Principals and Executives.

87.     Defendants Samson Chan, Liu, Dubinsky, and Alan Chan are the "Principals."

88.     Defendants Toth and Wu are both "Executives."  They are so named by virtue of their executive roles at MTD, MGS, and Toy Network (each of which was or is overseen by Toth in Iowa) and Dollar Empire (which is owned and overseen by Wu in California).

89.     Toth has worked with the Principals for decades, serving their interests in Iowa and the United States since at least 2000.

90.     68. Wu is also a Samson Chan's longtime, close friend of Chan's and business partner and has maintained a commercial relationships relationship with him and SLB Companies for many years.  2. The **Principals and Executives Treat Certain SLB Companies as Fungible** full extent of Wu's involvement in judgment-evasion activities is still unknown, but Wu became an active and integral participant in the SLB Enterprise no later than December 2015.  Wu's company Dollar Empire has shipped massive quantities

of SLB Products into Iowa, and helped conceal that those goods were being shipped to and from Iowa, all in furtherance of the SLB Enterprise.

69.     The Principals and Executives have a long history of using companies as interchangeable and expendable shells in order to conceal their assets and revenue streams from courts and creditors.

70.     On an as-needed basis, the Principals and Executives could fund such companies or cause them to become inadequately capitalized.

71.     Thus, if an SLB company became a liability

91.     Magalhaes is an Aquawood employee who conducts SLB Enterprise business.  He has participated in efforts to divert Manley assets.

92.     Wellmax, Jun Tai, and Winning are Hong Kong companies that have made frivolous and abusive litigation filings in U.S. courts to help the SLB Enterprise, the Principals and Executives could strip the company of its value while allowing the enterprise to continue realizing the benefits of the company's assets and revenue streams.

72.     Through their direct and surrogate leadership roles, the Principals and Executives collectively exercised total control over each of the Corporate Shell Defendants and their assets commit various frauds.

**B.     Unpaid Judgments Obtained by Aviva and the Iowa Claimants against SLB Companies**

**1.     Aviva**

93.     Aviva has tried and failed to enforce its judgment against Manley.

94.     In August 2013, this Court awarded Aviva a default judgment in the amount of $8,588,931.59 against Manley on a false advertising claim brought under the Lanham Act.

95.     Aviva, which competed against Manley in the market for inflatable water toys, alleged that Manley shrunk images of children depicted in its promotional materials to make "Banzai" brand water slides appear larger than they actually were.

96.     The default judgment was entered against Manley after it launched a relentless campaign to obstruct discovery, hide and destroy evidence, and drive up costs, and blatantly defied at least seven court orders.

97.     In January 2016, shortly before Manley entered bankruptcy, Aviva also obtained a default judgment in the Southern District of Iowa against MTD.  MTD was held jointly and severally liable with Manley after MTD failed to answer garnishment interrogatories.  Aviva's judgment against MTD recently was vacated for procedural reasons unrelated to the basis on which Aviva had requested entry of the judgment.

98.     Aviva has collected only around $140,000 on its judgments.

## 2.     Iowa Claimants

99.     The Iowa Claimants (Tammie Ackelson, Robin Lynn Drake, Heather Miller, Danielle Rennenger, and Ammee Roush) were employed at the call center in Indianola.  The women were customer service representatives responsible for fielding customer questions and complaints about SLB Products, especially "Toy Quest" and "Banzai" brand water toys.

100.    Defendants' disregard for U.S. laws and corporate formalities attracted and was perpetuated by the call center supervisors, who subjected the Iowa Claimants to what one court described as an "outrageous and hostile work environment."

101.    The call center supervisors relentlessly sexually harassed the Iowa Claimants by physically sexually assaulting them, propositioning them for sex, referring to them by vulgar sexualized slurs, asking them invasive sexual questions, sexualizing their underage children and grandchildren, boasting about the supervisors' alleged sexual exploits, and making other lewd and demeaning comments, noises, and gestures about the Iowa Claimants, their female colleagues, and female customers.

102.    The Iowa Claimants also experienced severe sexual discrimination, with male employees receiving preferential hiring, treatment, and retention, while the women were told they had no value and yet were forced to do most of the work.

103.    The Iowa Claimants obtained five separate judgments as a result of the extensive sexual harassment and discrimination they endured.  Judgments were entered against Aquawood, MTD, Toy Network, SLB Toys, and AW Computer Holdings, LLC (the "Iowa Judgment Debtors").  Three of the five Iowa Judgment Debtors—Aquawood, MTD, and Toy Network—are Defendants here.

104.    The Iowa Claimants have not been paid a penny on their over $2.4 million in judgments.

105.    The Iowa Claimants' judgments are listed below:

| Court | Matter | Prevailing Party | Judgment Debtors | Amount of Judgment | Date of Judgment |
|---|---|---|---|---|---|
| S.D. Iowa | *Danielle Rennenger v. Manley Toy Direct L.L.C., et al.*, No. 4:10-cv-00400 | Rennenger | • Aquawood (d/b/a ToyQuest)<br>• MTD<br>• Toy Network<br>• SLB Toys<br>• AW Computer Holdings, LLC | $1,056,000 | 9/29/15 (judgment amended 7/13/16) |
| S.D. Iowa | *Ammee Roush v. Manley Toy Direct L.L.C., et al.*, No. 4:10-cv-00401 | Roush | • Aquawood (d/b/a ToyQuest)<br>• MTD<br>• Toy Network<br>• SLB Toys<br>• AW Computer Holdings, LLC | $150,000 | 10/13/15 |
| Iowa District Court in and for Warren County | *Robin Lynn Drake & Heather Miller v. Manley Toy Direct, L.L.C., et al.*, No. LACV032931 | Miller<br><br>Drake | • Aquawood (d/b/a ToyQuest)<br>• MTD<br>• Toy Network<br>• SLB Toys<br>• AW Computer Holdings, LLC | $150,000<br><br>$150,000 | 9/15/16 |
| Iowa District Court in and for Warren County | *Tammie Ackelson v. Manley Toy Direct L.L.C., et al.*, No. LACV 032912 | Ackelson | • Aquawood (d/b/a ToyQuest)<br>• MTD<br>• Toy Network<br>• SLB Toys<br>• AW Computer Holdings, LLC | $912,000 | 3/20/17 |

**C.     Who's Who in the SLB Enterprise**

106.    The Defendants who have appeared in this case so far can be divided into

four primary groups based on choices they have made with respect to joint representation

by counsel.  Those choices generally but imperfectly correspond to the Defendants' places of primary residence:

- 73. One or more of the Principals and Executives served as an officer and/or director of one or more Corporate Shell The "Chan Defendants such as" are Samson Chan, Alan Chan, Liu, Toy Quest Ltd., Banzai International, MTD, Toy Network, and MGS and Park Lane—all being residents of Hong Kong.

- The "Dubinsky Defendants" are Dubinsky and Aquawood—both being residents of California.

- The "Toth Defendants" are Toth and MGS—both being residents of Iowa.

- The "Wu Defendants" are Wu, Dollar Empire, and Wellmax.  Wu and Dollar Empire are both residents of California.  Wellmax is an SLB company located in Hong Kong; although it shares counsel with Wu and Dollar Empire, upon information and belief, Wellmax is actually affiliated with the Chan Defendants.

107.   In addition, Aviva has amended its Complaint to add Manley and the Liquidators as Defendants.

108.   Each group is described in detail below, along with MTD, Toy Network, Jun Tai, and Winning (none of which has appeared in this case).

### 1.   The Chan Defendants: Samson Chan, Lisa Liu, Alan Chan, Toy Quest Ltd., Park Lane, and Banzai International

#### a.   Samson Chan

109.   Samson Chan is widely understood to be the "big boss" of the SLB Enterprise.  He exercised control, directly or indirectly, over MTD, Toy Network, and MGS in Iowa; Manley, Toy Quest Ltd., Park Lane, and Banzai International in Hong Kong; Aquawood in Los Angeles; and the other SLB Companies.

110.   74. To ensure their control over these those companies, Samson Chan and the other Principals have placed their relatives, friends and other allies into in leadership positions in these companies.

111.   For example, Samson Chan's sister Chan Ngan Ngor served as "Manager" of Toy Quest Ltd. and his son Gary Chan ("Gary Chan") is the director of several SLB Companies, an employee of Park Lane, and has personally directed litigation on behalf of Toy Quest Ltd.

3.   Even Its Most Prominent Company was Expendable in Order for the Enterprise to Continue Its Purpose.

75.   The Principals' looting and plundering of the SLB Enterprise's flagship company exemplifies the corporate "shell game" they play in order to sustain the enterprise.

76.   For many years, Manley was the most prominent company in the SLB Enterprise. In its last decade alone, Manley generated hundreds of millions of dollars in U.S. revenue by selling SLB Products to U.S. distributors.

77.   According to corporate filings, Manley was founded in Hong Kong by Chan in 1986, and a series of affiliates and other companies controlled by Chan were formed over the

succeeding years, including Toy Quest Ltd., Aquawood,  Manley Fashion Direct Ltd. ("Manley Fashion"), SLB Toys USA, Inc. ("SLB Toys"), Toy Box Limited ("Toy Box"), and, most recently, Banzai International.

78.     Manley now shares a corporate parent, Teng Yue, with at least nine different companies, including SLB Companies Toy Quest Ltd., Toy Box, Genesis Industries Ltd. ("Genesis"), and Manley Fashion.

79.     As described in Section II.D.4, infra, when Manley became a liability to the SLB Enterprise, the Principals, Toy Quest Ltd., and others acted to liquidate Manley and transfer its business and assets to Toy Quest Ltd. and related entities in order to protect the SLB Enterprise and its pursuit of selling SLB Products.

### 4.     With Chan's Approval, the Other RICO Defendants and their Related Entities Work Closely Together to Keep Money Flowing into the SLB Enterprise and Away from American Creditors.

80.     Each of the RICO Defendants has played a significant role in conducting the affairs of the SLB Enterprise and each has coordinated his or her respective actions with multiple RICO Defendants.

81.     All of the RICO Defendants have done so at Chan's direction and/or in accordance with his general wishes.

82.     For example, in 2006, acting within his authority as a member of the enterprise, Dubinsky changed the "50-50" ownership of SLB Toys from a partnership between Chan and Liu to a partnership between Alan Chan and Liu.

83.     Reporting back to Chan, Dubinsky explained that he had taken this step "because of legal issues due to Manley[…]. We don't want the same ownership in both companies.  I can always add back later.  If you have any issue, let me know."

44

84.   Dubinsky later explained that the "perception" of different ownership in related companies "keeps [away] the perception that they're one in the same."

a.   The Principals Conduct the SLB Enterprise's International Business by Coordinating the Control of Closely Related SLB Companies that Are Based in Hong Kong.

85.   In China, the SLB Enterprise operates in Hong Kong, where the Chans, Liu, and Manley, Toy Quest Ltd., Park Lane,  Manley Fashion, Banzai International, Wellmax, Jun Tai, Winning, Toy Box, and Toy Network Hong Kong are based.

86.   All of these companies have operated out of the same location, a building in the Kowloon district commonly known as "Manley Towers."

87.   The SLB Enterprise also keeps most of its assets in Hong Kong, where it transfers and banks revenue that it receives from its business in the United States.

88.   On numerous occasions, Dubinsky, Toth, and Wu have travelled from the United States to Hong Kong in order to conduct and discuss the SLB Enterprise's business with Chan and other RICO Defendants.

112.   89. Until March 2016, Samson Chan was in charge of primary decision making at Manley.  ChanHe served as its sole natural-person director from 2014 until March 2016, and was "Chairman & CEO."

113.   Manley's business records demonstrate that Samson Chan's role in the company was not limited to a mere title.  For example, Manley's general ledger covering July 2015 to March 2016 (when Manley initiated the liquidation process) contains dozens of entries with Samson Chan's name.  Those entries show that Samson Chan was using Manley funds throughout that period to pay for many thousands of dollars of expenses,

including travel once or twice a month to Los Angeles, Vancouver, and elsewhere; trips to inspect factories in China; meals with customers; miscellaneous other "entertainment" expenses; fees for industry dinners; toy samples; clothing; medical expenses; and multiple credit cards.

114.   Samson Chan likewise was heavily involved in the underlying litigation between Aviva and Manley.  Multiple Manley attorney invoices were addressed to Samson Chan's attention.  His name appears repeatedly throughout the invoices, including with respect to discovery-related issues such as litigation hold notices and responding to interrogatories and document requests.

115.   90.  Samson Chan is still a shareholder of Manley's immediate parent company, Teng Yue Holdings ("Teng Yue").

91.      Chan, which is a British Virgin Islands company that is also was one of the initial directors of Wellmax.  parent of nine other SLB Companies, including Toy Quest Ltd., Toy Box Ltd., Genesis, Echo Technologies, and Manley Fashion.

92.      Wellmax operated out of space leased from and/or occupied by Manley, and Wellmax was listed as a named insured on Manley's insurance policy, along with Toy Quest Ltd., Aquawood, and other members of the SLB Enterprise.

116.   Samson Chan was also a director of Complex Trader Ltd. ("Complex Trader"), which Aquawood has identified as its parent company.

117.   Samson Chan also was a director of Defendant Wellmax.

118.  Samson Chan, along with Liu, Dubinsky, and other members of the SLB Enterprise, regularly visited the SLB Enterprise's call center and warehouse in Indianola, Iowa to supervise the operations of MTD, Toy Network, and the other SLB Companies conducting business in Iowa, and they continue to exercise control over MGS's operations in Des Moines.  Samson Chan personally exercised control over employment decisions and operations in Iowa during those visits.

119.  On one particularly memorable occasion, after the Iowa Claimants' complaints no longer could be ignored because they had gone to the Iowa Civil Rights Commission, Samson Chan and Liu flew to Iowa to terminate the call center supervisors responsible for the sexual harassment and sexual discrimination directed at the Iowa Claimants.

120.  Samson Chan and Liu continued to visit Iowa on multiple occasions after firing the supervisors.

121.  Samson Chan, along with Alan Chan, Liu, and Dubinsky, also orchestrated Manley's Hong Kong liquidation for the purpose of shutting down litigation against Manley in the District of Minnesota and other courts.

### b.    Alan Chan

122.  Alan Chan is Samson Chan's son and is close to his father.

123.  Alan Chan was educated in the United States and has spent extensive time in the United States.

124. ~~93.~~ Prior to March 2016, Alan Chan was Manley's "President." Alan Chan has identified himself as Manley's "~~manager~~Manager" in numerous court filings. His name, like Samson Chan's, also appeared throughout Manley's 2015-2016 general ledger.

125. In conjunction with Dubinsky, Alan Chan also directs litigation on behalf of Manley and other SLB Companies and has offered declarations and affidavits for cases in this and other courts. He repeatedly has been identified as the main person responsible for managing document searching and collection for SLB Companies.

126. For example, in the District of Minnesota case where Aviva obtained its judgment against Manley, Alan Chan was the person primarily responsible for gathering the documents produced in China in response to Aviva's pre-judgment document requests. He made responsiveness determinations, managed the collection of documents, and shipped Manley documents from California to Hong Kong to drive up costs. This Court accordingly found that "Manley's counsel left the entire production to Manley employee Chan Siu Liu [aka Alan Chan]."

127. Alan Chan also is very active in Manley's liquidation. He oversaw payments to the Liquidators. He negotiated with the Liquidators, even though he was paying them. And he gave directions to the Liquidators. For example, he was a member of a liquidation "committee of inspection" that, according to a U.S. bankruptcy court filing by the Liquidators, directed the Liquidators to destroy Manley documents at the conclusion of Manley's liquidation.

128.    Dubinsky has testified that he and Alan Chan coordinated Toy Quest Ltd.'s collection of documents relating to Toy Quest Ltd.'s efforts to seize funds that arguably belonged to Manley, in violation of the bankruptcy stay.  Specifically, Dubinsky stated that Alan Chan had access to and ran searches across the entirety of Toy Quest Ltd.'s emails for all custodians to locate responsive documents.

129.    Alan Chan now is a "manager" at Park Lane, where he continues to direct sales and imports by Toy Quest Ltd., Park Lane, and Banzai International in the United States.

130.    Through his role with Park Lane, Alan Chan also coordinates activities with MGS, Aquawood, and Dollar Empire, arranging for shipments of SLB Products to Des Moines for storage, assembly, and distribution using Iowa facilities and personnel.

131.    94. Alan Chan serves as the director for several SLB Companies and their affiliates, including five companies owned by SLB Company Manley Overseas Ltd.

95.    Through his roles in these companies, Alan Chan continues to follow his father's orders.

132.    Alan Chan also wired more than $6 million from the building sale proceeds of the Indianola facility to Manley in Hong Kong, despite telling the Southern District of Iowa that Manley "did not own property in the United States or in the State of Iowa."

c.    Lisa Liu

133.    Liu is close to Samson Chan and has been an active participant in the SLB Enterprise for decades.

49

134. 96. Liu purportedly became Manley's Managing Director in 2011. According to Samson Chan, Liu was in charge of Manley's day-to-day operations, and she retained that position until shortly before Manley's voluntaryHong Kong liquidation proceedings began. Samson Chan testified in 2017 that Liu had a "big responsibility" at Manley, including having to "manage the general tasks of the company daily," "give directions to the company," "make a lot of decisions" about "[b]usiness and policies for the company," and "set up the guidelines" for the company. Her name shows up frequently in Manley's 2015-16 general ledger.

135. Liu worked with Dubinsky to destroy evidence sought by creditors.

136. Liu also has supervisory and signing authority at Toy Quest Ltd.

137. Liu has been a central participant in Manley's liquidation.

138. Liu now is a "managing director" at Park Lane, where she continues to direct sales and imports by Toy Quest Ltd., Park Lane, and Banzai International in Iowa and elsewhere in the United States and has supervisory and signing authority for all of those companies.

139. Through her role with Park Lane, Liu also coordinates activities with MGS, Aquawood, and Dollar Empire, arranging for shipments of SLB Products to Des Moines for storage, assembly, and distribution using Iowa facilities and personnel.

140. She has visited Iowa on dozens of occasions with Samson Chan to oversee the operations of MTD, Toy Network, and MGS.

97. Liu is now employed by Park Lane.

98.    Chan hired Dubinsky as Vice President of Marketing for Manley in March 1997. As the Minnesota Federal Court found, Dubinsky had been "integrally involved with Manley and Toyquest" since that time.

99.    Chan entrusted Dubinsky with increasing responsibility for managing the SLB Enterprise's affairs in the United States.

100.    Dubinsky was Manley's sole employee in the United States until 1998, when he switched to being President of Manley Toys USA Ltd.

a)   According to Dubinsky, he changed the name of Manley Toys USA Ltd. to SLB Toys in 2003.

b)   Dubinsky has admitted that Manley Toys USA Ltd. actually is the same company as Manley.

c)   Dubinsky also has admitted that those companies are the same as SLB Toys, where Dubinsky was President until the end of 2007.

b.

141.    Liu also directed Toy Warehouse, which is the company that held title to the Indianola warehouse.

142.    Toy Warehouse was founded as an Iowa LLC in 2000, but its initial principal place of business was 2228 Barry Avenue in Los Angeles—the same address used by Aquawood, SLB Toys, Toy Quest Ltd., and a host of other SLB Companies.  It later moved its principal place of business to the Indianola facility at 1800 N. 9th Street.

143.    While Manley was the "sole member" at the creation of Toy Warehouse, Manley transferred the entire capital account of Toy Warehouse to Samson Chan and

51

Manley Overseas Ltd. in May 2002.  Toy Warehouse's May 2002 operating agreement was signed by Liu as "Director" and by Samson Chan as "Member."  Toth submitted filings for Toy Warehouse to the Iowa Secretary of State.

### d.      Toy Quest Ltd.

144.   In China, the SLB Enterprise operates in Hong Kong, where the Chans, Liu, and SLB Companies such as Manley, Toy Quest Ltd., Banzai International, Park Lane, Toy Network-HK, Manley Fashion, Toy Box Ltd., and Wellmax are based.

145.   All of those companies have operated out of the same location, a building in the Kowloon district commonly known as "Manley Towers."  The Chans and Liu all have worked out of Manley Towers, and Dubinsky, Toth, and Wu regularly travel to Hong Kong to meet with the Chans and Liu there.

146.   The ~~Principals and Executives Direct the~~ SLB Enterprise's ~~Business in the United States Through Interdependent American~~U.S. revenues are generally transferred to Hong Kong banks, including Hang Seng Bank and HSBC Hong Kong.

147.   Manley initially used Toy Quest Ltd.'s name and assistance to continue its operations in Iowa and elsewhere in the United States and to evade judgment creditors, including Aviva and the Iowa Claimants, who hold judgments against SLB Companies~~.~~

~~101.   In the United States, the SLB Enterprise operates out of a Los Angeles address that has been shared by Manley, MTD,~~ that transferred assets to Manley.

148.   "Toyquest" and "Toy Quest" were registered trademarks of Manley.

52

149.   The Chans and Liu control Toy Quest Ltd., Aquawood, and direct substantially all of its activities with help from Dubinsky, as well as in facilities in Iowa, using a variety of names and entitiesToth.

150.   102. Dubinsky has been identified as a "legal consulting agent," "litigation representative," and contact person withinserved as the "litigation agent" for Toy Quest Ltd. and been integrally involved with its activities in the United States for these and other various member companies in the SLB Enterprise. .

i.   The Enterprise Has Conducted Business in California through MTD and Aquawood/Epic

103.   The SLB Enterprise conducts a broad array of commercial activity from Los Angeles, including the design, branding, and distribution of SLB Products.

104.   According to Dubinsky, Aquawood is his company and does not share common ownership with Manley or Toy Quest Ltd.

151.   Although Toy Quest Ltd. had no employees, its directors and officers—including Alan Chan—offered declarations and affidavits in support of the Defendants' efforts to hide assets that belonged to or had been transferred to Manley.

152.   At the direction of the Principals, Toy Quest Ltd. also hired lawyers to file a sham motion to intervene in this Court on behalf of Defendants Jun Tai and Winning.

153.   When Manley entered liquidation in March 2016, Toy Quest Ltd. took over Manley's business, using Manley's former employees, now at Park Lane, to sell the same SLB Products to the same customers, using the same Iowa facilities and personnel.

154.    Toy Quest Ltd.'s customers include Wal-Mart, Target, Amazon, Toys "R"
Us, Bed Bath & Beyond, Big Lots, and Costco, among others.

155.    Toy Quest Ltd. worked with Dollar Empire and MGS to facilitate the
shipment of goods to and through Iowa, with products routed to Des Moines to hide them
from creditors, including Aviva and the Iowa Claimants.

156.    The Chans, Liu, and Dubinsky are the ultimate beneficial and equitable
owners of Toy Quest Ltd.

157.    The Chans, Liu, and Dubinsky so dominate and control Toy Quest Ltd., and
have so blurred the lines between themselves and Toy Quest Ltd., that Toy Quest Ltd. has
an alter ego relationship with each of those individuals.

### e.    Banzai International

158.    In late 2016, Toy Quest Ltd.'s assets purportedly were sold to a new
company, Banzai International.

159.    "Banzai" was a trademark of Manley, and "Banzai" had for many years
been the name of the SLB Enterprise's leading toy line.  Manley's deceptive advertising
for its "Banzai" products formed the basis of the allegations in the lawsuit that led to
Aviva's judgment against Manley.

160.    Banzai's website, banzaifun.com, says that "Banzai has been making a big
splash around the world for over 15 years," and that "Banzai first made waves in the toy
industry with the Original Banzai Falls Slide," a product that appears to have been
introduced around 2006.

161.   Banzai International purportedly had a separate address, away from Manley Towers.

162.   But in fact, Manley's former employees continued to work for Park Lane at Manley Towers, in coordination with Aquawood and MGS, selling the same products to the same customers, using the same facilities and personnel in Iowa and elsewhere, in a scheme designed to evade judgment creditors such as Aviva.

163.   To hide Banzai International's location in Hong Kong, shipments from Banzai International listed "601-603 Tai Nan West" as their address of origin instead of "828 Cheung Sha Wan Road."  But in fact, Manley Towers sits at the intersection of Tai Nan West and Cheung Sha Wan Road; the employees never moved.

164.   To hide Banzai International's location in Los Angeles, Banzai International changed its address on certain insurance documents from the Aquawood office address at 2229 Barry Avenue in Los Angeles to 1007 North Sepulveda Boulevard, Suite #66, in Manhattan Beach.  The North Sepulveda address is actually an address for a branch of the United States Post Office, and there appear to be no "suites" in that building.  However, that post office branch is a short drive from Dubinsky's Manhattan Beach home.

165.   After taking over Toy Quest Ltd.'s business, Banzai International immediately entered into a sham "consignment" relationship with Dollar Empire in California to conceal its operations.  Dollar Empire falsely was listed as the importer of record for millions of dollars of SLB Products sold by Banzai International.

166.    In reality, the goods were shipped to MGS in Iowa and other locations, then re-routed from there to the actual customers.

167.    Banzai International continues to import SLB Products into Iowa and elsewhere in the United States in furtherance of the SLB Enterprise.

168.    The Chans, Liu, and Dubinsky are the ultimate beneficial and equitable owners of Banzai International.

169.    The Chans, Liu, and Dubinsky so dominate and control Banzai International, and have so blurred the lines between themselves and Banzai International, that Banzai International has an alter ego relationship with each of those individuals.

**f.    Park Lane**

170.    After Manley's liquidation, substantially all of Manley's employees—including Alan Chan and Lisa Liu—were "moved" into identical positions at Park Lane.

171.    When those employees "moved" from Manley to Park Lane, they never left Manley Towers.  They continued to perform the same tasks they had been performing all along.

172.    The Chans, Liu, and possibly Dubinsky control Park Lane and direct substantially all of its activities.

173.    Toth also handles some Park Lane activities in Iowa.  For example, Park Lane is the administrator for toysinquiry.com, a website that was registered by Toth in Iowa that provides customer service and technical support for SLB Products.

174.    Park Lane advertises itself through its website as "a full service supply chain solutions provider headquartered in Hong Kong.  We provide product design, development, app design, digital content production, sales, sourcing, vendor compliance, quality assurance, and logistic services.  We specialize in consumer products including toys, consumer electronics, décor, gifts, and novelties.  Our clients are fast growing businesses in their respective industries."

175.    Many of the "supply chain solutions," "sales," "sourcing," "vendor compliance," "quality assurance" and "logistical services" performed by Park Lane are performed in Iowa under Toth's day-to-day supervision.

176.    Park Lane's website also says that:

- "We strategically source quality products from suppliers with the right capabilities to meet our customers' needs and bring consumers the goods they rely on."

- "Our category experts work closely with customers to meet their needs using market research and trend forecasts."

- "We turn ideas into reality through a series of brainstorming, designing, and prototyping.  We embrace technology and think 'outside the box' for new ways to bring new products to market."

177.    The functions described on Park Lane's website are the same functions performed by MGS and Aquawood.

178.    Park's Lane website was registered using the email address
admin@mgsgroupltd.com.

179.    Park Lane's website lists as "Clients" Banzai International, MGS, Genesis,
Echo Technologies, and Toy Box, among others.

180.    Park Lane employees in Hong Kong coordinated imports of SLB Products
into and through Iowa and elsewhere in the United States with employees of Aquawood,
MGS, Dollar Empire, and other companies.

181.    The Chans, Liu, and Dubinsky are the ultimate beneficial and equitable
owners of Park Lane.

182.    The Chans, Liu, and Dubinsky so dominate and control Park Lane, and
have so blurred the lines between themselves and Park Lane, that Park Lane has an alter
ego relationship with each of those individuals.

183.    As of the filing of this Complaint, the Chan Defendants all are represented
by common counsel.

**2.     The Dubinsky Defendants: Brian Dubinsky, Peter Magalhaes, and Aquawood**

**a.     Brian Dubinsky**

184.    Samson Chan hired Dubinsky more than 20 years ago as Manley's sole
employee in the United States.  As this Court found, Dubinsky has been "integrally
involved with Manley and Toyquest" since he was hired by Samson Chan in 1997.

185. Several press releases on www.toyquest.com described Dubinsky as Manley's president, as well as president of "ToyQuest," "Toy Quest," "Manley ToyQuest," and Aquawood.

186. ~~105. However, Manley~~Dubinsky, Aquawood, Toy Quest Ltd., and ~~Dubinsky~~other SLB Companies all have shared the Los Angeles address of 2228 or 2229 Barry Avenue in Los Angeles ~~in recent years.106.~~.  MTD also used this address ~~as its principal place of business~~ before ~~it moved~~moving to Iowa.

~~107.    Aquawood has gone through several formal name changes and also has used several trade names.  It is now doing business as "Epic Studios."~~

~~108.    Aquawood handled the logistics details for the www.toyquest.com website.~~

~~109.  Several press releases on the website described Dubinsky as the "President" of "Toy Quest," "ToyQuest," or "Manley ToyQuest."~~

187. Dubinsky also registered websites for Genesis and Echo Technologies using the Barry Avenue street address and a Park Lane email address.

188. Dubinsky was the person who instructed the design team to miniaturize the images of children on the false Manley advertisements that violated the Lanham Act and led to the underlying lawsuit and Aviva's judgment.

189. Along with Samson Chan and Liu, Dubinsky visited the Indianola warehouse and call center to discuss Iowa operations with Toth.  Dubinsky has worked closely with Toth for more than a decade.

190.    Dubinsky has often acted as a "legal consulting agent," "litigation representative," and U.S. contact person for SLB Companies in U.S. litigation.  He has coordinated litigation responses with, among others, Alan Chan.

191.    Dubinsky has admitted that he has served as the "litigation agent" for Manley and Toy Quest Ltd. for almost 20 years.  Dubinsky also served as litigation agent for Defendants Jun Tai and Winning when they filed the sham intervention motion in this Court.

192.    Dubinsky's name appears hundreds of times in Manley lawyers' invoices for the District of Minnesota case in which Aviva obtained its judgment.  The invoices show that Dubinsky frequently provided input on strategy, commented on filings and correspondence, worked on document discovery issues, and supplied factual information.

193.    Dubinsky likewise has been involved in selecting counsel and developing legal strategy for Manley's liquidation, which was specifically intended to shut down Aviva's efforts to enforce its judgment.

194.    Dubinsky has worked with Liu, Samson Chan, and others to destroy evidence sought by creditors.

195.    During a hearing in 2012, this Court observed that:

> I have heard [counsel for Aviva] say again they have been unable to serve Mr. Dubinsky, who shows up over and over and over again on these papers.  And in fact I can see in one of the letters that was submitted as an exhibit, he's blind copied. . . .  a letter going to [counsel for Aviva], there is a blind copy going to Dubinsky.  It is clear that counsel has a relationship with Mr. Dubinsky.  He clearly has a role within ToyQuest and Aquawood.  And I find it incredible to date he has managed to avoid service and hasn't been made available

for deposition; but, that is a separate issue.  But I have got to tell you, I have this feeling that Manley Toys, with Aquawood and ToyQuest, is doing everything they can to be avoid discovery here.

196.   The Court likewise observed in 2013 that "obviously Mr. Dubinsky's name comes up right and left, has throughout this entire case."

197.   Dubinsky has bragged about Defendants' successful efforts to evade judgments.  On September 7, 2017, after being deposed in Los Angeles, Dubinsky declared to Aviva's counsel that Aviva had no chance of recovering anything of significant value from the Chans, their companies, or Dubinsky himself.  He boasted that he, the Chans, and their various companies would always stay at least "one step ahead of" Aviva.  He further explained that they are very adept at moving around assets and business relationships so that its companies can continue selling products in the United States without having any assets seized.

198.   As an example of the SLB Enterprise's skill at using corporate shells to hide the true source of their products, Dubinsky bragged about the enterprise's success in tricking Toys "R" Us ("TRU") into selling SLB Products even though TRU had decided to sever its business relationship with Manley, its affiliates, Dubinsky, and the Chans.  Dubinsky boasted that by selling what he called "my toys" through an entity that appeared unrelated to Manley and the Principals, Dubinsky and the Chans were able to continue receiving money from TRU even though TRU would not willingly have done business with them.

### b.    Peter Magalhaes

199.    Magalhaes is an employee of Aquawood and has identified himself as a General Manager and Senior Vice President of Epic Studios.

200.    ~~110.~~ Press releases on ~~www.toyquest.com have also identified~~www.toyquest.com describe Magalhaes as "vice president of business development for ToyQuest" and "General Manager of North America for The Manley Group."

~~111.    Magalhaes also has identified himself as a General Manager and Senior Vice President of Epic Studios, and he is also an employee of Aquawood.~~

201.    ~~112.~~ Magalhaes has helped other SLB Companies, including Toy Quest Ltd. and SLB Toys, with their efforts to conduct business in the United States for many years.

~~ii.    The Enterprise Has Anchored Certain Operations in Iowa, Where It Has Conducted Business through MTD, MGS and Related Entities.~~

~~113.    The SLB Enterprise used MTD for a variety of different purposes, with an initial focus on selling SLB Products to amusement parks.~~

~~114.    Chan and Liu were the sole owners of MTD.~~

~~115.    In 2001, MTD moved its principal place of business from California to Iowa.~~

~~116.    From approximately 2001 to 2015, MTD was based in Indianola, Iowa.  MTD and Toy Network were based at the same Indianola address where another SLB Company named "Toy Warehouse" owned a facility used by the SLB Enterprise.~~

202.     In June 2016, after Manley initiated liquidation proceedings, Magalhaes demanded that the retailer Costco transfer funds owed to Manley from Manley's vendor account to Toy Quest Ltd.'s vendor account and release the funds to Toy Quest Ltd.

### c.    Aquawood

203.     Aquawood is a California limited liability company that operates out of 2228 and 2229 Barry Avenue in Los Angeles.  It performs design, branding, marketing, and distribution services for SLB Companies.

204.     Aquawood has gone through several formal name changes and also has used several trade names.  It now does business as "Epic Studios."

205.     ~~117. According to Toth, Toy Network, which was used to market and develop SLB Products, is owned by Toy Network Hong Kong.~~ According to Dubinsky, Aquawood is Dubinsky's company and does not share common ownership with Manley or Toy Quest Ltd.

206.     Aquawood disclosed to a court in 2016 that it was a "subsidiary" of Complex Trader.  Complex Trader is a Hong Kong company.  Samson Chan was a director of Complex Trader and signed some of its corporate filings.  Complex Trader is currently owned by Chengda Holdings Limited, which is a British Virgin Islands company that owns other SLB Companies.

207.     While the precise details of Aquawood's ownership are not yet clear to Aviva, there have been extremely close relationships among Aquawood and many other

SLB Companies, including Manley, Toy Quest Ltd., Banzai International, Park Lane, MTD, and MGS.

208.    This Court ruled in January 2012 that Aquawood documents had to be considered as, and produced to the same extent as, Manley documents.

209.    Aquawood also was insured under Manley's insurance policy.

210.    Aquawood handled the logistics for the www.toyquest.com website, which sold "Banzai" brand water toys for many years, as well as the website that replaced it, banzaifun.com.

211.    Aquawood's own website has identified (among other SLB Companies) Banzai International, Genesis, and Toy Box as its business partners, using the same images as the Park Lane website to identify the companies.

212.    Aquawood's website also has contained a video that appears to show children playing with Banzai and Tekno toys, as well as other SLB Products.  The website also contains a video that flashes the "Banzai" logo at the beginning, and shows people in "Banzai" t-shirts hosting an outdoor event involving "Banzai" water toys, including a Banzai Sidewinder Falls slide, which has been advertised on Banzai International's website and has had an instruction manual on toysinquiry.com identifying the slide as a Toy Quest Ltd. product.

213.    In addition, Aquawood's website has identified Wal-Mart, Target, Amazon, Bed Bath & Beyond, Big Lots, and Costco as its customers, among others.  Those are the

same customers to which Toy Quest Ltd., Banzai International, and the Iowa Entities sold SLB Products.

214.    Aquawood's employees coordinated the importing of SLB Products into the United States with Toy Quest Ltd., Banzai International, Park Lane, Dollar Empire, MTD, MGS, and other companies.  Iowa-based employees have used Aquawood email addresses to do so.

215.    Many of the SLB Products imported with Aquawood's assistance were routed to Iowa, where MGS employees then re-routed them to customers in Minnesota and elsewhere in the United States, often at the direction of Aquawood and the Hong Kong Entities.  Aquawood used MGS, and MGS's Iowa facilities, to conceal the ultimate destination of SLB Products in the United States.

216.    As of the filing of this Complaint, the Dubinsky Defendants were represented by common counsel.

### 3.    The Toth Defendants: Richard Toth and MGS

#### a.    Richard Toth

217.    While Samson Chan, Liu, and Dubinsky all travelled to Iowa to supervise the operations of the SLB Enterprise, Toth is the only individual Defendant who lives in Iowa.

218.    Toth has overseen for decades the day-to-day operations of several SLB Companies directly or indirectly owned by the Chans, Liu, and/or Dubinsky, including MGS, Toy Network, MTD, Toy Box, and Toy Warehouse.[1]  He also has carried out tasks

[1] MTD and Toy Network are Iowa companies that are also Defendants here, but they are not listed as "Toth Defendants" because, unlike MGS, they do not share counsel with

in Iowa on behalf of other SLB Companies, including Toy Quest Ltd., Banzai International, Park Lane, and Aquawood.

219.   Toth and his companies provide centrally located warehouses and employees in Iowa so that SLB Products can be routed for delivery to customers throughout the country, including Target, Wal-Mart, and other retailers.

220.   Toth was hired by Samson Chan at least 20 years ago.  He reports to Samson Chan, Liu, and Dubinsky.

221.   118. From approximately 2000 until at least 2015, Toth served as the President of MTD.

222.   119. Toth also was listed as the President, General Manager, principal officer and registered agent for Toy Network.

120.   The Principals and Toth used MTD and Toy Network to service certain business needs of Manley and other SLB Companies, including operating a warehouse and call center at the Indianola address.

121.   Through his status in the SLB Enterprise and his positions with these companies, Toth has used MTD, Toy Network, MGS, and Toy Box to conduct the SLB Enterprise's business in Iowa.

122.   For example, at Dubinsky's request, Toth managed the call center for employes of the SLB Enterprise—on behalf of SLB Toys and under the auspices of MTD—at Indianola until 2006 or 2007.

---

not listed as "Toth Defendants" because, unlike MGS, they do not share counsel with Toth in the pending RICO cases.

66

223.	Toth now describes himself as the General Manager of MGS and the President of "Toy Box."

224.	The companies overseen by Toth generally have operated out of a building located at 1800 N. 9th Street in Indianola, Iowa and then out of a building located at 700 New York Avenue in Des Moines.  MGS has now moved to 301 S.E. 8th Street in Des Moines.

225.	The building at the Indianola address was a 260,000 square foot warehouse for many SLB Products.  The space was also used as a call center for customer service regarding SLB products.  Dozens of people worked at the Indianola facility.

226.	The Indianola call center is where the Iowa Claimants were subjected to the sickening sexual harassment that led to their unpaid judgments, including physical sexual acts and sexually coercive comments and questions.

227.	More than ten years later, in 2015, MTD and Toy Network moved to a rented warehouse facility at 700 New York Avenue in Des Moines, Iowa.  MGS, which was formed in 2015, initially operated out of the same address.

228.	Sometime in 2017 or 2018, after MTD and Toy Network had been shut down and replaced by MGS, MGS moved to yet another rented warehouse facility in Des Moines, located at 301 S.E. 8th Street.

229.	Under Toth's direction, SLB Products have been shipped from the Iowa facilities throughout the United States, including to Minnesota.

230.     While the Principals kept shifting their Hong Kong and Iowa operations from company to company to company, the movement of SLB Products has remained largely the same.  Thousands of tons of "Banzai" brand and other SLB Products continue to flow from Toy Quest Ltd., Park Lane, and Banzai International in Hong Kong; through warehouses run by MTD, Toy Network, and MGS in Iowa; to retailers like Target and Wal-Mart across the country.

231.     The Iowa companies run by Toth have had somewhat fragmented and confusing corporate structures, but the Iowa employees all understood that they were working for the benefit of the Chans, Liu, and Dubinsky.

232.     The Iowa staff, including the Iowa Claimants, handled customer service calls for "Toy Quest" and "Banzai" products, including those stored in the Indianola warehouse.

233.     Most of the Iowa employees understood themselves to be employees of a Hong Kong-based toy enterprise that Samson Chan owned and operated with the assistance of Liu, Dubinsky, and various U.S.-based SLB Companies.

234.     The Iowa employees also understood Toth to have authority over them, the call center supervisors, and the other Iowa employees.

235.     Iowa employees referred to Dubinsky's offices on Barry Avenue in Los Angeles as "California" or "corporate."  They referred to the companies based overseas as "Hong Kong."

236. Toth was understood by Iowa employees to report to and collaborate with both "California" and "Hong Kong."

237. In recent years, Toth has described himself as working for Dubinsky's company, Aquawood. For a period of time, Toth's wife also worked for an SLB Company and reported to Dubinsky. Toth still does business under the name "Epic Studios," which is one of Aquawood's trade names.

238. The Principals and Hong Kong Entities treat the Iowa facilities and personnel as belonging to the Hong Kong Entities.

239. Park Lane employees, including Anthony Cheng and Yolinda Wong, repeatedly have referred to "our IA warehouse" and "our Iowa warehouse" in discussions with customers and third-party facilitators. In February 2017, Cheng explained that Park Lane and/or Banzai International had "some goods available in domestic warehouse in Iowa."

240. The Park Lane employees were acting simultaneously on behalf of Park Lane, Toy Quest Ltd., and Banzai International in their interactions involving the Iowa warehouses. The divisions among those Hong Kong Entities are intentionally blurred.

241. An example of Park Lane acting on behalf of Toy Quest Ltd. and Banzai International in connection with an Iowa transaction can be seen in an email that Yolinda Wong of Park Lane sent to a customer in October 2016. In that email, she asks the customer to change its banking information from Toy Quest Ltd. to Banzai International.

Toy Quest Ltd.'s information literally was crossed out on the invoice, with Banzai International's information written above it.

242.    In addition, representatives of the Iowa Entities, Aquawood, and Dollar Empire regularly communicate with and take instruction from representatives of Toy Quest Ltd., Banzai International, and Park Lane.  A mix of representatives from all those companies, whose precise affiliations are often deliberately unclear, coordinate with third-party facilitators and customers regarding SLB Products to be shipped to Iowa, SLB Products available in Iowa, and SLB Products to be delivered from Iowa.

243.    Invoices and communications throughout 2016, 2017, and 2018 described "Banzai" brand water toys from Toy Quest Ltd. and Banzai International as being "FOB Iowa."

244.    In that same timeframe, many SLB Products, including "Banzai" brand water toys, were listed for "pickup" in Iowa.

245.    Multiple Toy Quest Ltd. and Banzai International invoices from 2016 to 2018 that were obtained from a shipping company likewise identify Des Moines as the ultimate destination of "Banzai" brand water toys and other SLB Products.

246.    In July 2019, a television news crew visited MGS's new headquarters in July 2019 and attempted to interview the employees there.  The employees refused to answer any questions.

247.    The news crew filmed a FedEx truck making a delivery to MGS's new headquarters in Des Moines.  The truck was full of "Banzai" brand water toys from the

70

Hong Kong Entities, including boxes labeled as Banzai Battle Blast Adventure Park.  The Banzai Battle Blast Adventure Park is advertised on Banzai's website, and its instruction manual identifies the product as a Toy Quest product.

248.    While the news crew was present, a second truck pulled in to make deliveries.  That truck sped off fifteen minutes later with its load still inside and undelivered when MGS employees noticed the film crew and told the truck to leave.  These furtive actions show consciousness of guilt, as Defendants continue to seek to hide their actions from the eyes of creditors.

249.    The Hong Kong Entities also have used the call center in Iowa to provide customer service and product support for their SLB Products, especially their "Banzai" brand water toys.

250.    Instruction manuals for SLB Products used to state expressly that the customer service center was located at the Indianola facility, and gave an 800 number to call.

251.    For years, however, the packaging, instruction manuals, and websites for virtually all "Banzai" brand water toys, as well as other SLB Products like "Tekno" electronics, no longer specify that the call center is in Iowa and instead direct consumers to contact "consumerservice@toysinquiry.com" or the same 800 number with any questions or comments.

252.    Toys Inquiry provides customer service and technical support for SLB Products.  It has done so in coordination with Park Lane for "Banzai" brand products sold

71

(or purportedly sold) by Manley, Toy Quest Ltd., and Banzai International, among other SLB Companies.

253.   The website toysinquiry.com is full of instruction manuals for SLB Products, most of which identify the products as Toy Quest Ltd. products.  Those same products are now being imported by Banzai International, with assistance from Park Lane.

254.   Although Defendants have tried to mask the connection between Toys Inquiry and Iowa, Toth registered the website "toysinquiry.com" using the physical address of the Indianola facility and the Park Lane email address admin@pls.com.hk.

255.   As recently as June 2020, a consumer filed a Better Business Bureau complaint against "Toys Inquiry."  The consumer reported that he or she had purchased the Banzai Speed Slide Water Park and the seams had come apart.  Toys Inquiry responded by refusing a refund, and gave its address as 301 S.E. 8th Street, Des Moines, which is MGS's new address.

256.   Though the physical addresses for Toys Inquiry have been Iowa addresses, the email address associated with the website toysinquiry.com is a Park Lane email address—admin@pls.com.hk.

### b.   MGS

257.   MGS is an Iowa limited liability company that currently operates at 301 S.E. 8th Street in Des Moines.

258.    As described above, Toys Inquiry is now giving that address in Des Moines as its address.

259.    MGS was created in early 2015 to serve as the successor to MTD and Toy Network, taking over the business of those entities in anticipation of the Iowa Claimants' judgments being entered against MTD and Toy Network.

260.    MGS is the latest Iowa entrant in a shell game that an Iowa appellate court has described as "corporate entity three card monte."

261.    MGS's initial workforce consisted of former employees of MTD or Toy Network, and MGS initially operated out of a warehouse at 700 New York Avenue in Des Moines that was used for shipments to MTD.

262.    MGS employees work closely with Park Lane and Aquawood; indeed, MGS employees use "@epic-studios.com" email addresses while carrying out the orders of Dubinsky and Aquawood regarding receiving, processing, and distributing SLB Products in Iowa.  As noted, "Epic Studios" is a trade name for Aquawood.

263.    According to its website, MGS operates not only in Iowa but also in the locations where other SLB Companies can be found, thereby blurring the lines between the activities of MGS in Iowa and the activities of other companies in California and Hong Kong:

> In LA: We are a design and innovation agency focused on hyper trend reporting and development.
>
> In Asia: We are a dynamic execution focused sourcing organization that has produced over 1 billion units to America's top retailers.

73

Together: We collaborate for kick-ass work that fuels great selling products for our clients.

264. The website goes on to say that MGS's "departments around the world are the pulse of the company," and lists those departments as "innovators," "artists," "product managers," "operations," "quality assurance," and "logistics."

265. MGS's website also says "we do the research to support the idea and the retails," and "We are embedded and work as an extended arm of our client's internal merchant teams."

266. The functions described on MGS's website are the same functions performed by Park Lane and Aquawood, and include shipping SLB Products to Minnesota and throughout the United States.

267. MGS's website also states "we manufacture great product for the world's largest retailers," and explicitly calls out the retailers Target, Amazon, Kmart, Toys "R" Us, and Wal-Mart as MGS's "partners."

268. MGS receives shipments of SLB Products from Toy Quest Ltd., Park Lane, Banzai International, and Dollar Empire, and then works with those companies to send those products to customers across the country, in an effort to hide the actual parties to transactions involving SLB Products.

269. MGS is providing the customer service and technical support roles previously filled by MTD and Toy Network.

270. Upon information and belief, the Principals and Toth have not adequately capitalized MGS.

271.    As of the filing of this Complaint, the two Toth Defendants were represented by common counsel.

### 4.    The Wu Defendants: Michael Wu, Dollar Empire, and Wellmax

272.    Wu is Samson Chan's friend and business associate.

273.    Wu lives in California, where he owns and operates Dollar Empire.  Wu is also the President of Dollar Empire.

274.    Dollar Empire's office is located at 4423 E. Bandini Boulevard in Vernon, California.  Its warehouse and showroom are located next door at 4425 E. Bandini Boulevard.

275.    Wu and Dollar Empire have been linked to the SLB Enterprise for twenty years.

276.    In 2000, Samson Chan registered Manley Toy Quest LLC as a California LLC.  Its principal place of business was at the same address as Dollar Empire's warehouse and showroom—4425 E. Bandini Blvd.  Samson Chan was the CEO of Manley Toy Quest LLC, and Liu was a member.  Manley Toy Quest LLC dissolved in 2002, after moving its principal place of business to the Barry Avenue address in Los Angeles.

277.    At Samson Chan's direction, Wu caused Dollar Empire to "import" and/or "purchase" (or at least say that it imported and/or purchased) tons of SLB Products; store (or at least say it stored) tons of SLB Products; and allow itself to be designated as a sham "consignee" and "importer of record" for tons of SLB Products.

278.    Wu and Dollar Empire played a major role in the transfer of Manley's assets out of the United States to Toy Quest Ltd. and/or Banzai International, in violation of the bankruptcy stay applicable to Manley's assets.

279.    With Wu's knowledge and with Dollar Empire's assistance, many of the SLB Products "sold" or "consigned" to Dollar Empire were actually shipped to Iowa, where they were then sent on to retailers or other distributors, all using Iowa facilities and personnel.  Other SLB Products "sold" or "consigned" to Dollar Empire were sent directly to retailers or other distributors.

280.    By cooperating in the submission of fraudulent entry documents and otherwise hiding the participants in the distribution chain, Wu and Dollar Empire played a major role in concealing millions of dollars in goods and cash from Aviva and the Iowa Claimants that they could have attempted to attach or seize.

281.    Apart from the fact that each of the Wu Defendants has helped the SLB Enterprise evade judgments, Aviva is not aware of another connection between Wellmax and Wu.

282.    Wellmax operated out of Manley's building in Hong Kong and Samson Chan was one of Wellmax's directors.

283.    As of the filing of this Complaint, the Wu Defendants were represented by common counsel.

### 5.    Manley and the Liquidators

284.    Manley was the SLB Enterprise's flagship company for decades.

285.   Manley was founded in Hong Kong by Samson Chan in 1986.

286.   Over the next thirty years, Manley generated hundreds of millions of dollars in U.S. revenue by selling SLB Products to U.S. distributors and retailers.

287.   After Aviva's judgment was entered, Manley switched from using its own name to using its trade name "Toy Quest Ltd." to conduct Manley business.  The company Toy Quest Ltd. then started demanding payment of money that was actually owed to Manley using its "Toy Quest Ltd." trade name.

288.   By early 2016, Manley's role in the fraudulent transfer of its assets to Toy Quest Ltd. was nearly complete and this Court was on the verge of imposing an import ban on all "Banzai" products as a sanction for Manley's litigation misconduct.

289.   The Chans, Liu, and Dubinsky decided to liquidate Manley in Hong Kong and initiate chapter 15 bankruptcy proceedings in the United States.

290.   Ng and Lees were appointed as Manley's liquidators in March 2016.

291.   Ng and Lees were selected and have been paid by Toy Quest Ltd., at the direction of the Chans, Liu, and Dubinsky.

292.   Ng and Lees initiated a chapter 15 bankruptcy proceeding in the District of New Jersey.  They sought and obtained a bankruptcy stay of all U.S. litigation involving Manley, including litigation in this Court.  The bankruptcy stay is still in place as of the filing of this Complaint, although Aviva has been granted various forms of stay relief.  In 2021, Aviva was granted permission to assert alter ego and fraudulent transfer claims that

previously could be asserted only by the Liquidators, and Aviva was granted permission to name Manley and the Liquidators as Defendants.

293. Ng and Lees are still acting as Manley's liquidators in the bankruptcy proceeding, at least for some purposes.

294. At the time they were appointed, Ng and Lees worked for JLA Asia Limited.  JLA Asia Limited merged into Ernst & Young in January 2019.

295. Ernst & Young retains possession of many of Manley's documents.

### 6. MTD and Toy Network

296. MTD and Toy Network have not appeared in this action through counsel.[2]

297. MTD and Toy Network are Iowa limited liability companies.  They both have played key roles in the SLB Enterprise.  They purportedly have stopped doing business and have been replaced by MGS.

298. MTD, however, has continued to litigate, including in the Southern District of Iowa, where MTD attempted to vacate Aviva's judgment against it.  Upon information and belief, one or more of the Hong Kong Entities is paying MTD's legal bills.

299. Samson Chan and Liu were the sole owners of MTD.

300. At the direction of Samson Chan, Liu, and Dubinsky, Toth formed MTD in Iowa in 2002.

---

[2] MTD was deemed served through service on Toth's counsel, pursuant to an order of this Court (ECF 155).  Toy Network was served through its registered agent and is in default (ECF 24, 153).

301.   MTD initially was located at the same Los Angeles address used by Manley, Toy Quest Ltd., Aquawood, and Dubinsky, before moving to Iowa.

302.   MTD began operating from 1800 N. 9th Street in Indianola no later than January 2002, when the property was purchased by Toy Warehouse.  Toy Network, which Toth formed in Iowa in 2001, was located at the same address.  MTD remained at that address until 2015.

303.   Subsequently, MTD also received shipments in its name or did other business at 700 New York Avenue in Des Moines.

304.   A year or two earlier, the Principals and Toth had transferred MTD's assets and business operations to Toy Network.  Thus, if MTD was operating at 700 New York Avenue, Toy Network almost certainly would have been operating there too.

305.   ~~123.~~ The Principals and Toth also conducted MTD's business through Toy Box, as well as through one or more ~~other~~ SLB Companies using "Toy Box" as a trade name.

306.   When the Iowa Claimants worked for MTD and Toy Network, Ms. Ackelson reported both to Toth and to Herman Haas, who often visited Iowa but was based in Hong Kong.  Haas said that Samson Chan was his boss, and used a ToyQuest.com email address.

307.   Ms. Ackelson talked on the telephone with Haas on a regular basis, at least once or twice per week, about the SLB Enterprise's operation in Iowa and also sent him

periodic reports about MTD and Toy Network.  Haas would make decisions and issue directives about the Iowa Entities' business.

308.   Haas said the SLB Products sold out of Indianola were made by Manley and sold by Toy Quest Ltd., both of which were owned by Samson Chan.

309.   The Principals and Toth did not adequately capitalize MTD and Toy Network and funded them strictly on an as-needed basis so they could continue performing their centralized distribution and customer service functions for the SLB Enterprise.

310.   124. Through Manley and Toy Quest Ltd., the Principals paid MTD for expenses including rent, payroll, accounting, storage, and shipping and shipping and handling fees.

311.   MTD in turn often paid other SLB Companies, including Toy Network and Toy Warehouse, for the same expenses.

312.   125. At various times, MTD, Toy Network, and Toy Warehouse also shared employees, the "manleytoy.com" website, and customers, and various other.

313.   Such arrangements to share resources and business opportunities generally were made without written agreements.

314.   a) Through MTD, Toth The rent paid certain expenses to Toy Network and to Toy Warehouse, including rent went directly to Hong Kong bank accounts controlled by Manley.

b)  Through MTD, Toth allowed Toy Network to use MTD's website ManleyToy.com.

c)  According to Toth, written agreements were unnecessary for these arrangements because the parties involved trusted each other.

126.  Toth now describes himself as the General Manager of MGS and the President of "Toy Box."

127.  Toth also remains affiliated with Aquawood, doing business as "Epic Studios."

### iii.  **The Executives Have Helped the Enterprise Import, Store, and Distribute SLB Products.**

128.  During the time that Toth has played various leadership roles at MTD, Toy Network, MGS, and Toy Box, Wu has been the owner and President of Dollar Empire.

129.  At Chan's request, Toth and Wu directed the SLB Companies that they oversaw to purchase SLB Products from other SLB Companies, including Manley and Toy Quest Ltd.

130.  At Chan's request, Toth and Wu directed the SLB Companies that they oversaw to store domestic inventory of SLB Products in SLB Company warehouses in the United States.

131.  At Chan's request, Toth and Wu directed the SLB Companies that they oversaw to help the SLB Enterprise import SLB Products by serving as transshipment points and/or falsely claiming that their companies were "consignees" of other SLB Companies.

132.  By 2014, at Toth's direction, MTD helped the SLB Enterprise import SLB Products into the United States from Hong Kong by allowing the SLB Enterprise to designate MTD as a recipient or "consignee" for shipments of SLB Products.  The SLB Enterprise sent SLB Products to MTD in Iowa, where they could then be distributed to actual customers in the United States.

315.   In addition to purchasing, storing, and distributing SLB Products, MTD allowed itself to be designated as a recipient or "consignee" of SLB Products and serve as the importer of record, thereby masking the actual purchasers of the products.

316.   133. In 2015, MTD moved to Des Moines Iowa, and MTD continued to allow the SLB Enterprise to designate it as a recipient or consignee. MTD continued to receive products from the SLB Enterprise, which were sent on to actual customers in the United States, perform this function even after MTD ostensibly it allegedly had ceased doing business.

134.   After Aviva and the Iowa victims obtained judgments against MTD, Wu allowed SLB Companies, including Banzai International, to ship hundreds of tons of SLB Products with Dollar Empire listed as the recipient or consignee, starting no later than 2016.

iv.   **Lawyers and Law Firms Have Protected the Enterprise through Sham Litigation.**

135.   Alan Chan, Dubinsky, and Aquawood have helped the SLB Enterprise keep assets away from creditors by utilizing attorneys and law firms willing to advance sham positions and litigation for the right price.

136.   The Minnesota Federal Court found, for example, that Manley's attorneys "too often acted as passive conduits of Manley's indefensible positions and statements… [and] on occasion compounded Manley's misguided behavior with their own."

137.   Monte Mann is an attorney at Novack & Macey LLP ("Novack"), which is a law firm based in Chicago, Illinois.

138.    Novack has shielded the SLB Enterprise from American creditors for many years. Novack, and Mann in particular, has represented Manley, Toy Quest Ltd., and Aquawood in multiple actions across the country over the years.

139.    In these lawsuits, Dubinsky often has acted as the "litigation agent" for various members of the SLB Enterprise.

140.    Alan Chan has also directed litigation on behalf of the SLB Enterprise.

141.    Chan has coordinated these litigation activities with members of the enterprise including Alan Chan, Dubinsky, and a person who has hidden behind the fictitious identity of "Gary Swerdlow" in a sworn court filing.

142.    For the sake of furthering ulterior and nefarious purposes, as discussed in Section II.D, these Defendants have helped the SLB Enterprise abuse legal process.

C.    **Thanks to the Principals' Unethical Business Practices and the SLB Companies' Flexible Corporate Structures, the SLB Enterprise Has Escaped Liability in U.S. Courts for Many Years.**

143.    Central to the SLB Enterprise's business model is its ability to sell products in the United States continuously while evading American creditors.

144.    Undeterred by lawsuits, judgments, or determined creditors, the SLB Enterprise has used its common resources, including a complex tangle of interchangeable trade names and companies with overlapping addresses, accounts, and personnel, to enable the enterprise to simultaneously earn profits in the United States without being subjected to the consequences of U.S. judgments.

145.    As a judge in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") acknowledged with reference to Manley's petition for recognition of

83

its voluntary Hong Kong liquidation,[1] Manley's "actions in various courts in the United States appear to have been improper."

146.    Moreover, the Minnesota Federal Court has noted that Chan, Liu, and Dubinsky have featured in several "alarming" communications over the years that demonstrate their willingness to hide, destroy, and falsify documents "to avoid and thwart litigation."

### 1.    To Evade Creditors, the Enterprise Plays What Courts Have Termed "Corporate Entity Three Card Monte" and a "Shell Game."

147.    For years, the SLB Enterprise has changed company names, destroyed evidence, and committed other deceitful acts, all in order to avoid liability.

#### a.    The Enterprise Has a Modus Operandi of Replacing One SLB Company with Another in Name Only.

148.    For example, the SLB Enterprise dissolved SLB Toys in 2006 and immediately replaced it with Aquawood.

149.    The purpose of replacing SLB Toys with Aquawood was not due to a change in location, employees, or business purpose.

150.    Rather, the SLB Enterprise transferred business and assets to Aquawood in order to evade a U.S. judgment that the toy company Wham-O, Inc. had obtained against SLB Toys.

151.    Even though SLB Toys had been replaced in name by Aquawood, the same employees continued to operate out of the same offices and performed the same role in helping the SLB Enterprise selling SLB Products in the United States.

---

[1] The Bankruptcy Court ultimately decided to recognize Manley's liquidation in Hong Kong pursuant to 11 U.S.C. § 1501 *et seq.*, meaning that the Bankruptcy Stay will remain in place unless and until further action is taken by the Bankruptcy Court or an appellate court.  That recognition decision has been affirmed by the United States District Court for the District of New Jersey; Aviva intends to appeal that recognition ruling.

152. As one former employee of two SLB companies would later testify, "When I inquired as to why the formal name of the company was being changed, I was told by [a manager] that the company was being sued so changing the name would permit them to continue to conduct business."

### b. The Enterprise Conceals, Falsifies and Destroys Evidence in Order to Avoid Lawsuits.

153. In 2006, Manley personnel expressed concern about which address should be placed on SLB Products sold under other names, including "Toy Quest," because "[l]awsuits will chase to the address." Dubinsky responded that the companies should not use the Hong Kong address, and Chan and Dubinsky ultimately decided not to use any address.

154. Shortly thereafter, Liu emailed Dubinsky to recommend a cover-up that would save money on royalty payments to Six Flags, noting that "we should change all the description to no six flag. in that cans [sic] if six flag come and audit they search nothing from the computer record." Dubinsky responded that "I told u guys to prepare a fire for all the documents . . . seriously . . . also, destroy [SLB Enterprise employee's name] notes and contact information."

155. Several months later, while e-mailing Chan about lawsuits against various SLB Enterprise companies, Dubinsky asked "[i]s it possible to make up a shipping invoice[?] . . . . Don't worry, I promise you wont get deposed this time . . . I am much smarter now . . . ." In response to Chan's concern about whether MTD had sent shipments during the relevant time period, Dubinsky said that "[t]hey did not . . . . I have to make it up," but he reassured Chan, "Don't worry, it wont turn to any issue—I have already thought it through—as they cant check mtd records or subpoena."

c.    **Courts in At Least Four Jurisdictions Have Seen through the Enterprise's Charade.**

156.    In recent years, courts have taken note of the SLB Enterprise's maneuvers to evade liability.

157.    As noted in a 2009 complaint filed against Manley for unpaid legal fees by the attorney who represented Manley in the Wham-O case, a federal district judge in California who was presented with limited evidence of the enterprise's corporate maneuvering described it as a "shell game."

158.    In 2015, a federal district judge in Iowa recognized the same "shell game" being played by MTD and other members of the SLB Enterprise in civil rights litigation brought by one of the Iowa victims.

159.    That same year, an appellate court presiding over a related case brought against Manley and Toy Quest Ltd. in Iowa state court concluded that:

> [Manley and Toy Quest Ltd.], their related companies, and the interrelated management of these companies are engaged in *corporate entity three-card monte* for the sole purpose of evading service of process and evading potential liability for their conduct . . . . The principals and owners of the related companies are largely the same. As found by the district court in the related federal case [in the Southern District of Iowa], 'There is no dispute that many, if not all, of the defendant corporations are closely related, and that many of the same individuals are involved in their ownership and daily management…. It also is clear that the corporations use many of the same employment forms and documents, transfer employees back and forth, and perform both activities in a lackadaisical fashion.

160.    Taking note of how the Defendants have abused the corporate form to avoid answering to U.S. courts, the Minnesota Federal Court found no "meaningful distinction" between Manley, Toy Quest Ltd., and Aquawood.

317.    Cash flow generated by MTD, Toy Network, and other SLB Companies in Iowa generally went back to Hong Kong.

86

### 7. Jun Tai and Winning

318.  Jun Tai and Winning are purported affiliates of Manley.

319.  Jun Tai and Winning unsuccessfully moved to intervene in Aviva's Lanham Act lawsuit after Aviva moved for monetary and injunctive sanctions for Manley's violation of this Court's order to respond to Aviva's post-judgment discovery.

320.  Aviva has been unable to locate Jun Tai and Winning to serve them with the Complaint in this matter.  Even though Toy Quest Ltd. hired and paid for their lawyer and Dubinsky served as their litigation agent, Toy Quest Ltd. and Dubinsky claim they have no documents containing contact information for Jun Tai and Winning.

## II. Defendants Have Cheated Aviva and Other Judgment Creditors through a Massive Web of Lies, Deceptions, and Corporate Abuses.

### A. Defendants Have Concealed and Destroyed Evidence to Keep It Away from Judgment Creditors Like Aviva.

#### 1. Courts in Minnesota and Elsewhere Have Concluded that Defendants Hide Information to Evade U.S. Judgments.

321.  As discussed above, Aviva has pursued expansive discovery to obtain information about the SLB Companies' operations and assets.  The Iowa Claimants likewise have sought considerable discovery on similar topics.

322.  These efforts have met with very limited success, because the Defendants have attempted to block discovery at every turn.  Among other tactics, the Defendants have refused to answer discovery; filed meritless motions to quash nonparty subpoenas; claimed that key individuals, entities, and documents are in Hong Kong and thus outside the reach of U.S. courts; created entirely new companies to take possession of and

conceal documents; and used Manley's liquidation proceedings to render other key documents inaccessible.

323.    Even when the Defendants were forced to provide discovery, they frequently lied in their responses and improperly withheld documents and information.

324.    According to the Liquidators, the Chan Defendants took control of many Manley documents and refused to give them to the Liquidators or Manley creditors.  In addition, according to the Liquidators, certain members of the "committee of inspection" for the liquidation (e.g., Toy Quest Ltd.) directed the Liquidators to destroy the Manley documents that had been turned over to the Liquidators at the conclusion of the liquidation.

325.    It took years of diligent investigation after its judgment against Manley was entered for Aviva to gather enough information to realize that it was the victim of a RICO judgment evasion scheme and to file this Complaint.

326.    Many of the details of the Defendants' fraudulent scheme still are unknown to Aviva.

327.    Defendants' criminal judgment evasion effort cannot be explained away as mere mistakes, sloppiness in record keeping, aggressive litigation tactics, or some sort of string of unfortunate business failures.  Defendants plainly understood the impact that their misconduct would have on Aviva and other judgment creditors, as shown by their prior behavior and courts' responses to it.

328.     Defendants' litigation misconduct has resulting in a series of scathing rulings by this Court and courts in Iowa.

### a.     Rulings in Aviva's Case in the District of Minnesota

329.     Aviva's default judgment against Manley was itself the result of Manley's violations of numerous discovery orders.  This Court (Mayeron, J.) described Manley's misconduct as a "cautionary tale" about a company that "has intentionally disobeyed every Order, has never offered any viable excuse for its willful conduct, and … very clearly believes that compliance with the Orders of this Court is optional." *Aviva Sports Inc. v. Fingerhut Direct Marketing*, 2013 WL 449775, at *1, 17 (D. Minn. Jan. 8, 2013).

330.     Such misconduct included refusing to provide discovery responses and documents despite multiple orders compelling production, failing to pay sanctions awards, a willful effort to multiply the costs of discovery by intentionally producing non-responsive documents that cost Aviva more than $500,000 to copy and translate, and improperly shipping documents from California to China to drive up Aviva's costs, hide documents, or both.  *See Aviva Sports*, 2013 WL 449775, at *5, *7, *33.

331.     This Court (Ericksen, J. & Mayeron, J.) found many of the Defendants here, including Dubinsky, Samson Chan, and Alan Chan, responsible for Manley's misconduct.  *See* ECF 722, 737, 822, *Aviva Sports, Inc. v. Fingerhut Direct Mktg, Inc.*, No. 0:09-cv-1091 (D. Minn.) (*Aviva I*).

332.     The Court (Ericksen, J.) noted that "the record contains alarming evidence of Dubinsky's deceptive attempts to avoid and thwart litigation—including evidence

suggesting evasion of service of process and encouraging the intentional destruction and falsification of documents."  ECF 822 at 8 n.8, *Aviva I*.

333.   161. The Minnesota Federal Court also found no "meaningful distinction" among Manley, Toy Quest Ltd., and Aquawood, and that Dubinsky and Samson Chan played key roles in those companies.  That ruling was issued when the court accepted Aviva's argument that the conduct of Manley's U.S.-based advertising designers working under Dubinsky should be attributed to the company Manley, even though the company Manley asserted that designers Rachel Harris and Peter Kallemeyn were not merely employees of Manley Aquawood:

> Manley has previously attempted to diminish the value of Harris's and Kallemeyn's testimony by asserting that they are not Manley employees, but rather employees of an entity known as Aquawood.  Harris, however, testified that she worked for Manley, Toyquest or possibly Aquawood—using the names interchangeably.  Kallemeyn believed he worked for Toyquest, but that Toyquest was owned by Manley. Kallemeyn explained that the employees "didn't have a full understanding of what was ….…" really going on with all the different names and such." Kallemeyn Dep. 93:14-17.  It is evident that not even the employees of the company were aware of any meaningful distinction between the various entities.   Nor does there appear to be any meaningful distinction.  For example, some documents identify Samson Chan as the president of Manley, while others identify Mr. Chan as the president of Toyquest.   Other documents, however, identify an individual named Brian Dubinsky as the president of Manley, while yet others identify Mr. Dubinsky as the president of Toyquest.  Dubinsky stated in one of his declarations that "ToyQuest is a d/b/a of Aquawood." Dubinsky Decl. ¶ 2 (ECF No. 134).  But Aviva has shown, and this Court has already determined, that Toyquest is actually a division of Manley.  *See, e.g.*, November 24, 2010 Order (ECF No. 250).  Manley owns the Toyquest mark and included images of Banzai products to support its trademark

application. Manley and Toyquest have also provided on numerous occasions identical addresses in California and in China, and appear to even be insured under the same insurance policy (as is Aquawood). The record also suggests that Aquawood's sole source of financing is Manley in China: Manley pays Aquawood's bills.

*Id.* at 7-8.

334. After entering the default judgment, this Court (Ericksen, J.) also sanctioned Manley for violating post-judgment discovery orders. ECF 1087, *Aviva I.*

**b.    Rulings in Aviva's Case in the Southern District of Iowa.**

335. Aviva subsequently obtained a default judgment in the Southern District of Iowa against MTD after MTD failed to respond to garnishment interrogatories.

336. 162. When denyingYears later, the Southern District of Iowa (Adams, J.) denied MTD's motion to set aside Aviva's judgment against MTD, a federal district judge in Iowa. The court explained that it was "trouble[d]" by "the indicia of bad faith" by the enterprise's conductMTD and its affiliates, including "troubling evidence of potential destruction and/or falsification of evidence" as well as evidenceand indications that the enterprisebusiness "changes corporate names whenever it incurs a significant debt or judgment against it." Oct. 12, 2018 Order at 14-15, ECF 40, *Aviva Sports, Inc. v. Fingerhut Direct Mktg, Inc.*, No. 4:15-mc-000434 (S.D. Iowa).

91

> ## 2.    The SLB Enterprise Is at Risk of Losing Millions of Dollars Due to Judgments Against SLB Companies.
>
> ### a.    SLB Companies Have Been Found Liable for Deceptive Trade Practices and Unfair Competition.

163.   In 2009, Aviva sued Manley in the Minnesota Federal Court for unfair competition, deceptive trade practices, and patent infringement.  Aviva, which also sold inflatable water toys, alleged that Manley had shrunk the images of children depicted in its promotional materials to make its water slides appear larger than they actually were.

164.   More than four years of litigation ensued.  Manley launched a relentless campaign to obstruct discovery, hide and destroy evidence, and drive up costs.

165.   Manley also blatantly defied at least seven court orders.

166.   As a sanction for Manley's protracted and willful contempt of court and after repeated warnings, the Minnesota Federal Court ultimately awarded Aviva an $8,588,931.59 default judgment against Manley in August 2013.

337.   MTD continued to litigate in the Southern District of Iowa in an effort to overturn Aviva's default judgment even though MTD did not appear in this case and asserts for other purposes that it is not operational.

338.   In February 2021, the Southern District of Iowa vacated Aviva's judgment against MTD for procedural reasons.  Specifically, the court ruled that the magistrate judge should have filed a report and recommendation for the district judge's review rather than an order and judgment.  Feb. 3, 2021 Order at 2-3, ECF 71, *Aviva Sports, Inc. v. Fingerhut Direct Mktg, Inc.*, No. 4:15-mc-000434 (S.D. Iowa).

339. 167. In January 2016, the United States District Court for The court made clear that vacating the MTD judgment "does not in any way affect the judgment against Manley Toys, Ltd. that was created in the Southern District of Iowa issued by the Iowa judgment, which found MTD jointly and severally liable for Aviva's registration of the Minnesota judgment against Manley.

**b.      SLB Companies Have Been Found Liable for Sexual Harassment and Sex Discrimination.**

168.    In 2010, MTD, Aquawood (as the successor to SLB Toys), Toy Network, Nor does it affect the previous order granting Plaintiff's motion to compel [ECF 9] and another Manley affiliate (collectively the "Sexual Harassment Debtors") were sued by the Iowa victims, each of whom had suffered sexual harassment and sex discrimination while working for SLB Companies Direct's failure to comply with that order." *Id.*

169.    In August 2015, a lawsuit brought by an Iowa victim who had been

**c.      Rulings in the Iowa Claimants' Cases**

340.    The civil actions and litigation leading up to the Iowa Claimants' judgments likewise were marked by egregious misinformation campaigns, discovery abuses, and delay tactics on the target part of discriminatory behavior and civil rights violations went to trial several Defendants, both in the Southern District of Iowa and in Iowa state court.

170.    Based on the extreme harassment and discrimination, which is described more fully below, the jury found the Sexual Harassment Debtors jointly and severally liable for millions of dollars in punitive and compensatory emotional damages.  The jury's original award of damages later was reduced to comply with the statutory cap on punitive damages available

under Title VII and precedent regarding emotional damages.  *See* Order, *Rennenger v. Manley Toy Direct, LLC* ("*Rennenger*"), ECF 414, No. 4:10-cv-00400-JEG-RAW (S.D. Iowa Sept. 29, 2015).

171.   An Iowa state court jury then found against the Sexual Harassment Debtors and awarded more than $900,000 to another of the Iowa victims.

172.   After those verdicts, the Sexual Harassment Debtors agreed to confessions to judgment for three of the remaining Iowa victims, and a default judgment was awarded to the fifth Iowa victim.  Those judgments were entered in the following amounts in the following matters:

| Matter | Prevailing Party and Amount of Judgment |
|---|---|
| Iowa District Court in and for Warren County, Case No. LACV 032912 *Tammy Ackelson v. Manley Toy Direct L.LC., Toy Network L.L.C., SLB Toys USA, Inc. d/b/a Toy Quest, Toy Quest, LTD., Aquawood, L.L.C. d/b/a Toy Quest, AW Computer Holdings, Inc.* | Ackelson - $912,000.00 |
| Iowa District Court in and for Warren County Case No. LACV032931 *Robin Lynn Drake and Heather Miller v. Manley Toy Direct, L.L.C., Toy Network, L.L.C., SLB Toys USA, Inc. d/b/a Toy Quest, Aquawood L.L.C. d/b/a Toy Quest, and AW Computer Holdings, L.L.C.* | Miller - $150,000.00 <br><br> Drake - $150,000.00 |

| | |
|---|---|
| United States District Court for the Southern District of Iowa, Case No. 4:10-cv-00400 *Danielle Rennenger v. Manley Toy Direct L.L.C., Toy Network L.L.C., SLB Toys USA, Inc. d/b/a Toy Quest, Toy Quest LTD, Aquawood, L.L.C. d/b/a Toy Quest, AW Computer Holdings, L.L.C.* | Rennenger - $1,056,000.00 |
| United States District Court for the Southern District of Iowa, Case No. 4:10-cv-00401 *Ammee Roush v. Manley Toy Direct L.L.C., Toy Network L.L.C., SLB Toys USA, Inc. d/b/a Toy Quest, Toy Quest LTD., Aquawood, L.L.C. d/b/a Toy Quest, AW Computer Holdings, Inc.* | Roush - $150,000.00 |

341.    In 2015, the Iowa Court of Appeals observed in Ms. Ackelson's case that Manley, Toy Quest Ltd., "their related companies, and the interrelated management of these companies are engaged in corporate entity three-card monte for the sole purpose of evading service of process and evading potential liability for their conduct." *Ackelson v. Manley Toys Ltd.*, 871 N.W.2d 520,*2 (Iowa Ct. App. 2015).

342.    That court noted that "[t]he principals and owners of the related companies are largely the same," that "many, if not all, of the defendant corporations are closely related," that "many of the same individuals are involved in their ownership and daily management," and that "the corporations use many of the same employment forms and documents, transfer employees back and forth, and perform both activities in a lackadaisical fashion." *Id.*

343.    In 2016, the Southern District of Iowa (Gritzner, J.) similarly found in Ms. Rennenger's case that it was "inescapable that Defendants created impediments to the investigation, discovery and trial preparation of the case which justifiably required counsel for Plaintiff to expend substantially more time and effort than should have been necessary." July 7, 2016 Order at 4, ECF 415, *Rennenger v. Manley Toy Direct LLC,* No. 4:10-cv-400 (S.D. Iowa) ("*Rennenger I*"). The court continued: "Both in their conduct pretrial and in testimony during the trial, Defendants engaged in an intentional pattern of obfuscation and non-cooperation that appears to have been difficult for counsel on both sides." *Id.* at 4 n.2.

344.    In 2017, the Southern District of Iowa (Walters, J.) denied Toy Quest Ltd.'s motion to quash Ms. Rennenger's post-judgment discovery and explained that the conduct of the defendants in that case justified extensive judgment enforcement discovery. *See* Mar. 17, 2017 Order, ECF 452, *Rennenger I.*

345.    The court held that, "[g]iven this history of, call it what you will – 'three-card monte,' obfuscation, noncooperation, stonewalling, deception or concealment – from the beginning to end of litigation it is reasonable to expect defendants, including [Toy Quest Ltd.], directly or through other affiliated companies, to use almost any means to avoid paying Ms. Rennenger what is owed to her." *Id.* at 12.

346.    The court also observed that "Defendants' participation in this litigation has been characterized by a pattern of dodging and weaving to avoid legal responsibility for their actions." *Id.* at 9. The court noted that the "obfuscation continues," describing how

Toth received orders to shut down Toy Network and form MGS days after Ms.

Rennenger's jury verdict against Toy Network.  *Id.*

### 2.    Aviva's Efforts to Obtain Information about SLB Companies

347.    The information presented in Aviva's Complaint took years to gather.

348.    For years, Aviva has pursued substantial party and non-party discovery to

obtain information about the SLB Companies' operations and assets.[3]  But Defendants

vigorously fought Aviva at every turn—defying court orders when necessary.

349.    As a result, Aviva did not learn until July 2015 that Defendants frequently

were mislabeling Manley assets as "Toy Quest Ltd." assets.

350.    Little by little, as retailers provided bits of information that the SLB

Companies themselves were withholding, a fuller picture emerged.

351.    In 2016, with the Manley bankruptcy filing and MTD corporate dissolution,

it became apparent that the Principals and the SLB Companies had not merely disguised

or hidden Manley and MTD assets; the Principals and SLB Companies had rendered

Manley and MTD assets completely inaccessible to creditors.

---

[3] *See, e.g.,* Case No. 3:15-mc-15 (M.D. Tenn.) (Dollar General Corp.); Case No.
3:15-mc-103 (N.D. Tex.) (Michaels Stores, Inc.); Case No. 1:15-mc-026 (E.D. Va.)
(Dollar Tree, Inc.); Case No. 2:15-mc-46 (S.D. Ohio) (Big Lots, Inc.); Case No.
2:15-mc-7893 (C.D. Cal.) (Aquawood); Case No. 4:15-mc-040 (S.D. Iowa) (MTD); and
Case No. 5:15-mc-1025 (W.D. Tex.) (HEB Grocery Co.); ECF 25, 26, 68, 69, 80, 115,
192, 222, Notices of Subpoenas, Discovery, and/or Motions to Compel, *In re Manley
Toys Ltd.*, No. 16-15374 (Bankr. D.N.J.); Order Denying Aquawood's Motion to Quash
Subpoena to Jet.com, ECF 20, *Aquawood, LLC v. Aviva Sports, Inc.*, No. 17-cv-01726
(D.N.J. May 9, 2017); Orders, ECF 23, 25, 34, 48, 54, 61, 62, 68, *Aviva Sports, Inc. v.
Manley Toys Ltd. (In re Subpoena to Dollar Empire LLC)*, No. 17-mc-00099 (C.D. Cal.).

352.   And over the following years, it became apparent—from inconsistent statements by the Chans and Wu, from Dubinsky's own confession, and from a close analysis of the documents obtained from diverse sources—that Defendants were engaged in a massive criminal scheme.

353.   Even now, however, many of the precise details of Defendants' criminal acts remain hidden.

354.   After November 6, 2014, when the Federal Circuit issued its mandate denying Manley's appeal and Aviva's judgment became final, Aviva engaged in fairly routine judgment collection efforts, attempting to garnish funds from large retailers including Target, Fingerhut, Wal-Mart, and Kmart.

355.   Though the retailers had all conducted business with Manley, representatives from Target, Fingerhut, Wal-Mart, and Kmart reported that they had no garnishable funds.  For example, Kmart stated that it had ceased doing business with Manley and instead entered into a contract with a new entity called Toy Quest Ltd.

356.   The retailers made these statements due to "Toy Quest Ltd.'s" material false representations, as discussed below.

357.   Based on the statements by retailers, Aviva relied on "Toy Quest Ltd.'s" material misrepresentations and did not garnish funds that were listed as payable to Toy Quest Ltd.

358.   In July 2015, Aviva obtained documents showing that certain Manley transactions had been mislabeled as "Toy Quest Ltd." transactions.

359.    At that point, Aviva became more aggressive in trying to determine the true nature of specific transactions and trying to garnish funds that really belonged to Manley but were recorded as belonging to Toy Quest Ltd.

360.    Aviva served discovery, garnishment interrogatories, and/or writs of execution on Manley, Aquawood, and other Manley business partners.

361.    On January 4, 2016, Aviva successfully obtained a judgment in the Northern District of Texas for approximately $140,000 held by Michaels owed to Manley.

362.    On March 23, 2016, the U.S. Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") stayed all proceedings against Manley and its assets and Aviva was precluded from obtaining more information from retailers and distributors.

363.    At that point, Aviva sought information from Manley's Liquidators.  But Manley's Liquidators resisted many of Aviva's discovery requests.  They also stated that they themselves lacked many of Manley's documents, as discussed below.

364.    In October 2016, Aviva also sought and obtained stay relief that, among other things, allowed it to resume pursuing discovery from retailers and distributors.

365.    That resulted in a drawn-out dispute with Dollar Empire from July 2017 through May 2018 (described below), during which Wu gave multiple inconsistent statements about imports by Manley, Toy Quest Ltd., and Banzai International, and Aviva filed multiple motions to compel.

366.    While Dollar Empire and Wu never gave a coherent account of their dealings with the SLB Companies, they did provide sufficient information to establish customs fraud and other frauds involving shipments to and through the SLB Companies in Iowa.

367.    Ironically, a major link in the chain of proof of the SLB Enterprise's criminality became known to Aviva not during formal discovery but during a conversation following a September 7, 2017 deposition, which was taken in connection with Aviva's motion for sanctions against Toy Quest Ltd. for violating the bankruptcy stay.  That is when Dubinsky made his "one step ahead" confession.

### 3.    Dubinsky, Liu, and Samson Chan Falsified and Destroyed Documents to Avoid Liability.

368.    Some of the evidence that this and other courts have found "alarming" and "troubling" are emails in which Dubinsky, Liu, and Samson Chan graphically discuss fabricating and burning records to ensure that nothing would be left for creditors to discover in a litigation.

369.    In 2006, Manley personnel expressed concern about which address should be placed on SLB Products sold under other names, including "Toy Quest," because "[l]awsuits will chase to the address."  Dubinsky responded that the companies should not use the Hong Kong address, and Samson Chan and Dubinsky ultimately decided not to use any address.

370.    Shortly thereafter, Liu emailed Dubinsky to recommend a cover-up that would save money on royalty payments to Six Flags, noting that "we should change all

the description to no six flag.  in that cans [sic] if six flag come and audit they search nothing from the computer record."  Dubinsky responded that "I told u guys to prepare a fire for all the documents … seriously … also, destroy bobo notes and contact information."

371.    Several months later, while discussing still more lawsuits against various SLB Companies, Dubinsky asked "[i]s it possible to make up a shipping invoice[?] …. Don't worry, I promise you wont get deposed this time … I am much smarter now …." In response to Samson Chan's concern about whether MTD had sent shipments during the relevant time period, Dubinsky said that "[t]hey did not …. I have to make it up," but reassured Chan, "Don't worry, it wont turn to any issue—I have already thought it through—as they cant check mtd records or subpoena."

**B.** ~~c. The Principals Keep the Enterprise~~**Defendants Play Corporate Shell Games to Stay** "One Step Ahead" of ~~the SLB Companies'~~**Judgment** Creditors.

~~173.    Neither Manley nor any of the Sexual Harassment Debtors have voluntarily paid a penny of the millions of dollars in judgments held by Aviva and the Iowa victims.~~

~~174.    To the contrary, the SLB Enterprise has vigorously fought to stop judgment creditors from collecting on their judgments by transferring businesses and assets from one SLB Company to another, pursuing vexatious litigation against creditors, and even causing one SLB Company to enter a sham liquidation.~~

~~175.    According to Dubinsky, the Principals are very adept at moving around assets and business relationships so that their international network of corporations can continue to sell products in the United States without having any assets seized.~~

176.   Indeed, Dubinsky openly declared to Aviva's counsel that Aviva had "no chance" of recovering anything of significant value from him, the Chan family, or their various companies because the Principals "always will stay at least one step ahead of" judgment creditors.

177.   To accomplish this goal, the RICO Defendants have conducted a pattern of racketeering that continues to this day.

**II.   Defendants' Illegal Conduct Has Sustained the SLB Enterprise.**

    A.   **Defendants' Misconduct Has Enriched the SLB Enterprise while Injuring Aviva and Others.**

178.   Each Defendant has committed federal crimes and/or tortious conduct to help the SLB Enterprise obtain and keep money that rightfully should have gone to American creditors who were not controlled by members of the enterprise (the "independent creditors"), including Aviva.

179.   Individually and collectively, these federal crimes and tortious acts have deprived Aviva of its ability to collect on the Minnesota and Iowa judgments and caused Aviva to suffer additional damages, including the costs of litigation.

    B.   **Defendants Have Conspired to Keep Assets from Independent Creditors by Propagating Lies, Material Omissions and False Narratives about the Assets and Operations of SLB Companies.**

        1.   **Defendants Have Coordinated to Help the SLB Enterprise Evade Liabilities and Cheat Independent Creditors Like Aviva.**

180.   In the face of mounting judgments and other liabilities arising from the SLB Enterprise's unethical business practices, Defendants conspired to hide the SLB Enterprise's assets from independent creditors.  Their plan was expansive, complex and dynamic, spanning

multiple continents and states and involving innumerable businesses engaged in interstate and foreign commerce.

181.   To carry out their plan, Defendants promulgated a series of false narratives designed to mislead customers, creditors, and courts, including the Minnesota Federal Court, into believing that SLB Companies, including Manley and MTD, had few if any assets and business and were unable to pay their respective creditors.

182.   As complex as this scheme was, its overarching and unlawful goal was simple: to deprive independent creditors of money they were due.

**2.   Various Members of the SLB Enterprise Conspired Together**

372.   As courts in Minnesota and elsewhere have observed, the Principals and Executives have a history of switching SLB Companies to conceal revenue and other assets to evade judgments.

373.   As needed, the Principals and Executives fund such companies or undercapitalize them.

374.   If a company has a judgment entered against it, the Principals and Executives strip it of value while allowing the enterprise to continue to profit.

375.   The Principals and Executives played this corporate shell game, for example, with SLB Companies in Hong Kong.  They have also played it with MTD, Toy Network, and MGS.

376.   While the names of these companies may have changed, the brand name of the SLB Products they sell, including "Banzai" and "Tekno," generally have remained the

same.  The companies also use the same facilities and personnel to sell the products to the same retailers.

**1.    As Judgments Piled up, the Principals Shifted Business from One Hong Kong Company to Another.**

377.    A prime example of the Principals' corporate shell game is their sequential looting of Manley and Toy Quest Ltd.

378.    For years, Manley engaged in hundreds of millions of dollars in U.S. transactions by selling tens of thousands of tons of SLB Products.

379.    But when judgments against Manley became a problem, the Principals and other Defendants acted to hide and disguise Manley assets and eventually liquidated Manley, transferring its business and assets to other SLB Companies to ~~Maintain~~protect the SLB Enterprise~~'s Control of Manley's Assets and Business Using Defendant Toy Quest Ltd.~~

~~183.    The Principals' manipulation of Manley's assets and business exemplifies the ways in which all Defendants have used the SLB Enterprise to victimize independent creditors with widespread deception.~~ for the Principals' benefit.  They did so by lying repeatedly to retailers, courts, Manley's Liquidators, customs officials, and others, as explained in more detail below.

380.    Manley's business initially went to Park Lane and Toy Quest Ltd., and from there to Banzai International and other SLB Companies.

.

### a.     Shift from Manley to Toy Quest Ltd. and Park Lane

381.    ~~184. Before the Minnesota Federal Court entered judgment for Aviva~~For many years, Manley used the trade names "Manley Toys Ltd.," "ToyQuest," "Toy Quest," and "Toy Quest Ltd." ~~interchangeably.~~

382.    ~~a) For example,~~Manley filed a registration for the "ToyQuest" trademark in 2008, stating that it had been using the mark since 1996.  As part of its trademark application, Manley included several "specimens~~" showing its use of the "ToyQuest" mark~~," including invoices, packing lists, and other form documents ~~reflecting~~showing its use of the "ToyQuest" and "Toy Quest Ltd." names.  Some of ~~these~~the documents ~~explicitly identified~~described Toy Quest as a "Division of Manley."

383.    ~~b) Likewise,~~Manley also promoted ~~its~~products on the website www.toyquest.com. ~~A 2006 press release from www.toyquest.com stated that "Manley ToyQuest" was ranked the seventh largest toy manufacturer in the United States.~~

384.    ~~185.~~In 2013, faced with ~~the specter of~~tens of millions of dollars of liability ~~arising from litigation, including Aviva's $8.5 million judgment~~, the Principals and their agents decided to use the trade name "Toy Quest Ltd." to exploit the separate existence of ~~a separate SLB Company – Defendant~~Toy Quest Ltd.

~~a)     Defendant Toy Quest Ltd. was incorporated in Hong Kong in 1993 as "Manley Fashion Limited."  It~~, which itself had changed its ~~official~~name several times ~~over~~.

385.    At the ~~next ten years, and ultimately emerged as the company called Toy Quest Ltd. in 2004.~~

~~b)     Prior to 2013, Defendant~~time, Toy Quest Ltd. had almost no sales in the United States, while Manley sold tens of millions of dollars of products annually, including products ~~sold using~~bearing Manley's "ToyQuest~~" and,~~" "Toy Quest Ltd.~~.~~," and "Banzai" trade names.

386.   ~~c) In~~But in 2013, the Principals and their agents ~~abruptly and~~ drastically reduced ~~Manley's~~the use of the ~~trade~~ name "Manley," ~~suddenly~~abruptly converting almost exclusively to the trade name "Toy Quest Ltd."~~to confuse retailers, hide Manley's assets and operations, and defraud independent creditors.~~

~~186.   As part of their fraudulent scheme, the Principals and their agents, including Toy Quest Ltd., falsely claimed to courts, retailers, and others that the business Manley conducted under its "Toy Quest" and "Toy Quest Ltd." trade names actually was conducted by Defendant Toy Quest Ltd.~~

~~187.   These material misrepresentations enabled members of the SLB Enterprise to seize and keep Manley assets even after the Bankruptcy Court issued an Order Granting Provisional Relief and Setting Further Hearing (the "Bankruptcy Stay"), which prohibited all attempts to seize Manley assets.~~

387.   The company Toy Quest Ltd. then started demanding payment of money that was actually owed to Manley using its "Toy Quest Ltd." trade name.

388.   In 2016, when the transfer of assets from Manley to Toy Quest Ltd. was complete and Manley was facing crippling import sanctions for its litigation misconduct in the District of Minnesota (more on that below), the Principals liquidated Manley and began doing business using Toy Quest Ltd.

106

389.   Toy Quest Ltd. continued to collect money owed to Manley, in violation of the bankruptcy stay, and to make new sales, generally with the assistance of Park Lane.

390.   The Principals formed Park Lane—another SLB Company operating in Manley Towers, one floor away from where Manley used to be—less than a month before liquidating Manley.

391.   On or about March 17, 2016, less than a week before the liquidation, the Principals reassigned nearly all of Manley's employees to identical positions at Park Lane.  Liu and Alan Chan, for example, hold the same positions at Park Lane that they held at Manley—"managing director" and "manager," respectively.

392.   The Principals created Park Lane to, among other things, drain Manley of resources and assume possession of Manley's documents, thereby keeping those resources and documents away from Manley's creditors and Liquidators but within the control of the SLB Enterprise.

393.   Park Lane employees continued to sell the same Manley products to the same Manley customers, using their @manleyservices.com.hk email addresses.

394.   Those same employees lied to retailers and other customers of the SLB Enterprise, sometimes claiming to represent Toy Quest Ltd. and other times claiming to represent Park Lane, depending on which audience the employees appeared before.

395.   Many of those employees continue to sell the same products to the same customers to this day, routing the SLB Products through facilities operated by MTD, Toy Network, and/or MGS and conspiring with those Iowa Entities, Aquawood, Toy Quest

Ltd., Banzai International, Dollar Empire, and other Defendants to conceal the importation and ultimate destination of those products from Aviva and other creditors.

396.   Thus, by approximately March 2016, Manley had transferred all or virtually all of its business assets—including its business relationships, good will, product inventory, intellectual property, right to receive proceeds from various transactions, employees, and documents—to Toy Quest Ltd. or Park Lane.

397.   Toy Quest Ltd. and Park Lane did not pay anything for these assets, let alone equivalent value.  There was no purchase agreement between Manley and Toy Quest Ltd.

> **b.**   **Shift from Toy Quest Ltd. to Banzai International and Other SLB Companies**

398.   Later in 2016, the Principals started using yet another company, Banzai International, to make it easier to continue evading independent creditors like Aviva.

399.   In July 2016, Toy Quest Ltd.'s purported assets were sold to a new company, Banzai International.

400.   The sale agreement between Toy Quest Ltd. and Banzai International was not an arm's length transaction.  The purchase price was less than $2 million (US).  Toy Quest Ltd.'s purported assets—comprised primarily of the assets transferred from Manley—were worth far more than $2 million.  Manley stated in its 2013 insurance application that its sales in 2013 were $49 million, and that its projected sales in 2014 were $39 million.

401.    The purchase agreement also contains multiple false representations and warranties.  For example, Toy Quest Ltd. represented that it was not engaged in, subject to, or threatened by any litigation related to the "Banzai" brand business.

402.    While the sale agreement was written to appear legitimate, both the agreement's low purchase price and its recitation of numerous obviously false representations and warranties make plain that the agreement was a sham and was not the result of a fair negotiation.

403.    Like "Toyquest" and "Toy Quest Ltd.," "Banzai" was a registered trademark of Manley.  "Banzai" also was the name of one of Manley's leading toy lines.

404.    Import records show the shift from Toy Quest Ltd. to Banzai International.

405.    For example, between January and May 2016, Dollar Empire received over one hundred shipments—weighing a total of more than 860 tons—from Toy Quest Ltd. Starting in December 2016, however, Dollar Empire no longer received shipments from Toy Quest Ltd. and instead began to receive shipments from Banzai International.  Many of these shipments from Banzai International contained exactly the same products—often using the same names and packaging—as prior shipments from Toy Quest Ltd.

406.    The last imports of Toy Quest Ltd. to the United States were in August 2016, around the same time that Toy Quest Ltd. supposedly sold its assets to Banzai International.

407.    Banzai International, on the other hand, has continued to import thousands of tons of "Banzai" brand water toys to the United States, including more than 1,290 tons

of merchandise in 2018, more than 1,570 tons of merchandise in 2019, more than 1,560 tons of merchandise in 2020, and more than 760 tons of merchandise so far in 2021.

408.  The instruction manuals of many of the "Banzai" brand water toys listed on Banzai International's website have identified those products as "Toy Quest" products, and many of the products were previously imported to the United States by Toy Quest Ltd.  Before that, the products were sold by Manley as "Manley," "Toy Quest" and "Banzai" products.

409.  For example, in 2013 and 2014, the "Banzai" brand "Speed Curve Water Slide" was sold to retailers such as Big Lots using the "Manley" name.  That same toy subsequently was imported to Dollar Empire and others by Banzai International and is advertised on Banzai International's website, but with an instruction manual containing a "Toy Quest" logo.

410.  SLB Companies also sell SLB Products other than "Banzai" brand products using other trade names.

411.  For example, Tekno (sometimes Teksta) robots, for example, were originally sold under the "Manley" name and then the "Toy Quest" name, and now are sold under the name "Genesis."  Genesis is another SLB Company controlled by the Principals.

412.  The "Manley Toy Quest Corporation" first registered the "Tekno the Robotic Puppy" mark in 2001.  Shortly before that mark was cancelled in 2008, Manley itself filed to register the mark "Tekno" for use with "robotic toy dogs."  The owner's

manual for the original Tekno the Robotic Puppy identified it as a Manley Toy Quest product.

413.   The "Manley" name now has been removed from all "Tekno" brand products.

414.   Instead, Defendants shifted those products to the "Toy Quest" name, and then to the "Genesis" name, as evidenced by the instruction manuals for Tekno products.

415.   A July 2016 press release for Tekno Newborns stated that the Tekno "franchise" belonged to Genesis, quoted Aquawood employee Magalhaes, and directed inquires to an Aquawood email address, press@epic-studios.com.

416.   SLB Companies continues to export hundreds of tons of Tekno products to the United States, often without bothering to list a "shipper" and sometimes identifying Genesis as the shipper.

### 2.   As Judgments Piled up, the Principals Shifted Business from One Iowa Company to Another.

417.   Another prime example of the Principals' corporate shell game is their sequential opening and closing of Iowa companies involved in product storage, product distribution, and customer service.

418.   As the Iowa Claimants pursued their court cases, the Principals and Toth began a game of "corporate three-card monte" in Iowa to try to shed liability and ensure that the women would not be able to execute on any judgments they would obtain.

419.   In 2013, the Principals and Toth caused Toy Network to sell off its amusement park and carnival novelty toy product inventory.  They and others then sent the proceeds from this sale, totaling $1.3 million, from Iowa to Manley in Hong Kong.

420.   The Principals and Toth then transferred MTD's assets and business opportunities selling toys to retailers to Toy Network, sold the Indianola facility, and moved MTD and Toy Network to Des Moines.

421.   Later, to defraud Aviva and the Iowa Claimants, MTD falsely claimed to the Southern District of Iowa that it had never operated in Des Moines or done business at 700 New York Avenue in Des Moines, and could not have been served with legal papers there.  In fact, between April 2015 and July 2015 alone, MTD received at least a dozen shipments from Manley and Toy Quest Ltd. at the Des Moines address.

422.   Shortly after MTD and Toy Network moved to Des Moines, the Principals and Toth caused them to cease to do business altogether.

423.   MTD continues to litigate even though it is purportedly defunct.  It has, for example, retained counsel and attempted to vacate Aviva's Iowa judgment against it based on MTD's misrepresentation, supported by false declarations from Toth and another individual from Hong Kong, that MTD did not do business at 700 New York Avenue in Des Moines.  Plaintiff believes MTD's legal bills are being paid by one or more of the Hong Kong Entities.

424.   In the place of MTD and Toy Network arose MGS, which continued to operate out of the same facility, performing the same functions, distributing the same

products, using the same equipment, operated by the same people, on behalf of the same customers, as MTD and Toy Network.

425.   The Principals and Toth created MGS—immediately after Ms. Rennenger's jury verdict—for the explicit purpose of protecting the SLB Enterprise from any judgments obtained by the Iowa Claimants.

426.   As the Southern District of Iowa described in Ms. Rennenger's case in 2017, after recounting the Defendants' long history of "dodging and weaving to avoid legal responsibility for their actions," within days of Ms. Rennenger's jury verdict, Toth "received instructions that he was no longer employed by Toy Network, but was now general manager of a company called MGS International, L.L.C. doing much the same thing he had been doing before—marketing and distributing Toy Quest products."

427.   MGS opened for business at 700 New York Avenue, Des Moines, using the same workforce that MTD and Toy Network were using when they were shut down. Those employees performed the same tasks under substantially the same working conditions as they had for MTD and Toy Network.  MGS used the same equipment as MTD and Toy Network.

428.   Toth was the General Manager of Toy Network when it purportedly closed, and he became General Manager of MGS when it opened for business immediately thereafter, making him the highest level U.S. employee of MGS.  Throughout the changes from MTD to Toy Network to MGS, Toth has retained the same place in the SLB Enterprise, managing its day-to-day operations in Iowa.

429.    MGS handled the same "Banzai" brand water toys and other SLB Products as MTD and Toy Network, and sold those products to the same retailers as MTD and Toy Network.  MGS also interacted with the same representatives of the Hong Kong Entities, Aquawood, and Dollar Empire in the same way as MTD and Toy Network to coordinate the distribution of goods from Iowa.

430.    MGS insiders have admitted that the company changed in name only.  One day they were working for one company and the next day they were for working for somebody else, but doing the same job.

431.    Despite all of these facts, MGS has falsely claimed to courts in Iowa that it is not the corporate successor to MTD and Toy Network.

### 3.    The Principals Changed the Ownership of SLB Toys and then Replaced It with Aquawood.

432.    The Principals' prior abuses of the corporate form confirm that their switches from Manley to Toy Quest Ltd. to Banzai International and Park Lane, and from MTD to Toy Network to MGS, were undertaken to evade judgments and not for legitimate business purposes.

433.    In 2006, for example, the Principals changed the ownership of SLB Toys and then replaced it with Aquawood for the express purpose of evading judgments.

434.    SLB Toys was registered at the Barry Avenue address in Los Angeles in 2003.

435.    In 2006, Dubinsky changed the "50/50" ownership of SLB Toys from a partnership between Samson Chan and Liu to a partnership between Alan Chan and Liu.

436.     Dubinsky told Samson Chan that he had taken this step "because of legal issues due to Manley.... We don't want the same ownership in both companies.  I can always add back later.  If you have any issue, let me know."

437.     Dubinsky later explained that the "perception" of different ownership in related companies avoids "the perception that they're one in the same."

438.     In October 2007, SLB Toys was hit with a multi-million dollar judgment in favor of Wham-o, Inc. for willful trademark infringement.

439.     Instead of paying that judgment, SLB Toys closed its doors and then—in what a California federal court actually called a "shell game"—reopened the next day as Aquawood.

440.     Even though SLB Toys had been replaced in name by Aquawood, the same employees continued to operate out of the same offices and performed the same role in helping SLB Companies sell SLB Products in the United States.

441.     As a former employee of two SLB Companies would later testify, "When I inquired as to why the formal name of the company was being changed, I was told by [a manager] that the company was being sued so changing the name would permit them to continue to conduct business."

### 4.     The Principals and Hong Kong Entities Have Admitted that the Purpose of Their Shell Games Is to Evade Creditors.

442.     As discussed above, Dubinsky has boasted that he, the Chans, and their various companies will always stay "one step ahead" of creditors because they are so adept at playing the corporate shell game.

443.     Communications between a Manley employee and Excelligence Inc. ("Excelligence") show that the Principals and the SLB Companies fully understood how their corporate shell games would create a misleading paper trail and harm creditors.

444.     In 2015, after Aviva garnished accounts payable to Manley by Excelligence, Excelligence attempted to cancel a purchase order.

445.     When Manley refused to cancel the order, Excelligence warned Manley that it would comply with the garnishment.

446.     In response, a Manley employee proposed that Manley circumvent the garnishment by "deliver[ing] the goods through another company."

447.     After Excelligence reiterated its cancellation request, Manley again suggested that Excelligence "ship this order by another company (rather than Manley Toys Ltd.)."  Excelligence refused.

448.     Dubinsky himself has bragged about another example—involving Toys R Us ("TRU")—of how the Principals deliberately have used phony paper trails to dupe creditors.

449.     For years, SLB Companies sold SLB Products, including "Banzai" water slides, to TRU.

450.     In 2011, a jury in Massachusetts awarded the estate of Robin Aleo over $19 million in damages against TRU in a wrongful death lawsuit.  Ms. Aleo had died when a defective "Banzai" water slide collapsed, causing her to suffer fatal injuries.

451.　TRU spent years trying to collect money from Manley for its alleged breach of an agreement to indemnify TRU for the judgment.

452.　By 2012, TRU had made an express decision not to do business with the Principals or any SLB Companies.

453.　Knowing this, the Principals and Toth hid behind a new trade name to fool TRU into continuing to do business with SLB Companies, and sold SLB Products to TRU using the name "Toy Box."

454.　Toybox is an Iowa LLC formed by Toth using the Indianola facility address, and MTD, Toy Network, Toybox, and MGS have operated alone and collectively using the "Toy Box" name.

455.　Each of the Hong Kong Entities, acting at the direction of the Principals and working with Toth, Aquawood, MTD, Toy Network, and MGS, used the "Toy Box" façade in Iowa to sell SLB Products to TRU.

456.　As a result of the Principals' fraudulent concealment of their involvement in "Toy Box" sales to TRU, TRU unwittingly remitted money to the SLB Enterprise that it would not knowingly have agreed to provide to the enterprise.

**C.　Defendants Repeatedly Lied to Retailers to Evade Judgments and Fraudulently Transfer Manley's Assets.**

457.　All of the Defendants repeatedly lied to retailers, or caused lies to retailers to be made, about which SLB Company sold SLB Products to the retailer and which SLB Company was owed money for those products.

117

458. Relying on those false statements, many retailers made changes to their vendor systems that allowed Defendants to deceive retailers, creditors, and (eventually) Manley's Liquidators into believing that money due to Manley was instead due to Toy Quest Ltd.

459. As a result, multiple retailers that purchased millions of dollars of products from Manley subsequently paid Toy Quest Ltd. for those Manley products.

460. For obvious reasons, these kinds of asset transfers made it much more difficult for holders of judgments against Manley to enforce those judgments.  For example, Aviva collected only a tiny fraction of its judgment against Manley.

      **1.** ~~a. Members of the SLB Enterprise~~**The Principals and Hong Kong Entities Instructed Retailers to Stop Using the "Manley" Name and to Use the "Toy Quest Ltd." Trade Name Instead.**

461. ~~188.~~Between 2013 and 2015, as part of the Principals' scheme to defraud independent creditors by conducting Manley's business under the "Toy Quest Ltd." trade name, members of the SLB Enterprise communicated by interstate mail, email, facsimile, and telephone calls with at least nine different retailers in the course of conducting interstate or foreign commerce.

462. ~~189.~~In particular, members of the SLB Enterprise caused numerous emails and electronic communications to be sent to such retailers to change the vendor name in their systems from "Manley" to "Toy Quest Ltd."  Until Manley actually entered liquidation, however, Manley was still the company entering into the transactions; it was just using an affiliate's name.

463. ~~190. For example, between 2014 and 2016, Defendant~~ These communications usually were sent by low-level employees at the direction of the Principals and the Hong Kong Entities, but Liu personally caused numerous letters to be sent by ~~either~~ mail or wire transmission from Hong Kong to retailers in the United States.

464. These letters, which Liu signed on behalf of "Toy Quest Ltd.," advised the retailers that "an additional or change of vendor name is needed in your system" from "Manley Toys Ltd." to "ToyQuest Ltd."

465. ~~191.~~ The letters went on to claim that "ToyQuest Ltd. products and toys have been in the USA market place overt [sic] the last 18 years and sold in all the major USA retailers under the ToyQuest Ltd vendor."

466. ~~192.~~ That statement ~~was~~ appears to be false.  In fact, as Toy Quest Ltd., Liu, and the other Principals well knew, over the preceding 18 years~~:~~

a)   ~~Toy Quest Ltd., unlike~~, although Manley~~,~~ and the Iowa Judgment Debtors had ~~not~~ sold "ToyQuest" brand products in the U.S. marketplace and to U.S. retailers ~~at all~~, ~~let alone~~ Toy Quest Ltd. had no employees and had not made such U.S. sales, and certainly had not made such sales for the past 18 years~~; and~~

b)   ~~Few if any sales in the U.S. marketplace or to U.S. retailers had been made using the "Toy Quest Ltd." (as opposed to the "ToyQuest") trade name~~.

467. ~~193.~~ Members of the SLB Enterprise directed several other retailers, including Target, Costco, Bed Bath & Beyond, Big Lots, and Michaels, to switch from the name "Manley" to the name "Toy Quest."  All of this was done fraudulently, so that

retailers would not realize that they were helping to disguise assets of Manley and/or the Iowa Judgment Debtors.

468.   The full extent of those communications is known to Defendants.

469.   The following table summarizes fraudulent electronic communications to retailers sent in interstate and foreign commerce, primarily from Hong Kong to the United States.

| Deceptive Communications to Customers of Manley | | | | |
|---|---|---|---|---|
| **Date** | **Purported Sender** | **Recipient** | **Method** | **Content** |
| 06/19/13 | Manley | Dollar General | Internet submission | Vendor Change Form, changing Manley to "Toy Quest Ltd." |
| 07/26/13 | Anthony Cheng (Manley) | A. Koch (Seventh Avenue) | Electronic mail | Name change, changing Manley to "Toy Quest Ltd." |
| 06/13/14 | Anthony Cheng (Manley) | Tina Taylor (Big Lots) | Electronic mail | Name change, changing Manley to "Toy Quest Ltd." |
| 06/18/14 | Manley | Michaels | Internet submission | Vendor Change Form |
| 09/10/14 | Toy Quest Ltd. | Bed Bath & Beyond | Electronic mail | Changing "Vendor of Record" to Toy Quest Ltd. |
| 09/23/14 | Kapo Tsang (Toy Quest Ltd.) | Costco | Electronic mail | Name change, changing Manley to "Toy Quest Ltd." |
| 11/20/15 | Jena Schmeling (Northern Lights Marketing) | Lindsey Heffron (Blain Supply, Inc.) | Electronic mail | Name Change, changing Manley to "Toy Quest Ltd." |

470.   It is reasonable to infer that the Principals or Executives approved or directed the sending of the communications.

471.    Many other retailers are likely to have received similar fraudulent

communications.  Based on a UCC Financing Statement for Manley as debtor that was

publicly filed in August 2013, as well as information provided by Manley's Liquidators,

the following list of retailers did business with Manley in the last few years before it

liquidated: Academy Sport; Albertsons, Inc.; Alco Stores Inc.; Amazon.Com, Inc.;

American Sales Corp.; Amscan Inc.; Apl Logistics OBB AAFES; Bed Bath & Beyond;

Big 5 Corp; Big Lots; Bi-Mart Corporation; BJs Wholesale Club Inc.; Bluestem Brands,

Inc.; Bonton Stores Inc.; Boscovs; Braha Industries, Inc.; Brooklyn Lollipop Import &

Export, Inc.; Burlington Coat Factory; C.K. Group, Inc.; CEC Entertainment, Inc.;

Columbus Closeouts; Cost Plus #901 - Stockton Dc; Costco Wholesale USA; Cracker

Barrel Old Country Stores; Current Usa; CVS Pharmacy Inc.; DD's Discount; Dicks

Sporting Goods; Direct Source Int'l Inc.; Dollar General; Excelligence Learning

Corporation; Family Dollar; Far East Brokers And Consultants., Inc.; Fred Meyer Inc.

dba Kroger; Fred's Inc.; Gordmans; Grocery Outlet Inc.; H.E. Butt, Inc.; Harris Teeter;

Hy-Vee, Inc.; Kenscott Ltd.; Kmart Corporation; Kohl's Department Stores; Lakeshore

Learning Materials; Leisure Systems Inc.; Leslie's Swimming Pool Supplies; Liss Global,

Inc.; Ltd Commodities LLC; Marlon Creations, Inc.; Mckenzie Buying Co.; McRae And

Associates; Meijer Inc.; Menard Inc.; Michaels Stores Procurement Co.; Michaels, Inc.;

OKK Trading, ONC; Mills Fleet Farm; National Stores, Inc.; Ollie's Bargain Outlet Inc.;

RSI International; Sears Roebuck & Co.; Seventh Avenue, Inc.; Shepher Distributors &

Sales Corp.; Shopko Stores Operating Co. LLC; Six Flags, Inc.; Strategic Global

Sourcing, LLC; Supervalu International Division; Target Corp.; Target.com; Toys 4 USA; Toys R Us - Delaware, Inc. Dba Toys R Us; U.S. Toy Company, Inc.; Value Source Intl. LLC; Variety Wholesalers Inc.; Wal-Mart.com; Wal-Mart Stores Inc. USA; and Wegmans Food Markets.

472.    The goal of those fraudulent communications was to seize money that belonged or was due to Manley and/or the Iowa Judgment Debtors and deprive independent creditors of that money.

473.    Each of the communications was intended to deceive retailers about the nature of the transaction discussed.  Relying on these communications, numerous retailers came to believe and report that that they were doing business with companies other than Manley, when in fact the retailers continued to do business with Manley.

474.    Exhibits A-E to Aviva's Complaint are tables listing dozens of invoices that the Principals, Hong Kong Entities, and Aquawood submitted or caused to be submitted to the retailers Big Lots, Dollar General, Michaels, and Target between 2013 and 2016.

475.    Each of those invoices falsely represented to the retailer that Toy Quest Ltd. sold the SLB Products in question, when in fact those products were sold by Manley using its "Toy Quest" trade name, and fraudulently demanded that the retailer pay money to Toy Quest Ltd. that actually was owed to Manley.

**2.** **b.** **Despite the Vendor Name Changes, the SLB Enterprise Retained the Same Employees, Products, Contact Information and Customers.**

476. 194. Although the vendor names changed, nothing else did.  The same employees were selling the same products to the same customers out of the same offices in Hong Kong, then shipping those products to the same locations in Iowa and elsewhere in the United States.  In order to hide assets and defraud creditors, however, the SLB Enterprise used subterfuge to confuse vendors, creditors, and even its own employees about which company was conducting business at any given moment.

477. 195. Representatives of Manley representatives and/or the Iowa Judgment Debtors assured many of its customers that the switch from "Manley" to "Toy Quest Ltd." was in name only.

478. 196. For example, in May 2014, a Manley representative of Manley and/or the Iowa Judgment Debtors introduced himself to the retailer Big Lots as "Anthony from Toy Quest (Manley)."  A month later, he emailed Big Lots to request a vendor name change from "Manley Toys Ltd." to "Toy Quest Ltd.," but noted that the "address and contact will remain the same."

479. 197. A few months later, in August 2014, Gary Dillman, a vendor representative for Manley and, Toy Quest Ltd., and the Iowa Judgment Debtors sent an email to Costco advising that:

> Manley has a new name.  It is now known as TOYQUEST LTD.  This was change as all Banzai product are now sold by TOYQUEST LTD.  The programs and all vendor details,

addresses, etc are the same.   Only the name change to TOYQUEST LTD.

480.   198. A Costco representative later observed that "Manley" and "Toy Quest Ltd." did in fact share the same personnel, mailing addresses, email addresses, and vendor contacts, all with email addresses ending in "manley.com.hk."

481.   199. The vendor change form that Manley and/or the Iowa Judgment Debtors submitted electronically to the retailer Michaels in September 2014 likewise listed the same address for "Toy Quest Ltd." as for "Manley Toys Limited," and the same individuals were listed as the export and shipping managers.  Those individuals continued to be Manley employees through March 2016.  Manley and/or the Iowa Judgment Debtors also checked the box for "change vendor information," not the box for "new vendor," and retained Manley's vendor ID number.

482.   200. Similarly, Michael Leddy, a U.S. representative of Manley and/or the Iowa Judgment Debtors located in Maryland, facilitated sales of Manley products to agents for multiple customers, including K-Mart in Illinois and Dollar General in Tennessee.  After the Principals decided to use the "Toy Quest Ltd." trade name for Manley sales, Leddy coordinated sales to the same buyers' agents, but claimed to be working on behalf of "Toy Quest Ltd."

483.   Manley's customers treated the change to "Toy Quest" as purely a change in nomenclature.

484.    For example, Michaels's Accounts Payable ledger lists "Manley Toys, Ltd. Dba Toy Quest Ltd" as the payee for all payments, despite a vendor change form submitted by Manley.

485.    Similarly, Seventh Avenue directed at least twenty purchase orders to "Toy Quest Ltd (Manley Toys)."

486.    201. Employees of Manley employees and/or the Iowa Judgment Debtors likewise continued to use "Manley" and "Toy Quest Ltd." interchangeably.  For example, the subject line of a November 2014 email from Gary Wong to Seventh Avenue referred to a purchase order for "Toy Quest Ltd (Manley Toys . . .)."  Wong introduced himself as "Gary Wong from Toy Quest Ltd," but used a Manley email address, garywong@manley.com.hk, and his signature block identified him as a Manley employee.

487.    202. Multiple Manley employees of Manley and/or the Iowa Judgment Debtors also signed their emails in 2013 and 2014 on behalf of both "Manley Toys Ltd." and "Toy Quest Ltd.," or even on behalf of "Manley Toys Ltd.  / Toy Quest Ltd."

488.    Yet in sworn court filings, Defendant Toy Quest Ltd. has stated that it had "no employees" and was an altogether different company from Manley.

489.    For example, in August 2014, after Manley and Manley employees had used the trade name "Toy Quest Ltd." to sell toys to U.S. retailers for over a year, Toy Quest Ltd. told the Southern District of Iowa that it had no employees.

490.    Manley repeatedly has said that it does not represent Toy Quest Ltd., so the Manley employees using the "Toy Quest Ltd." name could not have been acting simultaneously on behalf of Toy Quest Ltd.

491.    In January 2016, Defendant Toy Quest Ltd. likewise represented to a federal court that although an entity calling itself "Toy Quest" had been selling toys in New York, Toy Quest Ltd. "does not engage in sales in the United States" and "does not transact any business in the United States."

492.    203. As admitted in sworn court filings in Iowa and other jurisdictions, Defendant Toy Quest Ltd. had "no employees," was a different company than Manley, and was never represented by Manley.  Consequently, when Manley employees transacted business usingAccordingly, the so-called "Toy Quest Ltd." name, they mustentity operating in the United States, taking orders from retailers, and obtaining rights to payment from those retailers could only have been doing so on behalf of their employer Manley, not on behalf of defendant Toy Quest Ltd., athe separate company.

204.    Other facts confirm that when retailers did business with " Toy Quest Ltd.," they still were doing business with Manley, not with Defendant Toy Quest Ltd. or any other company.

493.    205. IndeedMoreover, for some licensed products, only Manley was authorized to sell the products in the United States, yet retailers were instructed to place orders for the products with "Toy Quest Ltd." rather than Manley.

494.    206. For example, only Manley and Aquawood were authorized in 2013 and 2014 to sell Crayola products in the United States, and those rights were not assignable.

Nevertheless, Manley employees using the "Toy Quest Ltd." trade name accepted multiple orders for Crayola products from Dollar General Corp. ("Dollar General") and Big Lots.

495. 207. Manley and/or the Iowa Judgment Debtors also continued to fill "Toy Quest Ltd." orders up until shortly before Manley's liquidation.

496. 208. In November 2014, Michaels placed a series of orders that Manley and/or the Iowa Judgment Debtors initially acknowledged and began to fulfill under its own Manley's name before cancelling the orders and reissuing invoices and packing slips—with the same invoice numbers, purchase order numbers, and dates—in the name of "Toy Quest Ltd."  The invoices also list the identical physical address, telephone number, fax number and "@manley.com.hk" email addresses for "Toy Quest Ltd." as for Manley, and identify "Toy Quest Ltd." as "a division of Manley."

497. 209. In addition, prior to Manley's liquidation, Manley continued to be listed on purchase orders as the ultimate payment beneficiary for many transactions, despite the SLB Enterprise's increasing use of the "Toy Quest Ltd." name with retailers.

498. 210. For example, Dollar General issued purchase orders dated February 18, 2013 and June 27, 2013 that listed "Toy Quest Limited" as the "Vendor," but identified "Manley Toys Ltd" as the "Beneficiary" and provided that payment be sent "Direct to Beneficiary."

499. 211. Seventh Avenue also received invoices from both "Manley" and "Toy Quest" through 2014 but continued to make all payments through irrevocable letters of credit that named "Manley Toys Limited" as the sole beneficiary.

### c. Members of the SLB Enterprise Deceived Retailers to Generate a False Paper Trail.

212. Defendants' fraudulent scheme to use the "Toy Quest Ltd." trade name to disguise Manley sales worked largely as planned, resulting in (a) the creation of false records that Defendants knew were materially false but would be relied upon by courts, creditors, and Manley's liquidators in Hong Kong (the "Liquidators"), and (b) retailers directing payments to Defendant Toy Quest Ltd. that really were due to Manley.

213. The purpose of this scheme was to impede collection efforts, cause Manley's creditors and Liquidators to think that receivables were not actually owed to Manley, and, ultimately, to deprive independent creditors of money.

500. 214. A series of transaction documents Documents concerning a single Seventh Avenue purchase in late 2014 and early 2015 illustrates the illustrate Defendants' false narrative Defendants were attempting to create.:

- a) Seventh Avenue issued the purchase order to "Toy Quest Ltd (Manley Toys)." b) The invoice and packing list were issued on "Manley Toys Ltd." letterhead and the invoice was executed "For and on Behalf of" "Manley Toys Ltd.," but the packing list was executed by "Toy Quest Ltd."

- c) And while the cargo receipt for the purchase order listed the shipper as "Manley Toys Ltd.," the express release form listed the shipper as "Toy Quest Ltd."

- d) Defendants' scheme was designed to create a false record so that, if Seventh Avenue ever were garnished or otherwise subject to execution for judgments against Manley, the SLB Enterprise could hide behind the "Toy Quest Ltd." name and assert spurious objections to collection.

501. 215. Purchase orders from retailers Dollar General and Big Lots similarly show tell the same story—a sudden shift from the "Manley" in name to the "Toy Quest Ltd." name that Defendants orchestrated shortly after the Minnesota with no change in substance:

- Before Aviva's judgment was entered against Manley in August 2013.

a) Before that time, Dollar General placed more than 70 orders with "Manley" and none with "Toy Quest Ltd." But in the two years after the judgment, Dollar General placed more than 30 orders with "Toy Quest Ltd." and only two with "Manley."

- b) Similarly, Big Lots placed hundreds of orders under the "Manley" name in the beginning of 2013, and continued to place orders primarily under the "Manley" name until May 2014. After that point, Big Lots placed orders exclusively under the "Toy Quest Ltd." name, even though it was buying exactly the same items it had been buying from "Manley."

129

216.   This switch in name has allowed Defendants to deceive retailers

**D.     Defendants Falsified Financial Records to Deceive Creditors, the Courts, and Manley's Liquidators.**

502.   Defendants' fraudulent scheme to exploit the "Toy Quest Ltd." trade name to conceal Manley's sales worked largely as planned, resulting in (a) the creation of false sales and financial records that Defendants knew were materially false but would be relied on by courts, creditors, and Manley's Liquidators into believing that money due to Manley is instead due to a separate company, Defendant Toy Quest Ltd.

217.   As a result, multiple retailers who purchased millions of dollars of products from Manley subsequently paid Toy Quest Ltd. millions of dollars in exchange for those Manley products.

            **d.     Defendants Fraudulently Recorded Manley Sales as Toy Quest Ltd. Sales to Mislead Creditors and Manley's Liquidators.**

218.   The SLB Enterprise's records demonstrate that Defendants fraudulently recorded Manley sales using the "Toy Quest Ltd." name as sales by Toy Quest Ltd. and other SLB Companies, thereby generating false financial documents that Defendants could pass on to Manley's Liquidators., and (b) retailers directing payments to Toy Quest Ltd. that really were due to Manley or its creditors.

503.   Exhibits G & H to Aviva's Complaint, for example, show payments that the retailers Target and Bed Bath & Beyond made to Toy Quest Ltd. that should have been made to Manley for distribution to its creditors.

504.   219. As shown by the solid red line in the graph below, according to Manley's internal financial documents— which Defendants knew would be available to and relied on by

130

show that Manley's Liquidators—Manley's sales dropped precipitously throughout 2013, at the same time as that multiple massive judgments were entered against Manley.

505. 220. However, as discussed above, Manley's sales did not really plummet in 2013; Manley merely conducted those sales using the "Toy Quest Ltd." name rather than the ". Rather, the Principals and Hong Kong Entities simply stopped recording sales under Manley"'s name.

221. The Principals and Toy Quest Ltd. directed the enterprise to, and instead falsely record recorded the Manley sales as sales by other SLB Companies, such as Toy Quest Ltd., MGS, and Toy Network-HK.

506. Defendants later provided these doctored financial statements from Manley and other SLB Companies to Manley's Liquidators, with the expectation that the Liquidators would rely on them.

507. 222. As shown by the blue line in the graph below, those Those companies went from having zero sales to a projected $40 million in sales in less than two years. (The dotted portion of the blue line is derived from data contained in Manley's insurance applications, in which Defendants provided information about total annual U.S. sales for all named insureds, including Toy Quest Ltd.) mid-2015.



**3.     The Principals Established Park Lane to Defraud Manley's Independent Creditors.**

223.    On February 29, 2016, less than a month before liquidating Manley, the Principals formed Park Lane, another SLB Company that operates from the same office building as Manley (and Toy Quest Ltd., and several other SLB Companies), one floor away from where Manley used to be.

224.    The Principals created Park Lane to drain Manley of resources and assume possession of Manley's documents, thereby keeping those resources and documents away from Manley's creditors and Liquidators but within the control of the SLB Enterprise.

225.    On or about March 17, 2016, the SLB Enterprise reassigned nearly all of Manley's employees to identical positions at Park Lane.  Defendants Liu and Alan Chan, for example, hold the same positions at Park Lane that they held at Manley—"managing director" and "manager," respectively.

226.    Park Lane employees continued to sell the same Manley products to the same Manley customers, using their @manleyservices.com.hk email addresses.

227.    Those same employees lied to retailers and other customers of the SLB Enterprise, falsely claiming to represent Toy Quest Ltd., when in fact they represented Park Lane and neither did nor could represent Toy Quest Ltd.  As discussed above, Toy Quest Ltd. actually had "no employees."  The individuals who suddenly worked for Park Lane had been working for Manley, not Toy Quest Ltd.  They had been selling products for Manley, not Toy Quest Ltd. And they had been generating revenue that should have been recorded as Manley revenue.

228.    Many of those employees continue to sell the same products to the same customers to this day.

**4.    The SLB Enterprise Continues to Conduct Business with the Same U.S. Retailers While Avoiding the Judgments of U.S. Courts.**

**a.    In 2016, the SLB Enterprise Began Selling Manley Products Through Banzai International.**

229.    In 2016—as Aviva was seeking injunctive sanctions from the Minnesota Federal Court and gathering and presenting evidence to courts around the country that "Toy Quest Ltd." was a Manley trade name and that sales to "Toy Quest Ltd." were really sales to Manley—the SLB Enterprise started using yet another company, Banzai International Ltd., to make it easier to continue evading independent creditors.

230.   Like "Toyquest" and "Toy Quest Ltd.," "Banzai" was a registered trademark of Manley.  "Banzai" also was the name of one of Manley's leading toy lines.  Manley's deceptive marketing for its "Banzai" products formed the basis of the allegations in the lawsuit that led to Aviva's judgment against Manley.

231.   Import records show the shift from "Toy Quest Ltd." to "Banzai International Ltd."

232.   For example, between January and May 2016, Defendant Dollar Empire received over one hundred shipments—weighing a total of more than 860 tons—from "Toy Quest Ltd." Starting in December 2016, however, Dollar Empire no longer received shipments from "Toy Quest Ltd." and instead began to receive shipments from "Banzai International Ltd."  Many of these shipments from "Banzai International Ltd." contained exactly the same products—often using the same names and packaging—as prior shipments from "Toy Quest Ltd."

233.   The last imports of "Toy Quest Ltd." to the United States were in August 2016, around the same time that Toy Quest Ltd. supposedly sold its assets to Banzai International.

234.   Banzai International, on the other hand, is still importing thousands of tons of Banzai products to the United States, including more than 1,290 tons of merchandise in 2018 and more than 439 tons of merchandise in just the first two months of 2019.

235.   The instruction manuals of many of the "Banzai" products currently listed on www.banzaifun.com still identify those products as "Toy Quest" products, and many of the products were previously imported to the United States by "Toy Quest Ltd."  Before that, the products were sold by Manley as "Manley," "Toy Quest" and "Banzai" products (using trade names that belonged to Manley).

236.   For example, in 2013 and 2014, the Banzai brand "Speed Curve Water Slide" was sold to retailers such as Big Lots using the "Manley" name.  That same toy is now being imported to Dollar Empire and others by "Banzai International Ltd." and is advertised on the website www.banzaifun.com, but still has an instruction manual containing a "Toy Quest" logo.

b.   **The SLB Enterprise Now Sells Manley Products Through Additional Trade Names Such as Genesis.**

237.   To evade creditors, the Principals, various Corporate Shell Defendants, and other members of the enterprise have sold Manley products other than Banzai using a series of trade names.

238.   Tekno (sometimes Teksta) robots, for example, were originally sold under the "Manley" name and then the "Toy Quest" name, and now are sold under the name "Genesis."

239.   The "Manley Toy Quest Corporation" first registered the "Tekno the Robotic Puppy" mark in 2001.  Shortly before that mark was cancelled in 2008, Manley itself filed to register the mark "Tekno" for use with "robotic toy dogs."  The owner's manual for the original Tekno the Robotic Puppy identified it as a Manley Toy Quest product.

240.   The "Manley" name now has been stripped from all Tekno brand products.

241.   Instead, Defendants shifted those products to the "Toy Quest" name, and then to the "Genesis" name, as evidenced by the instruction manuals for Tekno products.

242.   Approximately half of the instruction manuals on www.tekno-robotics.com (the current website for Tekno products), including the instruction manual for Tekno the Robotic Puppy 4.0, identify the products as "Toy Quest" products.  The other half of the instruction manuals, including the instruction manual for Tekno the Robotic Puppy 5.0, identify the products as "Genesis" products.  (The website www.genesis-toys.com, which has the same logo as the

instruction manuals, contains pages for all Tekno/Teksta products, including Tekno the Robotic Puppy 4.0 and 5.0.)

243.   A July 2016 press release for Tekno Newborns states that the Tekno "franchise" belongs to Genesis, quotes Defendant Magalhaes, and directs inquires to press@epic-studios.com.

244.   Defendants continue to export hundreds of tons of Tekno products to the United States, often without bothering to list a "shipper."

245.   When Defendants do include a shipper, they now use the name "Genesis Industries."

246.   These are the same product lines that

508.   This was a period during which the people selling the SLB Products worked for Manley and/or other SLB Companies; Toy Quest Ltd. claimed in sworn court filings in Iowa to have "no employees."

509.   In addition to frustrating creditors' efforts to trace the assets of judgment debtors and their successors, the false sales and financial records enabled members of the SLB Enterprise used to sell using the name "seize Manley."

**5.   The SLB Enterprise Has Cheated Independent Creditors by Hiding Behind the Names of SLB Companies Run by Toth.**

**a.   The SLB Enterprise Has Evaded Judgments against MTD Held by Aviva and the Iowa Victims.**

247.   In 2015, as courts began to find MTD liable for millions of dollars to the Iowa victims, Defendants plotted to cheat MTD's independent creditors of the money they were owed by depleting MTD of all assets or business.

.

248.   Just as the SLB Enterprise moved Manley's operations to Toy Quest Ltd. and then Banzai International, it moved MTD's operations to Toy Network and then MGS.

249.   First, the SLB Enterprise moved MTD from Indianola, Iowa to Des Moines, Iowa in 2015.

250.   Then, the SLB Enterprise transferred MTD's assets and business to Toy Network, which also moved from Indianola to Des Moines.

251.   Next, the SLB Enterprise created MGS and transferred Toy Network resources to it.

252.   In June 2016, shortly after Aviva obtained the Iowa judgment against MTD, MTD dissolved.

253.   Then, over the course of a few weeks that summer, Toth's employment as "General Manager" of Toy Network ended, MGS was incorporated, and Toth's employment as "General Manager" of MGS began.

254.   Through all of these changes, Toth has retained his place in the SLB Enterprise, managing its day-to-day operations in Iowa.

255.   The impact of these changes has been to cheat Aviva, the Iowa victims, and other independent creditors of money that they were owed.

256.   As a result, Aviva has been unable to collect on either the Iowa or Minnesota judgments.

### b.   The SLB Enterprise Tricked Toys R Us, Inc. into Buying Its Products.

257.   The SLB Enterprise also has played its shell game to dupe its own creditors into paying it money.

137

258.    For years, Manley sold SLB Products, including Banzai water slides, to Toys R Us, Inc. ("TRU").

259.    On July 2006, Robin Aleo, a young wife and mother, slid down one of these slides.

260.    The defective SLB Product collapsed as Ms. Aleo neared the bottom, causing her to suffer fatal injuries after her head slammed against a concrete pool deck while her daughter and husband watched in horror.

261.    In 2011, a jury in Massachusetts awarded Ms. Aleo's estate over $19 million in damages in a wrongful death lawsuit against TRU (the "Aleo matter").

262.    TRU, in turn, spent years trying to collect money from Manley for its alleged breach of an agreement to indemnify TRU for the judgment in the Aleo matter.

263.    By 2012, TRU had made an express decision not to do business with Manley, its affiliates, or the Principals.  TRU wanted to limit its interactions with the SLB Enterprise solely to efforts to collect money owed relating to the Aleo matter.

264.    To fool TRU into continuing to do business with the SLB Enterprise, the Principals and Toth hid behind an intermediary and sold SLB Products to TRU using the name "Toy Box."

265.    As a result of the Principals' fraudulent concealment of their involvement in sales to TRU, TRU unwittingly remitted money to the SLB Enterprise that it would not knowingly have agreed to provide to the enterprise.

6. **To Stay "One Step Ahead" of Creditors, the Principals Continue to Strip Corporate Shell Defendants of Assets That Could be Used to Satisfy Judgments Against Them.**

266. The SLB Enterprise's fraudulent conduct with respect to Aviva, TRU, and its other independent creditors has been so brazen that Defendant Dubinsky openly bragged about it to Aviva's counsel even as Aviva was attempting to enforce the Minnesota judgment.

a) On September 7, 2017, after Aviva deposed Dubinsky in Los Angeles, Dubinsky declared to Aviva's counsel that Aviva had no chance of recovering anything of significant value from the Chans, their companies, or Dubinsky himself.

b) Dubinsky boasted that he, the Chans, and their various companies would always stay at least "one step ahead of" Aviva.

c) Dubinsky further explained that the enterprise is very adept at moving around assets and business relationships so that its companies can continue selling products in the United States without having any assets seized.

d) As an example of the SLB Enterprise's skill at using corporate shells to hide the true source of their products, Dubinsky bragged about the enterprise's success in tricking TRU into selling SLB Products even though TRU had decided to sever its business relationship with Manley, its affiliates, Dubinsky, and the Chans.

e) Dubinsky boasted that by selling what he called "my toys" through an entity that appeared unrelated to Manley and the Principals, Dubinsky and

the Chans were able to continue receiving money from TRU even though TRU would not willingly have done business with them.

267.   The Principals and several Corporate Shell Defendants protected the SLB Enterprise's assets by making sure that neither Manley nor Toy Quest Ltd. would have sufficient funds to satisfy Aviva's judgment.  In the same manner, the Principals, several Corporate Shell Defendants, and Toth caused MGS to take over the business operations of MTD and Toy Network when judgments were entered against those companies.

268.   There is no meaningful distinction between MTD, Toy Network, and MGS. These companies did not observe basic corporate formalities.  Indeed, many of the same employees worked at all three companies, in the same location, with the same job title and/or job duties, with little or no understanding of the distinction between these companies.

269.   At this time, MTD, Toy Network, and MGS are not adequately capitalized and the Principals—who serve as officers and directors of the companies—have funded them strictly on an as-needed basis.

270.   MTD and Toy Network filed Statements of Dissolution with the Iowa Secretary of State in 2016, but there is no record of either company following the rules related to the winding up process.

271.   Because MTD, Toy Network, and MGS are not adequately capitalized, these entities are unable to satisfy a judgment against them.

C.     **The SLB Enterprise Allows SLB Companies to Mistreat Their Employees and Customers.**

1.     **The SLB Enterprise Hired and Enabled Sadistic Managers in Indianola.**

272.   As described above, the SLB Enterprise based certain operations, including a call center for customers (the "Indianola call center") and a warehouse, at 1800 N. 9th Street in Indianola, Iowa.

   a)   The Principals, Toth, and others used the 1800 N. 9th Street address for several SLB Companies, including MTD, Toy Network, and Toy Warehouse.

   b)   The Principals, Toth, and others closely intertwined the management, assets, and operations of these companies with those of the SLB Companies located on Barry Avenue in Los Angeles (collectively known to Indianola call center employees as "California" or "corporate").

   c)   The Principals, Toth, and others also intertwined the management, assets, and operations of these companies with those of certain SLB Companies located in Manley Towers (collectively known to Indianola call center employees as "Hong Kong").

273.   In Iowa, as elsewhere, the SLB Enterprise's goal was to maximize profit while minimizing or avoiding the necessary costs of running a legitimate business in the United States.

274.   To that end, the Principals, Toth, and others kept its operations in Iowa unencumbered by traditional obligations such as corporate formalities, developing good

customer relations, or protections from what one court described as an "outrageous and hostile work environment."

275.    For example, employees at the Indianola call center did not receive any harassment policy, anti-discrimination training, or even basic information about who their employers were.

276.    This culture of corporate informality attracted, incubated, and was sustained by perpetrators such as Tim Downey and Steffen Hampton (the "call center supervisors").

277.    The call center supervisors thrived at the Indianola call center, where they were free to degrade and harass the SLB Enterprise's customers on the basis of their sex:

> a)  One of the call center supervisors muttered "suck my dick" and "anal sex" to women who called to complain about SLB Products.

> b)  The supervisor regularly claimed that these customers "wanted" him.

> c)  In the presence of his subordinates, the same call center supervisor "placed a female customer on speaker phone and told her that the only way he would send the replacement equipment she needed was if she would bark like a dog."

278.    The Sexual Harassment Debtors not only tolerated the misogynist mistreatment of the SLB Enterprise's customers, they allowed the SLB Enterprise's employees in Iowa to suffer cruel and inhumane harassment and discrimination on a daily basis.

2.      **SLB Companies Subjected the Iowa Victims to a Sexually Hostile Work Environment.**

a.      **The Iowa Victims Suffered and Were Forced to Bear Witness to Extreme Sexual Harassment.**

279.   From 2005 to 2008, Ackelson was an employee of the SLB Enterprise who worked in the Indianola call center. At various points within this time period, each of the other Iowa victims also worked in the Indianola call center as employees of the SLB Enterprise.

280.   A court later found that the Sexual Harassment Debtors "encouraged a sexually hostile environment" during this time by forcing employees to endure outrageous behavior by the call center supervisors.

281.   The call center supervisors sexually harassed the Iowa victims by referring to them by vulgar sexualized terms.

a)   These slurs—including "Bitch," "Whore," "Slut," "Sexy Tits," "Big Boobs," "Sweet Cheeks," and "Cunt"—were directed at the Iowa victims on a daily or sometimes hourly basis.

b)   These slurs were often yelled at the Iowa victims in connection with work-related commands, such as "Go do your invoicing, Whore!" or "Get to work, Bitch!"

282.   The call center supervisors sexually harassed each of the Iowa victims with physical sexual acts such as the following (and often laughing afterwards):

a)   Trying to force her head down to a supervisor's genital area;

b)   Grabbing at and/or rubbing her buttocks, back, head, shoulders, or arms ;

c)   Trying to massage her shoulders before talking to her about sex;

d)   Simulating pelvic thrusts behind her when she bent over;

143

e) Blowing in and/or whispering in her ear or hair; and

f) Holding up money in order to encourage female employees to strip naked.

283. The call center supervisors sexually harassed female employees by asking them sexually coercive questions, such as the following questions they asked of Ackelson:

a) Whether she liked anal sex;

b) Whether she preferred "doggie style" to anal sex;

c) Whether she was wearing a bra; and

d) Whether a supervisor could touch "just one" of her breasts.

284. The call center supervisors sexually harassed each Iowa victim by making other demeaning comments, noises, or gestures in references to female breasts, including:

a) Threatening to pinch her nipple;

b) Making milk sucking sounds;

c) Asking if a spot on her shirt meant that she was "leaking milk";

d) Expressing a desire to see her wear clothing that revealed more cleavage;

e) Stating that a blouse would look better "laying on my bedroom floor"; and

f) Approaching her from behind and making hand motions of massaging her breasts.

285. The call center supervisors sexually harassed the Iowa victims by subjecting them to lewd and graphic claims about their sexual activity and preferences such as:

a) Discussing the size of and uses for one's own penis;

b) Discussing having a "stench on [one's] finger for two days" after "finger banging a chick";

144

c) Using language like "cock into her pussy" and "hot dog in the bun" to brag about sexual exploits;

d) Declaring that the friend of one of the Iowa victims "would love this cock";

e) Professing to "love tight pussy—like a 14 year old"; and

f) Suggesting that it would be "fun" to engage in sexual intercourse with a supervisor atop the popular children's toy "Sit N Spin."

286.   The call center supervisors sexually harassed the Iowa victims by sexualizing children and adults depicted in personal photographs that they kept in their cubicles.

a) The call center supervisors drew pictures of exposed women's breasts on the Iowa victims' personal pictures, including right next to the mouth of Ackelson's newborn granddaughter.

b) One supervisor told Ackelson that her 14 year old daughter was "hot" after seeing a picture of the child in Ackelson's cubicle.

c) The supervisor then began talking about 14 year old girls having firm breasts and buttocks.

287.   In addition to suffering the sexual harassment described above, each of the Iowa victims was forced to witness other female employees suffering similar if not identical abuses.

**b.   The Iowa Victims Were Targeted Because of Their Sex.**

288.   The sexual harassment suffered and witnessed by the Iowa victims was part of a pattern in which the Sexual Harassment Debtors allowed them and other female employees to be subjected to discriminatory treatment based on their sex, including:

145

a)  allowing male employees to play games on the internet while female employees were required to work;

b)  requiring female employees to carry a full work load while not requiring male employees to even answer phones;

c)  allowing the call center supervisors to assign most of their work to female employees so that they could spend the majority of the work day on internet dating sites; and

d)  retaining male employees while laying off female employees.

289.   One of the call center supervisors explained to a female employee: "I keep you women to handle the bullshit jobs."

290.   The call center supervisors also subjected the Iowa victims to symbols of male superiority and violence.

291.   The call center supervisors also openly discussed their mutual belief that "all women are whores."

3.   **The Iowa Victims Filed Complaints Because the Sexual Harassment Debtors Refused to Protect Them.**

292.   Despite numerous requests by Ackelson and the other Iowa victims, the call center supervisors refused to cease their constant sexual harassment of or discrimination against female employees.

293.   Instead of honoring these requests to stop, the call center supervisors responded with even more misogynist abuse, including the following comments:

a)  "Calling you a whore should be a compliment, considering the other names you have been called"; and

b)  "Why do women need to be so soft?  This is why men run shit."

146

294.    Ackelson complained to management at the Indianola call center, but these complaints did not result in any consequences for the supervisors nor an end to the sexual harassment.

295.    Ackelson also complained to "Hong Kong" and "California" on behalf of herself and the Iowa victims, but these complaints did not result in any consequences for the call center supervisors nor an end to the sexual harassment.

296.    After a female employee complained to "California" about the harassment, Downey screamed at her in front of many other employees:  "Don't ever try to contact them again. You are nothing but sex slaves to them anyway."

297.    Downey, the highest ranked employee at the Indianola call center, elaborated: "You think Hong Kong cares about women? They got kids working for cents."

298.    Trapped in a workplace in which they suffered and/or witnessed ongoing sexual harassment, discrimination, and retaliation, each of the Iowa victims suffered physical and emotional distress.

299.    After the Sexual Harassment Debtors refused to address and remedy the ongoing sexual harassment and discrimination at the Indianola call center, the Iowa victims sought relief from the Iowa Civil Rights Commission and the courts.

D.    **The Principals and Other** assets and send them out of the country even after the bankruptcy stay prohibiting all attempts to take or transfer Manley U.S. assets was put in place.

510.    Exhibit F to Aviva's Complaint, for example, reflects payments of more than $3 million of Manley assets that Dollar Empire and Wu conspired with the

Principals, Hong Kong Entities, Aquawood, Toth, and Iowa Entities to divert to Toy Quest Ltd. after the bankruptcy stay was entered.

    **E.**    **Defendants** ~~Abused Legal Process around the World to Protect the SLB Enterprise's Assets.~~**Lied to Courts.**

511. ~~300.~~ The Principals have ~~conspired with other~~ Defendants ~~to retain control of money that was rightfully due to~~repeatedly have misled courts in their efforts to evade the judgments of Aviva and other independent creditors ~~by deceiving courts and litigants around the country~~.

~~301.   To accomplish this goal, the Principals have dispatched attorneys to disrupt the administration of justice by presenting meritless motions and filings intended to create delay, distractions, and outcomes other than the requested relief.~~

~~302.   The Principals have used Corporate Shell Defendants, including Toy Quest Ltd., Wellmax, Jun Tai, and Winning, to conceal their influence in conducting and funding sham litigation.~~

~~303.   The Principals have directed attorneys, including Mann, to file motions and advance positions that are both baseless and designed to achieve ulterior purposes.~~

~~304.   These crude tools of obstruction have been condemned by courts as being "improper," "misguided," and "indefensible."~~

512.   They have done so with the assistance of lawyers who have appeared repeatedly on behalf of multiple SLB Companies across the country and served as the willing conduits of Defendants' misrepresentations.  Such lawyers have included Monte Mann of Novack and Macey LLP ("Novack") and Stephen Raucher of Reuben Raucher & Blum ("RRB").

1.   ~~The SLB Enterprise Attacked Independent Creditors with Sham Litigation in Hong Kong.~~**Toy Quest Ltd. and Samson Chan Submitted Fabricated Evidence and an Affirmation from a Fictitious Person in Hong Kong Litigation.**

513.   ~~305. As independent creditors asserted their rights against Manley and MTD in U.S. courts, the~~The Principals ~~retaliated by directing~~caused Toy Quest Ltd. to ~~pursue vexatious litigation~~file a lawsuit in Hong Kong~~.~~

~~306.   On March 30, 2016~~ against Aviva.  In that lawsuit, Toy Quest Ltd. ~~filed suit against Aviva in Hong Kong seeking~~sought alleged "damages" resulting from Aviva's judgment collection efforts, a declaration that Toy Quest Ltd. is not an alter ego of Manley, and an injunction blocking the post-judgment discovery served on Manley that ~~the Minnesota Federal~~this Court already had ordered Manley to answer.

514.   The purpose of that lawsuit was to intimidate Aviva, to circumvent the authority of the District of Minnesota and other courts, and to interfere with Aviva's efforts to collect on its judgment.

515.   ~~307.~~A few months previously, the Principals also had caused Toy Quest Ltd. ~~also filed suit~~to file a similar lawsuit in Hong Kong against all of the ~~five~~ Iowa ~~victims~~Claimants except Ms. Miller.

516.   Among other things, Toy Quest Ltd. sought a declaration that Toy Quest Ltd. is not an alter ego of ~~Manley or~~MTD, Toy Network, Aquawood, or Manley; an injunction barring the Iowa ~~victim~~Claimants from pursuing discovery relating to Toy Quest Ltd. from ~~Manley or~~MTD, Toy Network, Aquawood, or Manley; and damages.

517. ~~308. Manley likewise filed suit in Hong Kong against the Eclipse Group, which is Manley's former U.S. counsel and is now one of its independent creditors.~~ Toy Quest Ltd. and Manley even filed a lawsuit in Hong Kong against their own Iowa-based defense counsel, Ahlers & Cooney, which had represented MTD and Toy Network in the Iowa Claimants' cases in Iowa.  Toy Quest Ltd. and Manley sought an injunction preventing Ahlers & Cooney from pursuing discovery from Toy Quest Ltd. or Manley, or garnishing property "relating" to Toy Quest Ltd. or Manley.

~~309.   Through these Hong Kong lawsuits, the Principals have attempted to use the Hong Kong legal system to deprive independent creditors of what they are owed by circumventing litigations already underway in U.S. courts.~~

~~310.   This vexatious litigation targeted Aviva and the Iowa victims, all of whom had no contacts in Hong Kong and had obtained U.S. judgments against SLB entities based on those entities' U.S. activities.~~

~~311.   To support this vexatious litigation, Toy Quest Ltd. submitted an affidavit from Chan, who directed the litigation in coordination with the other Principals.~~

~~312.   Toy Quest Ltd. also submitted at least one fabricated affidavit from a fictitious person.~~

518. ~~313. Specifically, on~~On August 16, 2016, Toy Quest Ltd. ~~filed an Affirmation of~~submitted a purported sworn affirmation from a person supposedly named "Gary Swerdlow" (the "Swerdlow Affirmation") ~~before~~in the Hong Kong ~~court.~~lawsuit that Toy Quest Ltd. brought against Aviva.

519.   The Swerdlow Affirmation ~~alleged that~~was submitted to support the argument that Aviva's judgment enforcement efforts had caused Toy Quest Ltd. ~~had suffered damages from a loss of~~to lose business in the United States ~~due to~~.

520.   Aviva~~'s efforts to enforce the judgment against Manley.~~

~~314.   Upon information and belief~~ believes that the Swerdlow Affirmation is false and fraudulent in its entirety. ~~For example:~~

521.   ~~a)~~The Swerdlow Affirmation gave Swerdlow's address as 1008 Homer Street #508, Vancouver, BC. ~~b)~~That claim was false~~; no.~~ No such person resided or worked there, because the address does not exist.

522.   Diligent subsequent efforts by Aviva to identify anyone named Gary Swerdlow who works in the toy industry or lives in Vancouver have failed.

523.   ~~c)~~The Swerdlow Affirmation also alleged that Swerdlow had spoken to several retailers on behalf of Toy Quest Ltd., including Hot Topic, Dollar General, Home Depot, and Jet.com.

~~d)      None~~Aviva subsequently learned that none of those retailers had any record of Swerdlow, and Hot Topic provided a declaration that its personnel had never spoken to anyone named Gary Swerdlow on behalf of Toy Quest Ltd.

~~e)      In fact, despite a thorough search, Aviva cannot find any evidence that "Gary Swerdlow" of Vancouver, Canada even exists.~~

524.   On the same day the Swerdlow Affirmation was submitted, Samson Chan also submitted an affirmation.  Attached as "evidence" to his affirmation was a fabricated

fax purportedly from Swerdlow that summarized his supposed conversations with retailers.

> ### 2.  ~~To Protect the SLB Enterprise from Garnishment Actions, the Principals Directed Sham Litigation Defendants and Corporate Shell Defendants to Lie to U.S. Courts.~~The Principals Have Directed SLB Companies to Interfere with Garnishment Proceedings on False Pretenses.

525. ~~315.~~ To enforce ~~the Minnesota~~its judgment against Manley, Aviva brought a series of garnishment actions seeking funds from retailers that had conducted business with Manley when it was using the "Toy Quest" trade name.

~~316.   Toy Quest Ltd. conspired with other Defendants to protect the SLB Enterprise by interfering with garnishment actions brought by Manley's creditors.~~

526. ~~317. For example~~One such action was brought in the Middle District of Tennessee, so that Aviva ~~registered its judgment in the Middle District of Tennessee and opened a miscellaneous action there (the "Tennessee Action"), then filed a Motion for Judgment in the Tennessee Action to obtain~~could garnish funds owed by the retailer Dollar General to Manley.

527. ~~318. There, the~~The Principals dispatched Defendant Wellmax to contest Aviva's garnishment ~~by~~.

528. Wellmax operated out of space leased from and/or occupied by Manley, and Wellmax was listed as a named insured on Manley's insurance policy, along with Toy Quest Ltd., Aquawood, and other SLB Companies.  Samson Chan was one of the initial directors of Wellmax.

529. Wellmax falsely ~~asserting~~ asserted a security interest in the Dollar General funds~~.~~

~~319.   Wellmax's,~~ but its alleged security interest was a sham.

530. ~~320.~~ Wellmax had no evidence of any actual security interest in Manley's or Toy Quest Ltd.'s receivables and had taken none of the actions necessary to perfect a security interest in the United States or Hong Kong.

~~321.   As Aviva demonstrated with documents and expert testimony regarding Hong Kong's system for perfecting security interests, the Principals had concocted Wellmax's alleged security interest with no legal or factual basis.~~

531. ~~322.~~ Wellmax had no response to ~~Aviva's evidence~~ these facts.~~323.~~   Instead, Toy Quest Ltd. suddenly entered an appearance and sought to ~~intervene to oppose~~ challenge Aviva's ~~Motion for Judgment~~ garnishment.

532. ~~324.~~ Having been exposed as a sham intervenor, Wellmax withdrew from the ~~Tennessee Action~~ case within a few hours of Toy Quest Ltd. entering its appearance.

533. ~~325.~~ Toy Quest Ltd.'s decision to intervene in the Tennessee Action was made at the direction of Dubinsky, ~~Mann,~~ Gary Chan, Mann, and ~~attorney Stephen Raucher of Reuben Raucher & Blum ("RRB")~~ Raucher.

534. ~~326. In its proposed opposition,~~ Toy Quest Ltd. ~~demanded~~ proceeded to demand approximately $100,000 that Dollar General had paid into the court's registry ~~in response to Aviva's garnishment of Manley accounts receivable~~, but offered no evidence to

refute Aviva's argument that Manley had done business using the "Toy Quest Ltd." name.

535.   ~~327.~~ Like Wellmax, Toy Quest Ltd. intervened ~~not to protect its own assets, but~~ to interfere with the ability of Manley's creditors to collect Manley assets.

536.   ~~328.~~ Moreover, Toy Quest Ltd.'s attempt to seize these assets constituted a willful violation of ~~18 U.S.C. § 152 as well as the Bankruptcy Stay.~~

~~329.   Upon learning of this attempt to seize assets subject to the Bankruptcy Stay, the Bankruptcy Court imposed sanctions against~~ the bankruptcy stay imposed when Manley sought recognition of its liquidation in the United States.  As discussed in more detail below, Toy Quest Ltd. was sanctioned for that stay violation.

### 3.   Alan Chan Lied to the Iowa Federal and State Courts.

537.   In 2013, Alan Chan submitted affidavits in both Iowa federal and state courts in which he swore that Manley did not own property in the United States or in the State of Iowa, did not derive revenue from services rendered in Iowa, never maintained any bank accounts or assets or financial interest in Iowa, and never owned, rented, or leased property in Iowa.

538.   All of these claims were false, and Alan Chan knew they were false.

539.   At the time, Manley maintained offices in Indianola and Los Angeles.

540.   Manley also owned property in Iowa, and had numerous other assets and financial interests in Iowa.

541.     In January 2015, with the Iowa Claimants' trials approaching, the Principals caused Toy Warehouse to sell the Indianola facility for more than $6.1 million.

542.     On January 8, 2015, to ensure that this money could not be used to satisfy judgments obtained by the Iowa Claimants, Alan Chan wired building sale proceeds of $6,198,456.10 from Iowa to Manley's Hang Seng Bank account in Hong Kong.

543.     Alan Chan's false statements were material in that they were intended to persuade the courts that they did not have jurisdiction over Manley and that the Iowa Claimants' claims against Manley should thus be dismissed.

544.     The affidavits were electronically submitted in July or August 2013 to the Southern District of Iowa in Ms. Rennenger's case and Ms. Roush's case and to the Iowa state court in Ms. Ackelson's case and the combined case of Ms. Drake and Ms. Miller.

### 4.     Other False Statements to Courts

545.     Defendants made many other false statements to courts.

546.     The following table summarizes false court filings asserting that Manley and Toy Quest Ltd. kept separate accounts and did not commingle funds.  The purpose of those misrepresentations, which were transmitted to the courts in interstate and foreign commerce through the courts' electronic case filing systems, was to conceal the true activities of Manley and Toy Quest Ltd., thereby permitting the SLB Enterprise to conduct business using the "Toy Quest Ltd." name while evading liabilities.

| False and Fraudulent Communications to U.S. Courts | | | |
|---|---|---|---|
| Date | Purported Sender | Recipient | Content |
| 5/4/15 | Toy Quest Ltd. and Francis Wong | U.S. Dist. Ct. for the Northern Dist. of Tex. | Declaration of Francis Wong, on behalf of Toy Quest Ltd., falsely claiming that Manley and Toy Quest Ltd. kept separate accounts and did not commingle funds |
| 5/4/15 | Alan Chan and Manley | U.S. Dist. Ct. for the Northern Dist. of Tex. | Declaration of Chan Siu Lin a/k/a Alan Chan, on behalf of Manley, falsely claiming that Manley and Toy Quest Ltd. kept separate accounts and did not commingle funds |
| 5/4/15 | Toy Quest Ltd. and Francis Wong | U.S. Dist. Ct. for the Northern Dist. of Ill. | Declaration of Francis Wong, on behalf of Toy Quest Ltd., falsely claiming that Manley and Toy Quest Ltd. kept separate accounts and did not commingle funds |
| 5/4/15 | Alan Chan and Manley | U.S. Dist. Ct. for the Northern Dist. of Ill. | Declaration of Chan Siu Lin a/k/a Alan Chan, on behalf of Manley, falsely claiming that Manley and Toy Quest Ltd. kept separate accounts and did not commingle funds |
| 5/11/15 | Toy Quest Ltd. and Francis Wong | U.S. Dist. Ct. for the Middle Dist. of Tenn. | Declaration of Francis Wong, on behalf of Toy Quest Ltd., falsely claiming that Manley and Toy Quest Ltd. kept separate accounts and did not commingle funds |
| 5/11/15 | Alan Chan and Manley | U.S. Dist. Ct. for the Middle Dist. of Tenn. | Declaration of Chan Siu Lin a/k/a Alan Chan, on behalf of Manley, falsely claiming that Manley and Toy Quest Ltd. kept separate accounts and did not commingle funds |

547.   The following table lists false statements about the operations of SLB

Companies in several electronic court filings around the country sent in interstate and

foreign commerce.

| False and Fraudulent Communications to U.S. Courts | | | |
|---|---|---|---|
| **Date** | **Purported Sender** | **Recipient** | **Summary of False and Fraudulent Communication** |
| 12/12/16 | Toy Quest Ltd. (through counsel) | U.S. Bankr. Ct. for the Dist. of NJ | Motion to Compel Aviva to comply with Bankruptcy Stay, attempting to block discovery into Toy Quest Ltd.'s activities and forestall sanctions motion and falsely alleging that Aviva was in violation of Stay |
| 12/21/16 | Chan (through counsel) | U.S. Dist. Ct. for Dist. Of Minn. | Declaration falsely stating, *inter alia*, that Chan "retired" from "day-to-day operation[s]" and being "CEO" of Manley in 2011 and "was not aware of and made no decisions on behalf of Manley with respect to the post-judgment discovery at issue on this motion" |
| 12/21/16 | Dubinsky (through counsel) | U.S. Dist. Ct. for Dist. Of Minn. | Declaration falsely stating, *inter alia*, that "at no time did Aquawood or [Dubinsky] have any control over or decision-making authority" with respect to Manley |
| 12/21/16 | Alan Chan (through counsel) | U.S. Dist. Ct. for Dist. Of Minn. | Declaration falsely stating, *inter alia*, that making "decisions on behalf of Manley with respect to the post-judgment discovery at issue on this motion" was not part of Alan Chan's job responsibilities |
| 1/26/17 | Toy Quest Ltd. (through counsel) | U.S. Dist. Ct for the Middle Dist. of Tenn. | Opposition to Motion for Status Conference, fraudulently claiming that funds owed by Dollar General to Manley were in fact owed to Toy Quest Ltd. |
| 1/27/17 | Toy Quest Ltd. (through counsel) | U.S. Dist. Ct for the Middle Dist. of Tenn. | Supplemental Opposition to Motion for Status Conference, seeking to take funds owed by Dollar General to Manley |
| 3/15/17 | Dubinsky (through counsel) | U.S. Dist. Ct. for the Dist. of NJ | Declaration of Dubinsky, falsely claiming that Aquawood is an independent sales representative |
| 4/11/17 | Toy Quest Ltd. (through counsel) | U.S. Bankr. Ct. for the Dist. of NJ | Opposition to motion to compel documents and information, falsely representing Toy Quest Ltd.'s dealings with Dollar General |
| 5/17/17 | Toy Quest | U.S. Bankr. | Supplemental interrogatory response, falsely |

| | Ltd. (through counsel) | Ct. for the Dist. of NJ | describing Toy Quest Ltd.'s dealings with Dollar General and Toy Quest Ltd.'s actions in response to discovery |
|---|---|---|---|
| 6/8/17 | Toy Quest Ltd. (through counsel) | U.S. Bankr. Ct. for the Dist. of NJ | Second supplemental interrogatory response, falsely describing Toy Quest Ltd.'s dealings with Dollar General and Toy Quest Ltd.'s actions in response to discovery |
| 7/18/17 | Toy Quest Ltd. (through counsel) | U.S. Bankr. Ct. for the Dist. of NJ | Opposition to motion to compel depositions, falsely representing Toy Quest Ltd.'s efforts to respond to discovery served in bankruptcy case |
| 8/15/17 | Wu (through counsel) | U.S. Dist. Ct. for the Central Dist. of Cal. | Declaration falsely stating, *inter alia*, that Dollar Empire was "just a customer" of Toy Quest Ltd. and Banzai International |
| 10/2/17 | Wu (through counsel) | U.S. Dist. Ct. for the Central Dist. of Cal. | Declaration falsely stating, *inter alia*, that Dollar Empire was a "consignee" of Banzai International without disclosing the alleged fact that Dollar Empire did not actually receive the "consigned" goods |
| 1/12/18 | Wu (through counsel) | U.S. Dist. Ct. for the Central Dist. of Cal. | Declaration falsely stating, *inter alia*, that Dollar Empire had no interest in consigned goods whatsoever and that Dollar Empire received no revenue from Banzai International |
| 4/20/18 | MTD (through counsel and its "Corporate Secretary") | U.S. Dist. Ct. for the Southern Dist. of Iowa. | Declaration falsely stating, *inter alia*, that MTD had "never done business at the address of 700 New York Avenue, Des Moines, Iowa," and that MTD "has had no employees in the United States [sic] 2013" |
| 5/24/18 | Toth (through counsel) | U.S. Dist. Ct. for the Southern Dist. of Iowa. | Affidavit by certification falsely stating, *inter alia*, that MTD "never did business" at the address of 700 New York Avenue, Des Moines, Iowa. |
| 7/3/18 | Chan (through counsel) | U.S. Dist. Ct. for Dist. Of Minn. | Declaration falsely stating, *inter alia*, that Chan "retired" from "day-to-day operation[s]" and being "CEO" of Manley in 2011 and "was not aware of and made no decisions on behalf of Manley with respect to the post-judgment discovery at issue on this motion" |
| 7/3/18 | Liu (through | U.S. Dist. Ct. | Declaration falsely stating, *inter alia*, that Liu |

| | counsel) | for Dist. Of Minn. | "was not aware of and made no decisions on behalf of Manley with respect to the post-judgment discovery at issue on this motion" |
|---|---|---|---|
| 7/3/18 | Dubinsky (through counsel) | U.S. Dist. Ct. for Dist. Of Minn. | Declaration falsely stating, *inter alia*, that "at no time did Aquawood or [Dubinsky] have any control over or decision-making authority" with respect to Manley |
| 7/3/18 | Alan Chan (through counsel) | U.S. Dist. Ct. for Dist. Of Minn. | Declaration falsely stating, *inter alia*, that making "decisions on behalf of Manley with respect to the post-judgment discovery at issue on this motion" was not part of Alan Chan's job responsibilities |
| 7/3/18 | Park Lane (through counsel and its "Manager") | U.S. Dist. Ct. for Dist. Of Minn. | Declaration falsely stating, *inter alia*, that that Park Lane "was not aware of and made no decisions on behalf of Manley with respect to the post-judgment discovery at issue on this motion" |

548.    Defendants similarly furthered their fraudulent scheme by lying to courts to block independent creditors' efforts to garnish funds, including by falsely asserting rights to money that retailers owed to Manley and making false representations in response to court-ordered discovery, as summarized in the following table.

| Wire Communications Intended to Evade Garnishment or Take Funds Owed to Manley | | | | |
|---|---|---|---|---|
| **Date** | **Purported Sender** | **Recipient** | **Method** | **Content** |
| 5/4/15 | Toy Quest Ltd. (through counsel) | U.S. Dist. Ct for the Northern Dist. of Texas. | Electronic Case Filing | Motion to Dissolve Garnishment, seeking to take funds owed by Michaels to Manley |
| 5/11/15 | Toy Quest Ltd. (through counsel) | U.S. Dist. Ct for the Middle Dist. of Tenn. | Electronic Case Filing | Motion to Quash Garnishment, seeking to take funds owed by Dollar General to Manley |
| 5/11/15 | Toy Quest Ltd. (through counsel) | U.S. Dist. Ct for the Middle Dist. of Tenn. | Electronic Case Filing | Motion to Quash Garnishment, seeking to take funds owed by Dollar General to Manley |
| 11/6/15 | Wellmax (through | U.S. Dist. Ct for the Middle | Electronic Case Filing | Motion to Quash Garnishment, seeking to take funds owed by |

| | counsel) | Dist. of Tenn. | | Dollar General to Manley |
|---|---|---|---|---|
| 11/6/15 | Wellmax (through counsel) | U.S. Dist. Ct for the Middle Dist. of Tenn. | Electronic Case Filing | Memorandum in Support of Motion to Quash Garnishment, seeking to take funds owed by Dollar General to Manley |
| 11/6/15 | S. Lee and Wellmax | U.S. Dist. Ct for the Middle Dist. of Tenn. | Electronic Case Filing | Declaration of Samuel Lee on behalf of Wellmax, falsely asserting a security interest in funds owed by Dollar General to Manley |
| 12/7/15 | Toy Quest Ltd. (through counsel) | U.S. Dist. Ct for the Middle Dist. of Tenn. | Electronic Case Filing | Motion to Intervene and Opposition to Motion for Judgment, seeking to take funds owed by Dollar General to Manley |
| 2/24/16 | Jun Tai and Winning (through counsel) | U.S. Dist. Ct. for the Dist. of Minn. | Electronic Case Filing | Motion to Intervene and oppose motion for sanctions, falsely representing the filers' connection to Manley and filed for the undisclosed purpose of delaying the sanctions motion long enough for Manley to begin bankruptcy proceedings |

**F.   Defendants Have Deceived Creditors, Manley's Liquidators, and the Courts in Connection with Manley's Bankruptcy Case.**

549.   In late 2015 or early 2016, the Principals decided to liquidate Manley in Hong Kong and seek chapter 15 recognition of the liquidation in the Bankruptcy Court.

550.   In March 2016, as a result of the petition for chapter 15 recognition, the Principals succeeded in obtaining a stay of all U.S. litigations involving Manley.

551.   At that time, Aviva was seeking injunctive sanctions against Manley that would have prevented Manley and its affiliates from importing SLB Products into the United States.  The bankruptcy stay put an abrupt halt to those sanctions proceedings.

160

552.   The Principals' pre-liquidation misconduct also prevented Manley's Liquidators from pursuing any loss-recovery claims by depriving the Liquidators of the money and documents necessary to pursue or sustain such claims.

553.   Meanwhile, all of the Defendants violated the bankruptcy stay by disguising Manley assets and sending them out of the country.

**1.**   ~~3. Faced with the Likelihood that the~~**Prior to Manley's Bankruptcy Filing, the District of** Minnesota ~~Federal Court Would~~**Was Poised to** Impose Crippling Import Sanctions on the SLB Enterprise~~, the~~ ~~Principals Used Sham Intervenors to~~ ~~Escape the Court's Authority.~~

~~330.   On September 29, 2015, Aviva served Manley with post-judgment document requests and interrogatories, which Manley ignored.  Aviva then filed a motion to compel Manley to respond~~**.**

554.   ~~331.~~On December 30, 2015, the District of Minnesota ~~Federal Court granted Aviva's motion to compel and~~ ordered Manley to respond to ~~the discovery~~Aviva's post-judgment document requests and interrogatories by January 21, 2016.  The deadline passed, and Aviva received nothing~~, and Manley and the Principals once again violated a U.S. court order~~.

555.   ~~332.~~On February 12, 2016, Aviva filed a motion for sanctions~~motion based on that violation of the court's order~~.  The sanctions motion sought monetary sanctions and an injunction preventing Manley—as well as Toy Quest Ltd. or any other intermediary, affiliate, or alter ego of Manley—from selling, importing, distributing, or shipping SLB Products into the United States~~(the "importation injunction")~~.  A hearing was set for March 1, 2016.

556. ~~333.~~ The importation injunction would have posed a major threat to the SLB Enterprise.

557. ~~334.~~ During a previous hearing, the District of Minnesota ~~Federal Court~~ expressly had warned counsel for Manley that it would impose ~~the~~an importation injunction ~~that Aviva sought~~ as a coercive sanction:

> I think that they are over there in Hong Kong or China, and they just don't care. . . . I see no alternative but to put an embargo on all importation of Bonsai products, all Manley, and Manley-related products. None may be imported into this country until the responsibilities of Manley in this litigation have been discharged. And I intend to do that only because every other avenue seems hopeless. . . . So they're going to have to care. If they are going to do business in this country, they are going to have to follow the Court's orders. So that's all there is to it. . . . I mean this is bad. This is beyond shocking. Beyond shocking. . . . [E]verything smells like a ruse, and it smells like contempt.

### 2. ~~a.~~ The Principals ~~, Toy Quest Ltd., and Novack Concealed Their Collusion from the Court.~~

~~335.   On February 19, 2016, a Minnesota attorney called counsel for Aviva to state that his firm was considering a proposed engagement as local counsel for Toy Quest Ltd. and possibly other companies related to Aviva's motion for sanctions.  That attorney said that Novack would serve as lead counsel, and asked Aviva to consent to an extension of time to file a motion to intervene and to consent to Toy Quest Ltd.'s intervention.~~

~~336.   Counsel for Aviva did not consent to this transparent effort to delay the discovery process yet again.~~

~~337.   At the direction of the Principals, Toy Quest Ltd. retained Novack.~~

~~338.   Novack also represented Jun Tai and Winning—which were not mentioned during the meet-and-confer call on February 19—in this coordinated effort.~~

339.   Dubinsky served as the "litigation agent" for Toy Quest Ltd., Jun Tai, and Winning, just as he had in multiple previous lawsuits.

340.   On February 24, 2016, at the direction of the Principals, Jun Tai and Winning filed a motion to intervene before the Minnesota Federal Court.

341.   Novack entered an appearance only on behalf of Jun Tai and Winning, while failing to disclose its simultaneous representation of Toy Quest Ltd.

342.   Toy Quest Ltd. paid for the motion but, to conceal its role from the Court, refrained from joining the motion.

343.   In this litigation, Jun Tai and Winning provided materially false information about their corporate structure to the Court.

> a)   The corporate ownership of Jun Tai and Winning and their relationship to Manley were material issues in the litigation.
>
> b)   In the motion, Jun Tai and Winning claimed that they shared one or more corporate parents with Manley.
>
> c)   However, in the accompanying corporate disclosures Jun Tai and Winning claimed that they had *no* corporate parents.
>
> d)   It was not possible for both claims to be true.
>
> e)   Accordingly, one or both claims were materially false.

344.   In addition, Jun Tai and Winning falsely alleged that they had interests that could be harmed by an import injunction affecting Manley products.

345.   The Minnesota Federal Court agreed to hear the motion to intervene on March 14, 2016, and postponed the hearing on Aviva's motion for sanctions until March 31, 2016.

-

346.   Mann appeared on behalf of Jun Tai and Winning at the March 14 hearing.  Mann (and Novack) knew that the false claims Novack was advancing on behalf of Jun Tai and Winning had no merit and were being made purely for the purpose of delay.

347.   Novack did not disclose to the court the fact that Toy Quest Ltd. and Dubinsky were coordinating the motion or that its true purpose was to disrupt the sanctions hearing and deprive the Minnesota Federal Court of its ability to enforce its judgment.

**b.      The Motion to Intervene Was a Sham.**

348.   The Minnesota Federal Court denied the motion to intervene as "grossly deficient" on March 17, 2016.

349.   The court observed that Jun Tai and Winning had failed to set forth any factual support for their claims or comply with basic procedural requirements:

> For whatever reason, the movants wholly failed to provide the Court with any facts as to who they are, what they do (*e.g.*, do they even sell or distribute Manley toys in the United States), what their interest in the sanctions motion is, what their relationship to Manley is, or how the outcome of the sanctions motion would affect them.  Significantly, their motion was unsupported by any declaration or affidavits that would permit the Court to evaluate their contention that intervention was warranted.  In fact, even their conclusory statements that they have a common ownership with Manley, but are separate legal entities, was without any evidentiary support.

350.   The Minnesota Federal Court also took Novack to task for not discharging its duty to substantiate the claims it was presenting to the court, finding that Novack's excuses deserved "no credence":

> At the motion hearing, the movants' counsel described how the movants sold toys for Manley in the past and that they now have Manley products in their inventory that they would like to sell, but may not be able to do if the District Court granted the injunction portion of [Aviva's] sanctions motion.  Of course, this was news to the Court and opposing counsel as these representations were not reflected in the movants' motion papers. Counsel then explained that the reason no supporting affidavits or declarations were filed was that the motion had to be brought hurriedly

164

and there was no time for counsel to obtain a declaration or affidavits from the movants in support of their motion. The Court placed no credence in this explanation. Counsel represents Manley and Toy Quest [Ltd.] in garnishment actions by [Aviva] around the country and had two weeks to file motion papers after [Aviva] initially filed its sanctions motion on February 12, 2016, and set the hearing for the sanctions motion for March 1.

**c.     The Delay the Sham Motion Caused Bought the Principals Enough Time to Commence Bankruptcy Proceedings that Stripped the Minnesota Federal Court of Its Ability to Sanction Manley.**

351.    The sham motion to intervene was not filed to obtain the relief requested in the motion.

352.    Rather, it was intended only as a tactic of delay.

353.    The sham motion achieved its intended result, in that the Minnesota Federal Court continued the sanctions hearing until March 31, 2016 while it heard and considered the motion to intervene.

354.    As discussed below, that delay provided enough time for the Principals to begin Manley's liquidation in Hong Kong and for Manley's Liquidators to file a petition for chapter 15 recognition and a request for emergency provisional relief to shut down all U.S. litigation relating to Manley, including the litigation before the Minnesota Federal Court and efforts by TRU to hold Manley accountable for selling the waterslide that killed Robin Aleo.

355.    Thus, with less than a week to spare before the sanctions hearing, the Principals sidestepped the Minnesota Federal Court's authority, allowing them to continue to import products into the United States (through customs fraud and money laundering schemes, described below) and take millions of dollars out of the United States, without answering for their repeated violations of the Minnesota Federal Court's orders.

356.    Years later, acknowledging the mountain of evidence against Manley and the Principals, the Bankruptcy Court stated that it did "not doubt that Toy Quest and other insiders have taken actions to avoid paying Aviva's claims," that Manley's "actions in various courts in the United States appears to have been improper," and that Manley's "decision to enter into liquidation may have been the latest step in an effort to avoid a day of reckoning in the United States."

> ### 4.    The SLB Enterprise Protected its Assets through Sham Orchestrated Fraudulent Liquidation and Bankruptcy Proceedings Designed to Escape Liability in the U.S. and Cheat Independent Creditors like Aviva.
>
> #### a.    The Principals Rigged Manley's Creditor List to Give Themselves Control over the Liquidation.

558.    357. Once the Principals realized that time was running out in Minnesota, they rushed to liquidate Manley in Hong Kong, rigging manipulating Manley's creditor list to ensure that members of the SLB Enterprise Companies would control the liquidation and convening a "Creditors' Meeting" before most independent creditors received notice.

358.    Sixteen of the seventeen "creditors" at that meeting—including Toy Quest Ltd., which had assumed most of Manley's business relationships—were members of the SLB Enterprise and controlled by Chan and his family, including Alan Chan.  The Committee of Inspection ("COI") formed to supervise the Liquidators also is controlled by the Chans and is comprised exclusively of members of the SLB Enterprise.

359.    The Principals have prevented the Liquidators from pursuing any alter ego or fraudulent transfer claims by depriving the Liquidators of the money and documents necessary to sustain such claims.  Instead, the only significant funds available to the Liquidators were

reserved exclusively for shutting down all litigation that independent creditors had brought against Manley in the United States.

> **a.   The Principals Maintained Control over the Liquidation Process by Stacking Manley's Creditor List with Sham "Creditors."**

559. ~~360.~~ In late February and early March 2016, ~~at the same time the sham motion to intervene was being filed and briefed,~~ the Principals took steps to gerrymander Manley's creditor list to make it appear that the percentage of Manley liabilities owed to ~~Manley affiliates~~SLB Companies exceeded fifty percent, thereby giving those affiliates power over the liquidation at the expense of independent creditors.

560. ~~361.~~ As of mid-February 2016, Manley owed approximately HK $125 million to two banks, Hang Seng Bank and HSBC Hong Kong.  The banks were among Manley's largest creditors.

561. ~~362. Over~~But over the next two weeks, the Principals substituted in two ~~Manley affiliates~~SLB Companies—Toy Quest Ltd. and Manley Fashion—as purported creditors of Manley by having them provide funds to Manley to pay off the bank loans.

562. ~~363.~~ If Toy Quest Ltd. and Manley Fashion had not transferred funds to Manley to pay the banks, the affiliates would not have been Manley creditors when Manley liquidated.  Indeed, financial records demonstrated that those companies actually **owed** money to Manley until shortly before Manley's liquidation.

563. ~~364.~~ Moreover, Toy Quest Ltd. and Manley Fashion were ***themselves***
obligors on the loans, meaning that those ~~affiliates~~companies were paying off ***their own
loans***, even though their payments were ~~funneled~~routed through Manley.

564. ~~365.~~ The manufactured bank loan payments ~~from Toy Quest Ltd. and Manley
Fashion through Manley to the banks~~ artificially increased the percentage of Manley's total
liabilities that supposedly were owed to ~~Manley's affiliates~~SLB Companies just enough for
~~Manley affiliates~~those companies to assert control over the entire creditor group.

### b. The Principals Looted Manley Prior to the Liquidation.

565. As discussed above, the Principals and the Hong Kong Entities looted
Manley prior to the liquidation, taking its accounts receivable, inventory, business
opportunities, goodwill, and nearly all its cash, and hiding its documents with one or
more of the Hong Kong Entities.

566. The Principals and Hong Kong Entities also divested Manley of six luxury
automobiles—a Bentley, a Ferrari, a Porsche, a Jaguar, and two Mercedes Benz sedans.

### c. ~~b.~~ Manley's Creditors' Meeting Was Timed to Prevent Aviva and Other Independent Creditors from Receiving Adequate Notice.

567. ~~366.~~ The Principals held their first meeting with the Manley's Liquidators
on March 4, 2016, the day after the final bank loan was paid off.

568. ~~367.~~ The Principals convened a "Creditors' Meeting" in Hong Kong on
March 22, 2016, the "quickest date" possible.

168

569. 368. The Principals waited to mail notice of the meeting to Manley's U.S.-based creditors until it was too late for those creditors to attend the meeting, even if they had the time and money needed to fly halfway around the world. The notices were not emailed or faxed.

570. 369. Aviva did not receive notice of the Creditors' Meeting until March 24, 2016, two days after the meeting occurred.

370. The notice was dated March 11, 2016, and was postmarked in Hong Kong on March 12, 2016, leaving only six working days for it to make it to Aviva before the meeting occurred.

571. 371. Other U.S. creditors likewise did not receive notice until after the meeting.

- The law firm that represented the Iowa Claimants in their civil rights claims against SLB Companies did not receive notice of the Creditors' Meeting until *after* the meeting occurred.

- a) The Eclipse Group, a law firm that formerly represented Manley, did not receive notice until April 4, 2016, almost two weeks after the meeting.

  b) Newkirk Zwagerman, a law firm that represents the Iowa victims in civil rights claims against SLB Companies, similarly received notice after the meeting.

- c) Out of Manley's nine U.S. creditors, only one apparently knew about the meeting sufficiently ahead of time to submit a claim form, and he apparently learned about the meeting from a source other than the mailed notice.

572. 372. The Principals thus created a situation where it was impossible for most of Manley's independent creditors to have any effective voice in the initial liquidation proceedingsproceeding.

### d. c. The Meeting Was Principals Dominated by Shamthe Creditors Who' Meeting and Commissioned a COI Controlled by"Committee of Inspection" to Direct the PrincipalsLiquidation.

573. 373. Even if some of Manley's U.S. creditors had managed to learn about and attend the Creditors' Meeting, the Principals made certain that the deck would be stacked so heavily in favor of Manley insidersthe SLB Companies that the wishes of independent creditors would be overridden.

574. 374. BeforeImmediately before the Creditors' Meeting, Samson Chan, —acting as the shareholder and "proxy holder" for Manley's parent company Teng Yue Holdings Ltd., —was literally the only person present at the "Extraordinary General Meeting" at which the resolution to initiate Manley's liquidation was passed.

575. 375. HeSamson Chan then chaired the Creditors' Meeting, in his capacity as a director of Manley.

576. 376. Of the seventeen "creditors" represented at the Creditors' Meeting, sixteen of them —including Toy Quest Ltd., which had assumed most of Manley's

business relationships—were members of the SLB Enterprise and Companies controlled by Samson Chan and, Alan Chan, and Lisa Liu.

577.   377. Either Samson Chan or Alan Chan was identified as the point of contact and signed proof of debt forms for all sixteen of them.

578.   378. The sixteen SLB creditors appointed a five-member committee of inspection ("COI") to direct the liquidation.

579.   379. Samson Chan, Alan Chan, and Liu control all five companies on the COI, including Toy Quest Ltd.

- a) Alan Chan is the sole natural-person director of three of them the companies, all of which are owned by Manley Overseas Ltd.

- b) Samson Chan is the sole natural-person director of the other two companies, Toy Quest Ltd. and Manley Fashion, which are also the entities that provided the funds to pay off the bank loans.

- c) Liu is also the "authorized signatory" for Toy Quest Ltd.

**3.   The Principals Used Sham Intervenors to Circumvent the Authority of the District of Minnesota.**

580.   On February 24, 2016, a week before Aviva's motion seeking injunctive sanctions was scheduled to be heard, the law firm Novack, which frequently represents SLB Companies, filed a motion to intervene in the District of Minnesota on behalf of two companies, Jun Tai Co. Ltd. ("Jun Tai") and Winning Industrial Ltd. ("Winning").

581.    Although Novack had been retained by Toy Quest Ltd., Novack failed to disclose its representation of Toy Quest Ltd. to the court.  And while Toy Quest Ltd. paid for the motion filed on behalf of Jun Tai and Winning, Toy Quest Ltd. refrained from joining the motion itself and instead concealed its role from the court.

582.    Dubinsky served as the "litigation agent" not only for Toy Quest Ltd. but also for Jun Tai and Winning, just as he had served as the "litigation agent" for other SLB Companies in multiple previous lawsuits.

583.    Through Novack and at the direction of Dubinsky, Jun Tai and Winning provided materially false information about their corporate ownership to this Court, claiming both that they shared one or more corporate parents with Manley and that they had no corporate parents.

584.    Jun Tai and Winning also falsely alleged that they had interests that could be harmed by an import injunction affecting Manley products.

585.    The Court agreed to hear the motion to intervene on March 14, 2016, and postponed the hearing on Aviva's motion for sanctions until March 31, 2016.

586.    On March 17, 2016, the Court denied the motion to intervene as "grossly deficient."  The Court observed that Jun Tai and Winning had failed to set forth any factual support for their claims or comply with basic procedural requirements:

> For whatever reason, the movants wholly failed to provide the Court with any facts as to who they are, what they do (*e.g.*, do they even sell or distribute Manley toys in the United States), what their interest in the sanctions motion is, what their relationship to Manley is, or how the outcome of the sanctions motion would affect them. Significantly, their motion was unsupported by any declaration or affidavits that would permit the Court to evaluate their contention

that intervention was warranted.  In fact, even their conclusory statements that they have a common ownership with Manley, but are separate legal entities, was without any evidentiary support.

587.    Indeed, it is not clear that Jun Tai and Winning are even real companies. Aviva has served discovery on Dubinsky, Aquawood, Toy Quest Ltd., Samson Chan, Alan Chan, Lisa Liu, Banzai International, and Park Lane in an attempt to locate Jun Tai and Winning so Aviva can serve them.

588.    In response, Dubinsky, Aquawood, Toy Quest Ltd., Samson Chan, Alan Chan, Lisa Liu, Banzai International, and Park Lane have maintained that they do not have a single piece of paper reflecting contact information for Jun Tai and Winning, and that they communicated only with a "Mr. Li" at a phone number that is not functional.

589.    Nevertheless, the sham motion to intervene achieved its intended result, in that the District of Minnesota moved the sanctions hearing from March 1, 2016 to March 31, 2016.

590.     That delay provided enough time for the Principals to begin Manley's liquidation in Hong Kong and direct Manley's Liquidators to file a petition for chapter 15 recognition and a request for emergency provisional relief to shut down all U.S. litigation relating to Manley, including the litigation before this Court and efforts by TRU to hold Manley accountable for selling the waterslide that killed Robin Aleo.

591.    Thus, with less than a week to spare before the sanctions hearing, the Principals sidestepped this Court's authority, allowing them to continue to import products into the United States (through customs fraud and money laundering, described

below) and take millions of dollars out of the United States, without answering for their repeated violations of this Court's orders or paying the judgments owed to Aviva and other creditors.

### 4. ~~d.~~ The Principals Have ~~Arranged for~~Paid the Liquidators to Shut Down ~~U.S.~~ Litigation ~~against Manley but Have Prevented the Liquidators~~in the U.S. While Preventing Them from Pursuing Alter Ego or Fraudulent Transfer Claims.

592. ~~380.~~ From the ~~beginning~~start of the liquidation, the Principals and the Liquidators agreed that Toy Quest Ltd. would fund efforts to stop U.S. litigations—~~including the proceedings before the Minnesota Federal Court~~— through a chapter 15 proceeding. Toy Quest Ltd. would pay the Liquidators only for work in relation to chapter 15 activities, and none of Toy Quest Ltd.'s money could be spent on liquidation activities in Hong Kong.

593. The Principals also chose and are paying the Liquidators' U.S. bankruptcy counsel, Archer & Greiner and Goodwin Procter. Toy Quest Ltd. is paying these lawyers directly (and with criminal proceeds), without going through the Liquidators.

594. ~~381.~~ Meanwhile, Manley itself paid the Liquidators only a minimal amount of money to be used in ~~the~~ Hong Kong ~~litigation~~.

595. The Principals also concealed Manley's assets from the Liquidators.

596. The Liquidators incorrectly concluded—based on records supplied by the Principals—that Manley had conducted little to no business in the United States in recent years and had less than $100,000 in realizable U.S. assets. In reality, Dollar Empire alone owed Manley more than forty times that amount.

597.   In addition, the Liquidators purportedly did not know that Manley had been operating as "Toy Quest Ltd." until the week before Manley's liquidation filing.  The Liquidators thus failed to identify as Manley assets the millions of dollars that major retailers owed to Manley for sales it made using its "Toy Quest Ltd." name.

598.   ~~382. Accordingly~~While they have had no funding to take action in Hong Kong, the Liquidators have had substantial resources—including the proceeds of criminal activity—to fight ~~Aviva and other~~ independent creditors in U.S. courts.

599.   The Liquidators have used that money to pay their lawyers to file the initial chapter 15 recognition petition that triggered the bankruptcy stay, block Aviva's efforts to take discovery and to compel Toy Quest Ltd. to comply with the bankruptcy stay, and oppose Aviva's request for stay relief to allow independent creditors to assert alter ego or fraudulent transfer claims.

600.   ~~383.~~ In Hong Kong, however, the Liquidators have had almost no money to investigate or prosecute claims involving Manley's pre-liquidation transactions or the conduct of ~~Manley insiders.~~

~~384.   The~~the Principals ~~also chose and are paying Archer & Greiner and Daniel Glosband, the Liquidators' U.S. bankruptcy counsel.  Toy Quest Ltd. is paying these lawyers directly (and with criminal proceeds), without going through the Liquidators.~~or the Hong Kong Entities.

601.   ~~385. In addition~~At the same time, the Principals have withheld documents and information from the Liquidators that ~~would enable them to pursue~~might support alter ego and fraudulent transfer claims.

602.   Manley's Liquidator Mat Ng testified that the Liquidators were not granted access to the server used to store Manley's emails, which was in the custody of "Manley's related companies."

603.   ~~386. For example, the~~The Liquidators also could not obtain documents concerning Manley's bank loans because Toy Quest Ltd. and other borrowers on the loans would not consent to the documents' production.

604.   The Principals ~~have retained possession of the servers on which~~, Aquawood, Toth, and the Iowa Entities also have withheld from the Liquidators Manley's ~~electronic~~ documents ~~are stored and have not permitted the Liquidators to access those documents.  The Principals also have prevented the Liquidators from seeing documents relating to Manley's bank loans by directing Toy Quest Ltd. and other borrowers on the loans to refuse to consent to the documents' release.~~, as well as other documents related to Manley's financial condition and assets, located in California and Iowa.

605.   The Liquidators took possession of only a small subset of Manley's books and records.

606.   The Principals refused to produce Manley's documents in response to discovery requests that Aviva and others have served in the Bankruptcy Court.

### 5. Toy Quest Ltd. and the Liquidators Were on the Verge of Entering into a Collusive Settlement, Which Was Rejected by the Hong Kong Court.

607. On February 18, 2019, Manley's Liquidators informed Aviva by letter that the Liquidators had "negotiated" a settlement with Toy Quest Ltd.

608. The proposed settlement was not negotiated "with" Toy Quest Ltd. so much as it was negotiated at the behest of Toy Quest Ltd. and its affiliates in a collusive attempt to prevent independent creditors from recovering the money rightfully owed to them by Manley.

609. All sides of the negotiation over the proposed settlement were represented by professionals who were paid by Toy Quest Ltd. and/or other members of the SLB Enterprise.

610. The Liquidators' own lawyers also have represented SLB Companies in connection with the Manley liquidation and have been paid by SLB Companies throughout the process.

611. Pursuant to the proposed settlement, Toy Quest Ltd. would have paid HK $300,000 (around US $38,700) to be distributed pro rata among Manley's independent creditors. The Liquidators themselves separately would have received another HK $300,000 under the settlement terms.

612. Aviva would have received about US $30,000 of the settlement proceeds, leaving only about US $9,000 to be split among all other independent creditors, including

the five Iowa Claimants. In all, independent creditors would have received approximately *one-tenth of one percent* of their claims.

613. In return for Toy Quest Ltd. paying this tiny fraction of Manley's debts, Manley's Liquidators would have given up Manley's rights to assert alter ego and fraudulent transfer claims against Toy Quest Ltd. and any other affiliated company or individual. The deal was intended to deprive independent creditors of the money that could be obtained through such claims and ensure that no one ever would pursue the assets the Principals took from Manley.

614. The Liquidators' February 18, 2019 letter blamed their inability to adequately investigate alter ego and fraudulent transfer claims on a lack of funds. As discussed above, the Principals deliberately orchestrated that lack of funds in Hong Kong by looting Manley prior to the Principals' commencement of Manley's voluntary liquidation proceedings.

615. At the same time, the Principals bankrolled the Liquidators' efforts to shut down litigation in the United States. Bills by the Liquidators and their professionals for work to shut down U.S. litigation were paid by the Principals, the Hong Kong Entities, and/or other SLB Companies. By contrast, bills for other work have been left unpaid.

616. Moreover, the Liquidators' letter failed to address that for years, Aviva has been providing extensive documents and information that could have formed the basis of alter ego and fraudulent transfer claims with minimal additional effort and expense from the Liquidators.

617.    The letter likewise failed to address that Aviva repeatedly had offered to prosecute alter ego and fraudulent transfer claims against Toy Quest Ltd. and the other entities and persons that looted Manley before its liquidation, but that those offers had been refused.

618.    The Liquidators petitioned the Hong Kong court to approve the collusive settlement.

619.    In July 2020, the Hong Kong court rejected the proposed settlement.  The Hong Kong court adjourned the matter for the purpose of allowing the Liquidators to attempt to negotiate a settlement that would provide more value to independent creditors.

620.    The Liquidators subsequently announced that no sufficiently enhanced settlement was likely, terminated settlement negotiations with Toy Quest Ltd., so notified the Hong Kong court and U.S. courts, and requested leave to withdraw the petition to approve the proposed settlement.

**6.      The Liquidators Have Abandoned All Fraudulent Transfer and Alter Ego Claims and Intend to Close the Hong Kong Liquidation without a Distribution to Independent Creditors.**

621.    On September 9, 2020, the Liquidators advised Aviva that the Liquidators plan to close Manley's Hong Kong liquidation proceeding.

622.    The Liquidators stated that they will make no distribution to Manley's independent creditors and are abandoning all alter ego and fraudulent transfer claims that the Liquidators could have asserted against all individuals and entities, including principals and affiliates of Manley.

623.    In March 2021, the Liquidators held a final creditors meeting and filed the necessary paperwork with the Hong Kong Registrar of Companies to dissolve Manley. According to the Liquidators, Manley will be dissolved three months thereafter, around the end of June 2021.

**7.    At Toy Quest Ltd.'s Insistence, Manley's Liquidators Sought to Destroy All Manley Documents in Their Possession.**

624.    After abandoning their proposed collusive settlement, Manley's Liquidators sought to destroy all Manley documents in their possession as their last act before closing the liquidation.

625.    The Liquidators stated to Aviva and the Bankruptcy Court that they intended to destroy the documents because the "committee of inspection" instructed them to do so.  The committee of inspection is comprised entirely of Manley affiliates, including Toy Quest Ltd.

626.    After the Liquidators rejected all of Aviva's proposals to preserve the documents, Aviva sought and obtained relief from the Bankruptcy Court.

**8.    The Bankruptcy Court Ordered the Liquidators to Preserve Manley's Documents and Granted Stay Relief to Aviva.**

627.    In February 2021, the Bankruptcy Court ordered the Liquidators to preserve Manley's books and records through at least June 30, 2021.

628.    The Bankruptcy Court also granted Aviva stay relief to (a) ask other courts to compel the production and/or preservation of Manley documents; (b) pursue alter ego, fraudulent transfer, and other claims against third parties, including Manley's principals,

.

affiliates, and agents, in any appropriate court; and (c) name Manley as a defendant in related litigations.

### **9. ~~e.~~ While Independent Creditors Have Been Stayed from Seeking Manley Assets, SLB Companies Like Toy Quest Ltd. Have Sought Those Assets Illegally.**

629. ~~387.~~ The ~~Bankruptcy Stay~~bankruptcy stay prohibited any act to obtain possession of Manley's assets or to allow such assets to leave the United States.

630. ~~388. This order has prevented Manley's~~Before obtaining stay relief in February 2021, Aviva and other independent creditors have complied with that order, refraining from seeking assets from Manley ~~and has been exploited by the Principals, who continue to deprive Aviva of money it is rightfully due~~or asserting claims based on Manley's alter-ego relationships with other companies or individuals.

631. ~~389. Since~~By contrast, the ~~entry of the Bankruptcy Stay,~~Principals and Toy Quest Ltd. ~~improperly has taken~~—with the help of Wu, Dollar Empire, Park Lane, and other Defendants—disguised millions of dollars ~~from~~in Manley~~'s debtors~~ assets as Toy Quest Ltd. assets and took them out of the country, in violation of 18 U.S.C. § 152.

632. Since the entry of the bankruptcy stay, Toy Quest Ltd. improperly has taken more than $7 million of Manley's money by causing retailers and distributors to pay Toy Quest Ltd. instead of preserving the funds for the benefit of Manley's creditors.

633. Toy Quest Ltd. has then passed those Manley assets on to the Principals, Banzai International, Park Lane, Aquawood, and possibly other RICO Defendants.

181

634. ~~390.~~ For example, after the ~~entry of the Bankruptcy Stay~~bankruptcy stay was entered, Wu directed Dollar Empire to wire Toy Quest Ltd. millions of dollars ~~that actually were owed to~~in Manley ~~doing business using its "Toy Quest" trade name.~~

~~391.   The Principals have sought to defraud~~receivables to keep that money from Manley's ~~independent~~ creditors ~~by directing the SLB Enterprise's representatives to send e-mails and other wire communications to deceive Manley's debtors about which~~.

635.   Representatives of SLB Companies also have deceived retailers about whom they represented, ~~in violation of 18 U.S.C. §§ 152 and 1343.~~

~~392.   The misrepresentations and omissions in these communications were material, in that they induced or tended to induce certain action~~thereby aiding efforts to move Manley assets offshore.

636. ~~393.~~ For example, in June 2016, Peter Magalhaes, a longtime employee of the SLB Enterprise's California companies, emailed a representative of the retailer Costco to demand that Costco transfer approximately $25,000 it owed to Manley from Manley's vendor account to Toy Quest Ltd.'s vendor account, and then turn those funds over to Toy Quest Ltd.  Magalhaes identified himself as the "General Manager and SVP" of Epic Studios.

637. ~~394.~~ To deceive Costco, Magalhaes omitted from his message any mention of the connection between Manley and Toy Quest Ltd., the chapter 15 bankruptcy proceedings, or the ~~Bankruptcy Court's stay order prohibiting any act to obtain possession of Manley's assets or to allow such assets to leave the United States~~bankruptcy stay.

638. ~~395.~~ Magalhaes sent at least two additional emails to Costco demanding the funds.

639. ~~396.~~ A few months later, Toy Quest Ltd. again attempted to seize Manley assets by filing papers demanding that the court in the Tennessee garnishment action involving the retailer Dollar General hand over to Toy Quest Ltd. approximately $100,000 that ~~the retailer~~ Dollar General had paid into the court's registry in response to Aviva's garnishment of Manley accounts receivable.

640. ~~397.~~ The Bankruptcy Court imposed sanctions against Toy Quest Ltd., noting it was "the second time Toy Quest has taken actions against property that was subject to the Bankruptcy Stay without first appearing before this Court to seek relief."

### 10. ~~f.~~ **Toy Quest Ltd. and** ~~the Liquidators Are on the Verge of Entering into a Collusive Settlement~~**Other SLB Companies Submitted False Proofs of Claim.**

~~398.   On February 18, 2019, the Liquidators informed Aviva and Manley's other independent creditors that the Liquidators had "negotiated" a settlement with Toy Quest Ltd.~~

~~399.   The proposed settlement was not negotiated "with" Toy Quest Ltd. so much as it was negotiated at the behest of Toy Quest Ltd. and its affiliates in a collusive attempt to prevent Aviva and other independent creditors from recovering the money rightfully owed to them by Manley.~~

~~400.   All sides of the negotiation over the proposed settlement were represented by professionals who were paid by Toy Quest Ltd. and/or other members of the SLB Enterprise.~~

~~401.   Pursuant to the proposed settlement, Toy Quest Ltd. would pay HK $300,000 (around US $38,000) to be distributed pro rata among Manley's independent creditors.  By the~~

Liquidators' own admission, Manley owes its independent creditors at least HK $77,688,108.07 (almost US $10 million), most of which is owed to Aviva.

402.    In return for Toy Quest Ltd. paying this tiny fraction (less than .4%) of Manley's debts, Manley's Liquidators apparently would give up all rights to assert alter ego and fraudulent transfer claims against Toy Quest Ltd. and any other affiliated company.  The deal is intended to deprive Aviva and other independent creditors of the money that could be obtained through such claims and ensure that no one ever will pursue the assets the Principals took from Manley.

403.    The Liquidators blamed their inability to adequately investigate alter ego and fraudulent transfer claims on a lack of funds.  As discussed above, the Principals deliberately orchestrated that lack of funds in Hong Kong, while bankrolling efforts to shut down litigation in the United States.

404.    The Liquidators failed to disclose that for years Aviva has been providing extensive documents and information that could have formed the basis of alter ego and fraudulent transfer claims with minimal additional effort and expense from the Liquidators.

405.    The Liquidators also failed to disclose that Aviva repeatedly has offered to prosecute alter ego and fraudulent transfer claims against Toy Quest Ltd. and the other entities and persons that looted Manley before its liquidation, but that those offers have been refused.

**5.    The SLB Enterprise Has Attempted to Mislead Courts in Iowa.**

406.    With the help of numerous lawyers, including Mann, the SLB Enterprise has fought aggressively to shield various Corporate Shell Defendants from liability for the damages the Iowa victims suffered while they worked for MTD.

407.    The SLB Enterprise's "bad faith" tactics to evade judgments against MTD have been condemned by state and federal courts in Iowa.

184

408.    The Principals' efforts to protect the SLB Enterprise from liability included the use of material misrepresentations to defraud independent creditors.

409.    Alan Chan, for example, tried to defraud the Iowa victims by submitting affidavits in which he falsely swore that Manley "does not maintain an office in the United States and does not own any assets within the United States."

410.    The first claim was

641.    Toy Quest Ltd. and other SLB Companies submitted false proofs of claim in connection with Manley's liquidation and U.S. bankruptcy case.  Those proofs of claim falsely alleged that the companies were creditors of Manley.

642.    The gerrymandering of the creditor list had a direct impact on Manley's U.S. bankruptcy case because Manley's Liquidators expressly relied on the false proofs of claim in the U.S. proceedings.

643.    The Liquidators' petition for chapter 15 recognition of the Hong Kong liquidation stated that Manley's "creditors" had authorized the Liquidators to act.  Without the fraudulent proofs of claim, the Principals could not have filed the bankruptcy case.

644.    Manley's Liquidators also relied on Toy Quest Ltd.'s fraudulent proof of claim when the Liquidators accepted money from Toy Quest Ltd. as a "funding creditor."

645.    If Toy Quest Ltd. had been identified as owing money to Manley, the Liquidators' willingness to take Toy Quest Ltd.'s money and use it to block U.S. litigation would have been improper.

185

646.   The Liquidators continued to rely on the fraudulent proofs of claim to oppose Aviva's efforts to obtain documents and make decisions related to the bankruptcy case.

647.   Toy Quest Ltd. also appeared in the chapter 15 case and asserted its purported status as a Manley creditor.

### 11.   Dubinsky and Others Made False Oaths and Declarations in Connection with Manley Bankruptcy Case.

648.   Dubinsky and others made many false oaths in ~~that~~connection with Manley~~, as Alan Chan well knew, maintained one or more offices in the United States.~~

~~411.   The second claim was false in that Manley, as Alan Chan well knew, had numerous assets in the United States, including accounts receivable.~~

~~412.   These claims were material in that they were intended to persuade courts that they did not have jurisdiction over Manley.~~

~~413.   Alan Chan asserted these materially false claims in (a) an affidavit electronically submitted to an Iowa federal court on or about July 15, 2013 and (b) an affidavit electronically submitted to an Iowa state court on or about July 25, 2013.~~

~~414.   Iowa courts have rejected such false claims, including MTD's false claim that it had no employees in the United States after 2013.~~

~~415.   Indeed, as late as 2014, Defendant Toth was serving as MTD's president and defending it in a lawsuit, as a federal judge in Iowa noted when commenting on "troubling" examples of "falsification of evidence" by members of the SLB Enterprise.~~'s bankruptcy case.

649.   For example, the interrogatory answers that Samson Chan's son Gary Chan verified on behalf of Toy Quest Ltd. in the bankruptcy case were contradictory.

650.     Toy Quest Ltd.'s original answers claimed that Gary Chan had approved Toy Quest Ltd.'s decision to participate in the Dollar General garnishment action in violation of the bankruptcy stay and that Dubinsky, Raucher, and Mann were "consulted."

651.     The amended answers reversed the roles of Gary Chan and Dubinsky, stating that Dubinsky "approved" the decision, Gary Chan "consented to" the decision, and Raucher and Mann were "consulted."

652.     Those answers cannot both be true.  Accordingly, at least one of Chan's verifications under penalty of perjury was false.

653.     In addition, during a deposition in Manley's bankruptcy case on September 26, 2017, Dubinsky falsely testified that he lacked knowledge about:

- The relationship between Complex Trader (the alleged owner of Aquawood) and the Chan family;

- The ownership of Complex Trader;

- The products sold by Manley; and

- Manley's use of the "Toy Quest" trade name.

654.     Dubinsky also denied knowing—just months after submitting a declaration signed in Vancouver—whether he himself had ever been to Vancouver.   (The point was relevant because, at around the time Dubinsky visited Vancouver, Toy Quest Ltd. submitted an affidavit from a purported Vancouver resident ("Gary Swerdlow") who provided a fake name and a nonexistent address, as discussed above.)

187

655.   Similarly, on September 22, 2017, Gary Chan, who has acted on behalf of Toy Quest Ltd., Park Lane, and other SLB Companies, gave the following false testimony in a deposition taken in Manley's bankruptcy case:

- That he lacked knowledge of the identity of the head of Park Lane—the company for which he allegedly worked;

- That he lacked knowledge regarding the reason he is identified as a director of multiple Manley affiliates; and

- That he had extremely limited information about Toy Quest Ltd.—the company whose interrogatory answers he already had verified.

**G.   Defendants Lied about the Importation and Distribution of SLB Products.**

656.   Defendants repeatedly have incorrectly described the sources and destinations of SLB Products so they can continue to make money in the U.S., while simultaneously hiding assets of SLB Companies and concealing the presence of assets in Iowa.

**1.**   ~~E. Defendants Have Committed Customs Fraud and Money Laundering to Keep SLB Products Flowing into the United States and Money Streaming to the SLB Enterprise in Hong Kong.~~**Defendants Falsely Identified Toy Quest Ltd. as the Seller of Goods on Customs and Shipping Records.**

~~416.~~

657.   Multiple shipments of SLB Products in 2015 and 2016 were accompanied by false invoices and other documents that falsely identified Toy Quest Ltd. as the seller

of goods that were actually sold by Manley using its "Toy Quest" trade name or another SLB Company.

658. The purpose of these fraudulent documents was to trick retailers into making payments to Toy Quest Ltd. of money actually owed to Manley or another SLB Company.

659. As discussed above, ~~between 2013 and 2016, to protect the SLB Enterprise from pending and potential judgments in Iowa and Minnesota, members of the SLB Enterprise tricked~~for example, Exhibits A-E to Aviva's Complaint list dozens of invoices that falsely represented to retailers ~~into believing~~ that ~~they were dealing with Defendant Toy Quest Ltd.~~Toy Quest Ltd. sold the products in question, when in fact ~~they still~~those products were ~~doing business with Manley and MTD.~~

~~417.   Since 2016, members of the SLB Enterprise have deceived U.S. Customs and others into believing that its products were being shipped to or imported by Dollar Empire in California, when in fact most of these goods ultimately were sent to retailers across the United States.~~

~~418.   These ruses have allowed the SLB Enterprise to continue importing Manley's products into the United States and streaming payments out to Hong Kong.~~

~~419.   Moreover, the related financial transactions have laundered the proceeds of criminal activity while concealing the funds from independent creditors, including the creditors of Manley and MTD.~~

**1.    Defendants Have Used the SLB Enterprise to Continue Importing SLB Products Illegally Without Being Vulnerable to Garnishments.**

420.   To hide assets from Aviva, the SLB Enterprise attempted to involve unwitting retailers in its deceitful shipping practices.

a)    In 2015, for example, after Aviva garnished accounts payable to Manley by Excelligence Inc. ("Excelligence"), Excelligence attempted to cancel a purchase order.

b)    When Manley refused to cancel the order, Excelligence warned Manley that it would comply with the garnishment.

c)    In response, a Manley employee proposed that Manley circumvent the garnishment by "deliver[ing] the goods through another company."

d)    After Excelligence reiterated its cancellation request, Manley again suggested that Excelligence "ship this order by another company (rather than Manley Toys Ltd.)."

e)    Excelligence refused.

421.   When outsiders like Excelligence declined to participate in their fraudulent schemes, Defendants used members of the SLB Enterprise, such as MTD and Dollar Empire, to commit crimes to protect and sustain the enterprise's flow of imports into the United States.

422.   As described below, members of the SLB Enterprise have used deceptive and fraudulent shipping practices to shield the enterprise from garnishments from independent creditors.sold by Manley.

660.   Exhibit J to Aviva's Complaint is a table listing purchase orders placed by Bed Bath and Beyond between 2013 and 2016.

661.    Exhibit K to Aviva's Complaint is a table listing the dates and ports of entries of shipments to Target in 2015 and 2016.

662.    Each of the shipments reflected in Exhibits J and K was accompanied by invoices and other documents falsely claiming that Toy Quest Ltd. was the seller of the goods when in fact the seller was Manley, MTD, Toy Network, MGS, or another SLB Company.

663.    Furthermore, Exhibit I to Aviva's Complaint identifies dozens of transactions totaling more than $5 million in the months leading up to and following Manley's bankruptcy case.  To carry out those transactions, Dollar Empire and Wu conspired with the Principals, Hong Kong Entities, Aquawood, Toth, and the Iowa Entities to misrepresent the seller of SLB Products as Toy Quest Ltd. rather than Manley or another SLB Company.

### 2.    Defendants Falsely Listed Dollar Empire as the "Importer of Record" on Customs Documents and Lied to Courts about It.

#### a.    The SLB Enterprise Used Dollar Empire to Disguise the Destination of Its Products and the Source of Its Payments.

664.    423. For example, inFrom at least 2014 to 2015, MTD was designated in customs documents as the recipient or consignee and importer of record for shipments sent from "Toy Quest Ltd.","," even after MTD ostensibly had ceased to do business.  Once

665.    That arrangement concealed from customs officials and creditors the ultimate destination of the goods.

191

666.   However, once MTD became vulnerable to its own U.S. judgments, including the judgments of the Iowa Claimants, it became less capable of shielding the SLB Enterprise from liability.

424.   By contrast, Dollar Empire continues to commit federal crimes to protect and sustain the enterprise to this very day.

**2.   Wu Directed Dollar Empire to Become a Sham Consignee for the SLB Enterprise to Generate False Import Records and Obstruct Judgment Enforcement Efforts.**

**a.   The SLB Enterprise Used Dollar Empire to Disguise the Destination of Its Products and the Source of Its Payments.**

667.   425. As Aviva and the Iowa victims began to accrue judgments against MTD, theThe SLB Enterprise turned to Dollar Empire to impede collection efforts by masking the final destination of products shipped to Iowa and elsewhere in the United States.

426.   Between December 2015 and February 2016, Dollar Empire purportedly bought millions of dollars of toys from the SLB Enterprise.  The orders were placed with, and filled by, Manley employees.

668.   From 2016 through at least 2018, Toy Quest Ltd. and Banzai International, at the direction of the Principals and with the assistance of Park Lane, Aquawood, and the Iowa Entities, falsely listed Dollar Empire as "importer of record" for hundreds of tons of "Banzai" water toys and other SLB Products worth millions of dollars.  Those publicly available customs forms said that the SLB Products would end up at Dollar Empire in California.

669.   The Chans, Liu, and Dubinsky knew that Wu would be willing to lie under oath—which he did—to conceal the nature and existence of shipments of SLB Products into the United States.

670.   ~~427. Although Dollar Empire purportedly bought those SLB Products~~In reality, the SLB Enterprise continued to ~~direct their resale and delivery to other customers~~control where those products went, shipping the products directly to retailers in the United States ~~after~~, or sending the ~~nominal transfer of~~products to MTD, Toy Network, and MGS in Iowa to distribute.

671.   Non-public documents like shipping records obtained from the shippers themselves expose that both Toy Quest Ltd. and Banzai International issued invoices bearing notations that the SLB Products were destined for Des Moines or other locations, contrary to the public customs declarations that the products were going to Dollar Empire in California.

~~428.   This charade prevented Aviva and other independent creditors from learning which companies actually were receiving Manley products, and thus could have been subjected to garnishments prior to the Bankruptcy Stay.~~

~~429.   In March 2016, Manley began its liquidation in Hong Kong. According to Manley's Liquidators, all of Manley's employees were laid off and Manley ceased doing business. Nevertheless, former Manley employees continued to send the same products to Dollar Empire on behalf of Toy Quest Ltd.~~

~~430.   In or around August 2016, Banzai International, Ltd. began sending goods to Dollar Empire. But the same former Manley employees continued to send the same products to~~

Dollar Empire, supposedly pursuant to various so-called "consignment" arrangements that Dollar Empire has refused to describe in any detail.

431.   This deception allowed the SLB Enterprise to continue listing Dollar Empire as the importer of record for millions of dollars of shipments into the United States.

432.   In reality, the SLB Enterprise continued to control where those products went, using Dollar Empire to send the products on to other retailers in the United States.

672.   Exhibit L to Aviva's Complaint, for example, shows 50 shipments spanning from January 2016 to July 2018 that Toy Quest Ltd., Banzai International, and other SLB Companies purportedly shipped to Dollar Empire in California, but were actually sent to MTD, Toy Network, and MGS in Iowa.

673.   433. The arrangement was intended to conceal the sources of payment payments to the SLB Enterprise, to hide assets from creditors like Aviva and the Iowa Claimants, and to make it harder for creditors to trace the SLB Enterprise's business movement of money, so that the SLB Enterprise could continue its unlawful activities.

674.   The scheme also disguised the final destination of products, effectively blocking Aviva from attempting to garnish money that could have been owed by retailers like Wal-Mart, Target, Amazon, and Dick's Sporting Goods to Manley.

675.   Toy Quest Ltd. originally orchestrated the use of Dollar Empire to mask the true destinations of SLB Products and the shipment of goods to and through Iowa.

676.    The public Customs Entry Summary for a Toy Quest Ltd. shipment in June 2016, for example, identifies Dollar Empire as the importer of record, stating that the shipment would go to Dollar Empire in California.

677.    But the non-public Toy Quest Ltd. invoices associated with the shipment—which contained an assortment of "Banzai" water toys and other SLB Products—reveal that the products actually were destined for "Toy Quest Customer Service" at the 700 New York address in Des Moines.

678.    Banzai International subsequently entered into a sham consignment relationship with Dollar Empire.

679.    The public Customs Entry Summary for a Banzai International shipment in April 2017, for example, again identifies Dollar Empire as the consignee and importer of record, stating that the shipment would go to Dollar Empire in California.

680.    This time, the non-public Banzai International invoices associated with the shipment—which again contained "Banzai" water toys—revealed that the products were destined for "Banzai International Ltd. / Consignment 2017 / GL Group / Spring & Summer" at the 700 New York address in Des Moines.

681.    A confidential witness has confirmed that Banzai International would ship products from China to California, and then move the products to Des Moines, where MGS would then be directed to send them out to customers like Target, Wal-Mart, Amazon, and Dick's Sporting Goods. Park Lane also helped coordinate the customs

paperwork and the actual movement of the Hong Kong Entities' products, as described above.  Billing was handled by Aquawood and Dubinsky's staff in California.

682.   434. Dollar Empire's designation as the importer of record for shipments from the SLB Enterprise also violated U.S. ~~Customs~~customs law~~.~~:

a)   As an importer of record, Dollar Empire is required by law to be either an

683.   Each shipment described above required the creation and submission of a fraudulent statement to U.S. Customs, because the Customs Entry Summary included a declaration that the signee is the "importer of record and that the actual owner, purchaser, or consignee for CBP purposes is as shown above, OR owner or purchaser or agent thereof."

684.   That declaration was false for each shipment from a Hong Kong Entity to Dollar Empire, because Dollar Empire was not the owner ~~or~~, purchaser, consignee, or agent thereof of the ~~goods it receives, or a licensed customs broker~~SLB Products in that shipment.

685.   b) Although Dollar Empire has given contradictory sworn statements on the subject (as discussed below), Dollar Empire most recently has denied that it was an owner or purchaser of the SLB Products that Banzai International sent to it ~~received. c)~~ Dollar Empire also is not a licensed customs broker for the Port of Los Angeles or anywhere else.

686.    The Customs Entry Summary declaration for each shipment also includes a certification that "the merchandise was obtained pursuant to a purchase or agreement to purchase and that the prices set forth in the Invoices are true."

687.    Dollar Empire already has admitted that it had not made any "purchase or agreement to purchase" the SLB Products purportedly sent to it, and the declarations therefore were false in that respect.

688.    d) Thus, rather than acting as either a true purchaser or a legitimate consignee, Dollar Empire, at Wu's direction, insteadknew about and consented to this scheme, and has allowed Toy Quest Ltd. and Banzai International fraudulently to use Dollar Empire's name on customs forms so that the SLB Enterprise can conceal the destination of SLB Products that it importsbrings into Iowa and elsewhere in the United States.

435.    The false records created and submitted by Dollar Empire and/or Banzai International constitute violations of 18 U.S.C. § 542.

689.    The Hong Kong Entities responsible for each shipment knowingly caused their attorneys-in-fact falsely to declare that the conditions for entry of the SLB Products into the United States had been met.

690.    Aquawood and MGS personnel also have colluded in the purported "consignee" relationship between Dollar Empire and the SLB Enterprise and have assisted the SLB Enterprise in sending "consigned" goods to U.S. retailers.

691.    436. As a result of this ongoing criminal conduct, the SLB Enterprise has been able to import and sell thousands of tons and millions of dollars of SLB Products in

197

the United States while hiding the nature of much of its business, including the destination of its products and the source of its payments, from Aviva and other independent creditors who have been deprived of the ability to enforce judgments against SLB Companies.

692.    Moreover, the prices set forth in the invoices for SLB Products purportedly sold to Dollar Empire—but actually sent to MTD, Toy Network and/or MGS in Iowa—were far below the prices of SLB Products actually delivered to retailers. Examples of such false pricing include, but are not limited to, each of the shipments identified in Exhibit L.

693.    Some, and perhaps all, of the SLB Products sent to Iowa were intended for specific third-party retailers or customers, who paid or would pay prices significantly higher than the amounts reported to U.S. Customs.  Indeed, although all of the invoices identified Dollar Empire as the purchaser, some of the shipping marks or carton main marks actually listed customers such as Leisure Systems, Scheels, Buy Buy Baby, and other retailers as the real recipients.

694.    By underreporting the prices of the SLB Products sent to Iowa, the Hong Kong Entities also reduced the Merchandise Processing Fee and Harbor Maintenance Fee charged by U.S. Customs on each shipment and thereby defrauded the United States government.

695.   In addition, to the extent that taxes, duties, or other charges were based on the reported invoice prices, the underreporting of those prices would fraudulently reduce the amounts paid for those taxes, duties, or other charges.

**b.**   ~~To Prevent Aviva from Obtaining Evidence of these Crimes,~~ **Wu Lied to a Federal Court about Dollar Empire's Relationship with Banzai International.**

696.   ~~437. In furtherance of Defendants' scheme to defraud creditors,~~ Wu has submitted several materially false statements, under penalty of perjury, to the ~~United States District Court for the~~ Central District of California ~~(the "California Federal Court")~~ about Banzai International's agreement with Dollar Empire.

697.   ~~438. As described below, Wu~~ He has made mutually exclusive factual representations in different sworn declarations, while essentially confessing to Dollar Empire's participation in the recording of sham transactions on official ~~Customs~~ customs documents.

698.   ~~439.~~ On July 24, 2017 and July 26, 2017, in response to Aviva's subpoena, ~~two of~~ Dollar Empire~~'s attorneys~~ represented that ~~Dollar Empire~~ it had import records for shipments from Banzai International, which an importer of record ~~would be~~ is required to maintain under federal law.

699.   ~~440. Indeed~~ While Dollar Empire did not actually produce those records, Dollar Empire~~'s counsel~~ told the ~~California Federal Court~~ court—with bold, italicized emphasis—not only that ~~it~~ Dollar Empire had import records from Banzai International, ~~and~~ but also that Dollar Empire had offered to produce those records to Aviva:

> Dollar Empire **offered to produce its import records during the meet and confer process.** (*See* Ex. B to Declaration of Stephen Z. Boren, attached to original Motion.) Dollar Empire never said it keeps *no* records; it merely explained how it keeps records, and it keeps customer records separate from import records.[22]

(~~emphasis~~Emphasis in original~~.~~)

700. ~~441.~~ Then, in ~~a declaration dated~~an August 15, 2017 declaration submitted to the ~~California Federal Court~~court, Wu claimed that Dollar Empire was "just a customer" of Toy Quest Ltd. and Banzai International and had no special relationship with either company.

701. ~~442. By Order dated~~In September ~~18,~~2017, Dollar Empire was ordered to produce information involving purchases from ~~all companies identified in a list of Manley-related "Entities~~several SLB Companies,[22] including Banzai International.

702. ~~443.~~ Dollar Empire, however, failed to produce any documents regarding ~~any~~ purchases from Banzai International.

703. On October 3, 2017, ~~attorneys for~~ Dollar Empire ~~explained~~argued that ~~Dollar Empire did~~it should not ~~believe it had~~have to produce any documents about Banzai International because Dollar Empire was merely a "consignee" for Banzai International shipments and——despite Wu's earlier declaration under penalty of perjury to the contrary—had never been a customer of Banzai International.

704. ~~444. In response to those new arguments, the California Federal Court~~The court then ordered Dollar Empire to produce any consignment agreements with Manley ~~Entities~~related entities and any documents showing Dollar Empire receiving or

forwarding goods as a consignee, as well as documents reflecting revenue associated with those goods, ~~for~~ in 2016 and 2017.

705.   ~~445.~~ But in a subsequent declaration dated January 12, 2018, Wu claimed, on behalf of Dollar Empire, that Dollar Empire had no import records for any of the "consignment" shipments—notwithstanding ~~its lawyers' earlier~~his prior statements to the contrary.

706.   Wu also claimed, on behalf of Dollar Empire, that Dollar Empire had never received physical possession of the "consigned" goods and had no interest in the goods whatsoever.

707.   ~~446.~~ At a minimum, Wu's claim that Dollar Empire never received physical possession of the "consigned" goods was false.

708.   ~~a)~~ Emails obtained from Dollar Empire show the company communicating with Aquawood and Park Lane employees, including Toth (using ~~Toth's~~an Aquawood "Epic ~~Studio domain~~Studios" email address), to coordinate shipments of goods to ~~third-party~~ retailers.

709.   ~~b)~~ Based ~~upon the purchase orders~~on documents produced by Dollar Empire, none of those goods had been purchased by Dollar Empire.

710.   ~~c)~~ Since at least some of those shipments originated from Dollar Empire's own warehouse, Dollar Empire therefore had at least some so-called "consigned" goods in its possession.

711.   447. The ~~California Federal Court~~court then ordered Dollar Empire to explain its consignment relationship with Banzai International and account for any revenue received.

712.   448. In response, Wu submitted a declaration dated August 7, 2018, in which he asserted, on behalf of Dollar Empire, that Dollar Empire has a "commercial relationship" with Banzai International and allows Banzai International to use Dollar Empire's company name as a "consignee" on Banzai International's shipments ~~to various third parties~~.

713.   449. In ~~this~~that version of Wu's story to the ~~California Federal Court~~court, he facilitates a "commercial relationship" in which he allows Banzai International to list Dollar Empire as "consignee" even though (a) Dollar Empire does not take any goods into its own possession and (b)  lacks the credentials necessary to serve as "consignee" for imported goods.

714.   450. Wu continued to deny that Dollar Empire took any actions in its alleged role as "consignee," despite the emails demonstrating that Dollar Empire regularly conferred with SLB Company employees as to where —including Iowa—Dollar Empire should direct the SLB Products in its warehouse.

715.   451.  Wu also claimed that Dollar Empire receives no revenue for its "commercial relationship" with Banzai International.

716. However, Wu failed to explain why Dollar Empire would agree to participate in an arrangement designed to create false customs records for tons of imported products if Dollar Empire received nothing of value.

452. Many of Wu's numerous representations were intentionally false, and were designed by Wu, Dollar Empire, and the Principals to deceive the California Federal Court and Aviva.

453. Wu's misrepresentations were material, in that they were designed to persuade the California Federal Court that Dollar Empire was not required to give Aviva documents responsive to Aviva's requests.

454. As a result of these misrepresentations, Aviva has been unable to obtain Manley and other SLB Enterprise records from Dollar Empire.

III. The RICO Defendants Have Conducted and Conspired to Conduct the Affairs of the SLB Enterprise through a Pattern of Racketeering that Victimized Independent Creditors.

A. The RICO Defendants Are Committing Federal Criminal Offenses.

455. To sustain the SLB Enterprise, the RICO Defendants have committed, and continue to commit, numerous crimes at the expense of independent creditors, in violation of 18 U.S.C. §§ 152 (bankruptcy offenses), 542 (customs fraud), 1343 (wire fraud), 1512 (obstruction of justice) and 1956-57 (money laundering).

1. The SLB Enterprise Has Obtained Money through the Commission of Wire Fraud.

456. From on or about June 19, 2013 through on or about March 23, 2016, the Principals, the Executives, Magalhaes, Toy Quest Ltd., Park Lane, Jun Tai, Winning, and Dollar Empire (the "Wire Fraud Conspirators") and other members of the SLB Enterprise devised and

intended to devise a scheme and artifice to defraud independent creditors, and to obtain money and property through false and fraudulent pretenses, representations, and promises.

457.   As part of the fraudulent scheme, members of the SLB Enterprise, including the Wire Fraud Conspirators, made material omissions and misrepresentations to retailers and U.S. courts about Manley's operations and assets, the relationship of Manley to Toy Quest Ltd., and other matters.  Such omissions and representations were intended to allow the SLB Enterprise to continue doing business in the United States while evading liability and the obligation to pay judgments against Manley.

458.   For example, the Wire Fraud Conspirators sent or caused to be sent electronic communications to several retailers designed to trick the retailers into believing that they were dealing with Defendant Toy Quest Ltd., when in reality they still were dealing with Manley. Such electronic communications were sent on the following dates, in interstate and foreign commerce, primarily from Hong Kong to the United States.

| Deceptive Communications to Customers of Manley | | | | |
|---|---|---|---|---|
| Date | Purported Sender | Recipient | Method | Content |
| 06/19/13 | Manley | Dollar General | Internet submission | Vendor Change Form, changing Manley to "Toy Quest Ltd." |
| 07/26/13 | Anthony Cheng | A. Koch (Seventh Avenue) | Electronic mail | Name change, changing Manley to "Toy Quest Ltd." |
| 06/13/14 | Anthony Cheng (Manley) | Tina Taylor (Big Lots) | Electronic mail | Name change, changing Manley to "Toy Quest Ltd." |
| 06/18/14 | Manley | Michaels | Internet submission | Vendor Change Form |
| 09/10/14 | Toy Quest Ltd. | Bed Bath & Beyond | Electronic mail | Changing "Vendor of Record" to Toy Quest Ltd. |
| 09/23/14 | Kapo Tsang (Toy Quest Ltd.) | Costco | Electronic mail | Name change, changing Manley to "Toy Quest Ltd." |
| 11/20/15 | Jena Schmeling | Lindsey | Electronic | Name Change, changing |

| (Northern Lights Marketing) | Heffron (Blain Supply, Inc.) | mail | Manley to "Toy Quest Ltd." |
|---|---|---|---|

459.   The goal of the fraudulent communications was to seize money that belonged or was due to Manley and deprive independent creditors of that money.

    a)   Each of the communications was intended to deceive retailers into believing that they were doing business with Toy Quest Ltd. rather than Manley, and thereby defraud independent creditors such as Aviva.

    b)   Relying on these communications, numerous retailers falsely believed and reported that they were doing business with companies other than Manley, when in fact, as the Wire Fraud Conspirators well knew, the retailers continued to do business with Manley.

    c)   Relying on false representations that the retailers were not doing business with Manley, and thus had no Manley receivables, Aviva did not garnish funds that were listed as payable to "Toy Quest Ltd."

    d)   Had Aviva known that the retailers had Manley receivables, Aviva would have garnished funds that were listed as payable to "Toy Quest Ltd." and thus prevented the SLB Enterprise from transferring certain assets from the United States to Hong Kong.

460.   As the next step in their fraudulent scheme, the Wire Fraud Conspirators and other members of the SLB Enterprise subsequently sent or caused to be sent invoices to retailers containing fraudulent demands to pay money to Toy Quest Ltd. that instead belonged to Manley. Attached as Exhibits A-D are charts of invoices submitted electronically in interstate and foreign

205

-

commerce between 2013 and 2015 to Big Lots, Dollar General, Michaels, and Target.  All of these invoices, which are dated prior to the Bankruptcy Stay, seek payment to Toy Quest Ltd. of money actually owed to Manley.  Such money should have been subject to execution or seizure by Aviva and other independent creditors.

461.    Similar fraudulent demands for payments of money due to Manley continued to be made after the Bankruptcy Stay was put in place.  Attached as Exhibit E is a chart of invoices submitted electronically to Target after March 24, 2016, that seek payment to Toy Quest Ltd. of money actually owed to Manley.[2]

462.    Other fraudulent demands for payment of money due to Manley were made to recipients known to the Wire Fraud Conspirators but are not yet known to Aviva.

463.    Attached as Exhibits F-H are charts of payments made from Dollar Empire, Bed Bath & Beyond, and Target in the United States to Toy Quest Ltd. in Hong Kong.

464.    On the dates set forth in those charts, for the purpose of executing the fraudulent scheme, and aiding and abetting its execution, the Wire Fraud Conspirators and other members of the SLB Enterprise, sent and caused to be sent electronically: writings, signs, and signals effectuating the financial transactions set forth in Exhibits F, G, and H, in interstate and foreign commerce.

465.    It was also part of the fraudulent scheme that the Wire Fraud Conspirators and other members of the SLB Enterprise used court filings to advance their fraudulent scheme and further obstruct independent creditors' efforts to obtain money owed to Manley.

_____

[2] Aviva will file Exhibits A-E,G, H, J and K conditionally under seal as required by a protective order entered by the Minnesota Federal Court in *Aviva Sports, Inc. v. Fingerhut Direct Marketing, Inc.*, No. 0:09-cv-1091, and seek leave of court to maintain them under seal as set forth in the Local Rules.

466.   For example, as set forth in the chart below, Toy Quest Ltd., Alan Chan, and other members of the SLB Enterprise falsely claimed in multiple U.S. court filings that Manley and Toy Quest Ltd. kept separate accounts and did not commingle funds.  The purpose of these false representations, which were transmitted to the courts in interstate and foreign commerce through the courts' electronic case filing systems, was to conceal documents and information about the true activities of Manley and Toy Quest Ltd., thereby permitting the SLB Enterprise to conduct business using the "Toy Quest Ltd." name while evading liabilities to Aviva and other independent creditors.

| False and Fraudulent Communications to U.S. Courts | | | |
|---|---|---|---|
| Date | Purported Sender | Recipient | Content |
| 5/4/15 | Toy Quest Ltd. and Francis Wong | U.S. Dist. Ct. for the Northern Dist. of Tex. | Declaration of Francis Wong, on behalf of Toy Quest Ltd., falsely claiming that Manley and Toy Quest Ltd. kept separate accounts and did not commingle funds |
| 5/4/15 | Alan Chan and Manley | U.S. Dist. Ct. for the Northern Dist. of Tex. | Declaration of Chan Siu Lin a/k/a Alan Chan, on behalf of Manley, falsely claiming that Manley and Toy Quest Ltd. kept separate accounts and did not commingle funds |
| 5/4/15 | Toy Quest Ltd. and Francis Wong | U.S. Dist. Ct. for the Northern Dist. of Ill. | Declaration of Francis Wong, on behalf of Toy Quest Ltd., falsely claiming that Manley and Toy Quest Ltd. kept separate accounts and did not commingle funds |
| 5/4/15 | Alan Chan and Manley | U.S. Dist. Ct. for the Northern Dist. of Ill. | Declaration of Chan Siu Lin a/k/a Alan Chan, on behalf of Manley, falsely claiming that Manley and Toy Quest Ltd. kept separate accounts and did not commingle funds |
| 5/11/15 | Toy Quest Ltd. and Francis Wong | U.S. Dist. Ct. for the Middle Dist. of Tenn. | Declaration of Francis Wong, on behalf of Toy Quest Ltd., falsely claiming that Manley and Toy Quest Ltd. kept separate accounts and did not commingle funds |
| 5/11/15 | Alan Chan and Manley | U.S. Dist. Ct. for the Middle Dist. of Tenn. | Declaration of Chan Siu Lin a/k/a Alan Chan, on behalf of Manley, falsely claiming that Manley and Toy Quest Ltd. kept separate accounts and did not commingle |

207

| | | | funds |
|---|---|---|---|

467.    The Wire Fraud Conspirators and other members of the SLB Enterprise similarly furthered their fraudulent scheme by blocking independent creditors' efforts to garnish funds by attempting to ship Manley goods through other companies, falsely asserting rights to money owed to Manley by retailers, and making false representations in response to court-ordered discovery.  As described in the chart below, these false statements were contained in numerous electronic communications and electronic court filings and were sent in interstate and foreign commerce.

| Wire Communications Intended to Evade Garnishment or Take Funds Owed to Manley | | | |
|---|---|---|---|
| **Date** | **Purported Sender** | **Recipient** | **Method** | **Content** |
| 2/26/15 | Dorothy Lo (Manley) | P. Milestone (Excelligence) | Electronic Mail | Offer to "deliver goods through another company" to evade creditor's garnishment |
| 3/2/15 | Dorothy Lo (Manley) | P. Milestone (Excelligence) | Electronic Mail | Suggestion to "ship this order by another company (rather than Manley Toys Ltd.") |
| 5/4/15 | Toy Quest Ltd. (through counsel) | U.S. Dist. Ct for the Northern Dist. of Texas. | Electronic Case Filing | Motion to Dissolve Garnishment, seeking to take funds owed by Michaels to Manley |
| 5/11/15 | Toy Quest Ltd. (through counsel) | U.S. Dist. Ct for the Middle Dist. of Tenn. | Electronic Case Filing | Motion to Quash Garnishment, seeking to take funds owed by Dollar General to Manley |
| 5/11/15 | Toy Quest Ltd. (through counsel) | U.S. Dist. Ct for the Middle Dist. of Tenn. | Electronic Case Filing | Motion to Quash Garnishment, seeking to take funds owed by Dollar General to Manley |
| 11/6/15 | Wellmax (through counsel) | U.S. Dist. Ct for the Middle Dist. of Tenn. | Electronic Case Filing | Motion to Quash Garnishment, seeking to take funds owed by Dollar General to Manley |
| 11/6/15 | Wellmax (through counsel) | U.S. Dist. Ct for the Middle Dist. of Tenn. | Electronic Case Filing | Memorandum in Support of Motion to Quash Garnishment, seeking to take |

| | | | | funds owed by Dollar General to Manley |
|---|---|---|---|---|
| 11/6/15 | S. Lee and Wellmax | U.S. Dist. Ct for the Middle Dist. of Tenn. | Electronic Case Filing | Declaration of Samuel Lee on behalf of Wellmax, falsely asserting a security interest in funds owed by Dollar General to Manley |
| 12/7/15 | Toy Quest Ltd. (through counsel) | U.S. Dist. Ct for the Middle Dist. of Tenn. | Electronic Case Filing | Motion to Intervene and Opposition to Motion for Judgment, seeking to take funds owed by Dollar General to Manley |
| 2/24/16 | Jun Tai and Winning (through counsel) | U.S. Dist. Ct. for the Dist. of Minn. | Electronic Case Filing | Motion to Intervene and oppose motion for sanctions, falsely representing the filers' connection to Manley and filed for the undisclosed purpose of delaying the sanctions motion long enough for Manley to begin bankruptcy proceedings |

468.   The RICO Defendants' pattern of wire fraud and other racketeering activity injured Aviva by depriving it of the ability to enforce the Minnesota and Iowa judgments before the Principals put Manley into liquidation in March 2016.

469.   Since the Bankruptcy Stay, the Wire Fraud Conspirators have continued to conduct the affairs of the SLB Enterprise through the commission of wire fraud.

   a)   These crimes have injured Aviva by depriving it of the ability to collect on and enforce the Iowa judgment.

   b)   These acts of wire fraud also have helped conceal the criminal activity that resulted in Aviva being unable to enforce the Minnesota judgment prior to the Bankruptcy Stay.

c)      These acts of wire fraud also have allowed the SLB Enterprise to continue conducting business in the United States while evading liabilities to Aviva and other independent creditors, all of which has enabled the Principals to fund litigation efforts that have resulted in substantial legal fees to Aviva.

470.    Since the Bankruptcy Stay, for example, the Wire Fraud Conspirators and other members of the SLB Enterprise have carried on their fraudulent scheme by lying to U.S. courts about the nature of Manley's pre-liquidation operations and concealing information and documents from Manley's creditors and Liquidators.

471.    These false statements were contained in several electronic court filings around the country and were sent in interstate and foreign commerce, as listed below.

| Date | Purported Sender | Recipient | Summary of False and Fraudulent Communication |
|---|---|---|---|
| 12/12/16 | Toy Quest Ltd. (through counsel) | U.S. Bankr. Ct. for the Dist. of NJ | Motion to Compel Aviva to comply with Bankruptcy Stay, attempting to block discovery into Toy Quest Ltd.'s activities and forestall sanctions motion and falsely alleging that Aviva was in violation of Stay |
| 12/21/16 | Chan (through counsel) | U.S. Dist. Ct. for Dist. Of Minn. | Declaration falsely stating, *inter alia*, that Chan "retired" from "day-to-day operation[s]" and being "CEO" of Manley in 2011 and "was not aware of and made no decisions on behalf of Manley with respect to the post-judgment discovery at issue on this motion" |
| 12/21/16 | Dubinsky (through counsel) | U.S. Dist. Ct. for Dist. Of Minn. | Declaration falsely stating, *inter alia*, that "at no time did Aquawood or [Dubinsky] have any control over or decision-making authority" with respect to Manley |
| 12/21/16 | Alan Chan (through counsel) | U.S. Dist. Ct. for Dist. Of Minn. | Declaration falsely stating, *inter alia*, that making "decisions on behalf of Manley with respect to the post-judgment discovery at issue on this motion" was not part of Alan Chan's job responsibilities |
| 1/26/17 | Toy Quest | U.S. Dist. Ct | Opposition to Motion for Status |

**False and Fraudulent Communications to U.S. Courts**

210

| | Ltd. (through counsel) | for the Middle Dist. of Tenn. | Conference, fraudulently claiming that funds owed by Dollar General to Manley were in fact owed to Toy Quest Ltd. |
|---|---|---|---|
| 1/27/17 | Toy Quest Ltd. (through counsel) | U.S. Dist. Ct for the Middle Dist. of Tenn. | Supplemental Opposition to Motion for Status Conference, seeking to take funds owed by Dollar General to Manley |
| 3/15/17 | Dubinsky (through counsel) | U.S. Dist. Ct. for the Dist. of NJ | Declaration of Dubinsky, falsely claiming that Aquawood is an independent sales representative |
| 4/11/17 | Toy Quest Ltd. (through counsel) | U.S. Bankr. Ct. for the Dist. of NJ | Opposition to motion to compel documents and information, falsely representing Toy Quest Ltd.'s dealings with Dollar General |
| 5/17/17 | Toy Quest Ltd. (through counsel) | U.S. Bankr. Ct. for the Dist. of NJ | Supplemental interrogatory response, falsely describing Toy Quest Ltd.'s dealings with Dollar General and Toy Quest Ltd.'s actions in response to discovery |
| 6/8/17 | Toy Quest Ltd. (through counsel) | U.S. Bankr. Ct. for the Dist. of NJ | Second supplemental interrogatory response, falsely describing Toy Quest Ltd.'s dealings with Dollar General and Toy Quest Ltd.'s actions in response to discovery |
| 7/18/17 | Toy Quest Ltd. (through counsel) | U.S. Bankr. Ct. for the Dist. of NJ | Opposition to motion to compel depositions, falsely representing Toy Quest Ltd.'s efforts to respond to discovery served in bankruptcy case |
| 8/15/17 | Wu (through counsel) | U.S. Dist. Ct. for the Central Dist. of Cal. | Declaration falsely stating, *inter alia*, that Dollar Empire was "just a customer" of Toy Quest Ltd. and Banzai International |
| 10/2/17 | Wu (through counsel) | U.S. Dist. Ct. for the Central Dist. of Cal. | Declaration falsely stating, *inter alia*, that Dollar Empire was a "consignee" of Banzai International without disclosing the alleged fact that Dollar Empire did not actually receive the "consigned" goods |
| 1/12/18 | Wu (through counsel) | U.S. Dist. Ct. for the Central Dist. of Cal. | Declaration falsely stating, *inter alia*, that Dollar Empire had no interest in consigned goods whatsoever and that Dollar Empire received no revenue from Banzai |
| 4/20/18 | MTD (through counsel and its "Corporate Secretary") | U.S. Dist. Ct. for the Southern Dist. of Iowa. | Declaration falsely stating, *inter alia*, that MTD had "never done business at the address of 700 New York Avenue, Des Moines, Iowa," and that MTD "has had no employees in the United States [sic] 2013" |
| 7/3/18 | Chan (through | U.S. Dist. Ct. for Dist. Of | Declaration falsely stating, *inter alia*, that Chan "retired" from "day-to-day |

| | counsel) | Minn. | operation[s]" and being "CEO" of Manley in 2011 and "was not aware of and made no decisions on behalf of Manley with respect to the post-judgment discovery at issue on this motion" |
|---|---|---|---|
| 7/3/18 | Liu (through counsel) | U.S. Dist. Ct. for Dist. Of Minn. | Declaration falsely stating, *inter alia*, that Liu "was not aware of and made no decisions on behalf of Manley with respect to the post-judgment discovery at issue on this motion" |
| 7/3/18 | Dubinsky (through counsel) | U.S. Dist. Ct. for Dist. Of Minn. | Declaration falsely stating, *inter alia*, that "at no time did Aquawood or [Dubinsky] have any control over or decision-making authority" with respect to Manley |
| 7/3/18 | Alan Chan (through counsel) | U.S. Dist. Ct. for Dist. Of Minn. | Declaration falsely stating, *inter alia*, that making "decisions on behalf of Manley with respect to the post-judgment discovery at issue on this motion" was not part of Alan Chan's job responsibilities |
| 7/3/18 | Park Lane (through counsel and its "Manager") | U.S. Dist. Ct. for Dist. Of Minn. | Declaration falsely stating, *inter alia*, that that Park Lane "was not aware of and made no decisions on behalf of Manley with respect to the post-judgment discovery at issue on this motion" |

### 2.   The SLB Enterprise Obtained and Retained Money through the Commission of Bankruptcy Crimes.

472.   To keep money and property within the control of the enterprise and away from independent creditors, the Principals, the Executives, Toy Quest Ltd., Aquawood, Park Lane, and Dollar Empire (the "Sham Bankruptcy Conspirators") have perpetrated a criminal bankruptcy scheme that continues to injure Aviva to this day.

#### a.   The Sham Bankruptcy Conspirators Fraudulently Concealed Property.

473.   The Sham Bankruptcy Conspirators violated 18 U.S.C. § 152(1) by knowingly and fraudulently concealing property belonging to the estate of a debtor (Manley) from both (a) officers of the court charged with the control or custody of property (Manley's Liquidators) and (b) independent creditors, in connection with a case under title 11.

474.    Prior to the liquidation, the Sham Bankruptcy Conspirators and other members of the SLB Enterprise took several steps to hide Manley's assets from its future liquidators and its independent creditors.

475.    The Sham Bankruptcy Conspirators divested Manley of six luxury automobiles—a Bentley, a Ferrari, a Porsche, a Jaguar, and two Mercedes Benz sedans—writing them off as "depreciated."  They simultaneously divested Manley of other assets.

476.    As described above, the Sham Bankruptcy Conspirators and other members of the SLB Enterprise likewise concealed millions of dollars of Manley's accounts receivables due to Manley using its "Toy Quest" name.

477.    Each invoice set forth in Exhibits A-E seeking payment to Toy Quest Ltd. of money actually owed to Manley was sent, or caused to be sent, with the knowledge that it was fraudulent and with the intent to conceal Manley's property in violation of 18 U.S.C. § 152(1).

478.    Each transaction involving money owed to Manley set forth in Exhibits F, G, and H, including transactions made after March 24, 2016, was made, or caused to be made, with the knowledge that it was fraudulent and with the intent to conceal Manley's property in violation of 18 U.S.C. § 152(1).

479.    The purpose of these fraudulent transfers and concealment was to hide the money from creditors and ensure that the SLB Enterprise could take and keep those funds for itself.

480.    In addition, the Sham Bankruptcy Conspirators fraudulently transferred and concealed Manley's electronic records, which were removed before the filing of Manley's chapter 15 petition for recognition on March 24, 2016.

481.   The Sham Bankruptcy Conspirators failed to provide those documents to the Liquidators prior to March 24, 2016, then refused to produce them in response to requests for discovery served in the Bankruptcy Court, to prevent Aviva or the Bankruptcy Court from obtaining further evidence of the Sham Bankruptcy Conspirators' conduct.

### b.   The Sham Bankruptcy Conspirators Made False Oaths in Connection with Manley's Bankruptcy Case.

482.   Dubinsky and Gary Chan violated 18 U.S.C. § 152(2) by knowingly and fraudulently making false oaths or accounts in Manley's bankruptcy case.

483.   On September 22, 2017, in a deposition taken in Manley's bankruptcy case, Gary Chan gave, at a minimum, the following false testimony under oath:

a)   That he lacked knowledge of the identity of the head of Park Lane—the company for which he allegedly worked;

b)   That he lacked knowledge regarding the reason he is identified as a director of multiple Manley affiliates; and

c)   That he had extremely limited information about Toy Quest Ltd.—the company whose interrogatory answers he already had verified.

484.   On September 26, 2017, also in a deposition taken in Manley's bankruptcy case, Dubinsky gave, at a minimum, the following false testimony under oath:

a)   That he lacked knowledge of the relationship between Complex Trader, the alleged owner of Aquawood, and the Chan family;

b)   That he lacked knowledge regarding the ownership of Complex Trader;

c)   That he lacked knowledge regarding the products sold by Manley;

d)   That he lacked knowledge regarding Manley's use of the "Toy Quest" trade name; and

214

e)   That he did not know—just months after submitting a declaration he had signed in Vancouver (the supposed home of "Gary Swerdlow," discussed below)—if he had ever been to Vancouver.

**c.   The Sham Bankruptcy Conspirators Made False Declarations in Connection with Manley's Bankruptcy Case.**

485.   Chan, Dubinsky, Gary Chan, and "Gary Swerdlow" violated 18 U.S.C. § 152(3) by knowingly and fraudulently making false declarations or statements under penalty of perjury in or in relation to Manley's bankruptcy case.

486.   In the Hong Kong proceedings, Toy Quest Ltd. sought to preclude Aviva from arguing that Toy Quest Ltd. was a trade name and/or alter ego of Manley.

487.   A purpose of seeking this relief was to frustrate Aviva's ability to advance its position in the proceedings before the Bankruptcy Court and enforce the Minnesota judgment.

488.   On or about August 16, 2016, Samson Chan submitted an affirmation to a court in Hong Kong, where Toy Quest Ltd. had filed lawsuits against Aviva and the Iowa victims.

a)   In that affirmation, Chan made multiple false statements in which he falsely denied knowledge that Manley had been operating as "Toy Quest Ltd."

b)   Accordingly, Chan knowingly and fraudulently made false statements in his affirmation.

489.   On or about August 16, 2016, "Gary Swerdlow" submitted an affirmation to the Hong Kong court.

a)   In that affirmation, "Swerdlow" claimed to have spoken with multiple retailers that no longer would do business with Toy Quest Ltd. due to Aviva's judgment enforcement efforts.

b)  However, none of those retailers had any record of any contact with "Gary Swerdlow," and one retailer confirmed that it had *not* had any contact with any "Gary Swerdlow."

c)  In addition, the address listed by Swerdlow in his affirmation does not exist.

d)  If Swerdlow himself exists, his statements regarding fictitious contact with retailers and his false address were knowingly and fraudulently made.

490.   The Chan and Swerdlow affirmations were in relation to the Manley bankruptcy case before the Bankruptcy Court.

491.   Additionally, Gary Chan submitted multiple verifications under penalty of perjury to the Bankruptcy Court in April 2017.

492.   Gary Chan's first verification claimed that he had approved Toy Quest Ltd.'s decision to participate in the Tennessee Action in violation of the Bankruptcy Stay and that Dubinsky, Raucher, and Mann were "consulted."

493.   Toy Quest Ltd.'s amended answers reversed the roles of Gary Chan and Dubinsky, stating that Dubinsky "approved" the decision, Gary Chan "consented to" the decision, and Raucher and Mann were "consulted."

494.   Chan verified both answers, which cannot both be true, under penalty of perjury. Accordingly, at least one of Chan's verifications under penalty of perjury was false.

**d.      The Sham Bankruptcy Conspirators Made False Claims for Proof.**

495.   Toy Quest Ltd. and other Manley affiliates submitted false claims for proof against Manley's estate, in violation of 18 U.S.C. § 152(4).

216

496. In these claims, submitted in Manley's Hong Kong liquidation, the companies alleged that they were creditors of Manley.

497. Financial records from just a few months earlier demonstrate that those companies had been *debtors* of Manley.

498. As discussed above, the Principals gerrymandered Manley's financial affairs by routing money through Manley to pay off a loan on which all of the affiliated companies were co-obligors.

499. In truth, Toy Quest Ltd. and the other affiliated companies were only paying off their own debt. By routing the "loan payment" through Manley however, they claimed to be creditors of Manley.

500. This claim was false. The routing of money was nothing more than a financial sleight of hand designed to cheat independent creditors during the Hong Kong liquidation and bankruptcy proceedings.

501. Manley's Liquidators relied on these false proofs of claim in the chapter 15 bankruptcy proceeding in the United States. In drafting their verified petition for recognition of the Hong Kong liquidation proceeding in the chapter 15 bankruptcy proceeding, Manley's Liquidators alleged that Manley's "Creditors" had passed a resolution confirming the Liquidators' appointment and providing authority to act under Hong Kong law. Without the fraudulent proofs of claim, the Principals would not have been able to authorize the Liquidators to act.

502. Manley's Liquidators also relied upon Toy Quest Ltd.'s fraudulent proof of claim to take money from Toy Quest Ltd. as a funding creditor. If Toy Quest Ltd. had in fact been recognized as a debtor of Manley, the Liquidators' willingness to take Toy Quest Ltd.'s money,

.

and block litigation efforts in the United States, would have been blatantly improper under any conceivable standard of impartiality.

503.    In opposing Aviva's efforts to obtain documents and information, and in supporting their petition for liquidation and related decision-making and litigation efforts, Manley's Liquidators continued to rely upon the fraudulent proofs of claim.

504.    In addition, Toy Quest Ltd. itself directly asserted its purported status as a Manley creditor in the chapter 15 bankruptcy proceedings.

**e.    The Sham Bankruptcy Conspirators Fraudulently Received Property.**

505.    The Sham Bankruptcy Conspirators fraudulently received payments, books, and records belonging to Manley, in violation of 18 U.S.C. § 152(5).

506.    When Manley filed its Chapter 15 petition for recognition of the Hong Kong bankruptcy, it was owed millions of dollars in outstanding payments for goods that Manley sold using the "Toy Quest Ltd." trade name.

507.    By order of the Bankruptcy Court, those payments could not be removed from the United States.

508.    Nevertheless, Toy Quest Ltd. sought and received more than $7 million in payments for goods sold by Manley, including the payments after March 24, 2016 set forth in Exhibits F through H.

509.    In addition, the Sham Bankruptcy Conspirators caused Manley's books and records, including electronically stored information, as well as several vehicles to be taken and hidden from Manley's Liquidators.

510.    Each of those takings constituted the knowing and fraudulent receipt of material amounts of property from a debtor after the filing of a case under title 11, with intent to defeat the provisions of title 11.

### f.    The Sham Bankruptcy Conspirators Made Fraudulent Payments for Acting or Forbearing to Act in a Case under Title 11.

511.    The Sham Bankruptcy Conspirators made payments to lawyers and the Liquidators in violation of 18 U.S.C. § 152(6).

512.    The Principals did not intend for Manley's Chapter 15 petition in the United States to allow an orderly marshaling of assets and winding up of affairs.

513.    Rather, the petition was designed to protect sham creditors while blocking independent creditors' efforts to collect debts owed to them by the SLB Enterprise.

514.    Accordingly, payments to Manley's Liquidators and counsel, as well as Toy Quest Ltd.'s bankruptcy counsel, were knowingly and fraudulently made in an effort to get those individuals to act in a case under Title 11—Manley's bankruptcy case.

515.    Those payments funded the filing of the chapter 15 petition, which imposed an automatic stay of all actions against Manley, including Aviva's then-pending motion for sanctions in Minnesota, as well as Aviva's efforts to garnish funds in the Middle District of Tennessee and other jurisdictions to satisfy its judgment. As a result of the stay, Aviva no longer was able to compel Manley to produce documents and information.

516.    Those payments also were used to fund efforts to block Aviva from taking discovery from the Liquidators and Toy Quest Ltd. and obstruct Aviva from compelling Toy Quest Ltd.'s compliance with various orders.

219

517.   Those payments also funded the Liquidators' efforts to oppose Aviva's request for stay relief to pursue alter-ego and fraudulent-transfer claims, as well as the Liquidators' failure to enforce the stay against participants in the SLB Enterprise.

g.   **The Sham Bankruptcy Conspirators Fraudulently Transferred and Concealed Property.**

518.   The Sham Bankruptcy Conspirators transferred and concealed assets, documents, and information in violation of 18 U.S.C. § 152(7).

519.   Since at least July 2013 through March 23, 2016, the Sham Bankruptcy Conspirators contemplated that Manley would pursue one or more bankruptcy proceedings in the event that it could not otherwise defeat or evade pending and prospective U.S. judgments.

520.   In contemplation of a bankruptcy proceeding and/or to defeat the provisions of title 11, as detailed above, the Principals took steps to artificially strip Manley of assets in order to defraud Manley's creditors.

521.   The Principals also misled the Liquidators in order to defraud and conceal assets from Manley's creditors.

a)   As a result of the Principals' conduct, Manley's Liquidators purportedly believed that Manley had conducted little to no business in the United States in recent years.  Consequently, the Liquidators also failed to contact business parties, like Dollar Empire, that owed millions of dollars to Manley when the liquidation recognition process began.

b)   The Liquidators purportedly did not know that Manley had been operating as "Toy Quest Ltd." until the week before Manley's liquidation filing.

c)   Liquidator Mat Ng offered a declaration dated March 22, 2016, in which he stated that Manley's primary assets in the United States were limited to

220

a $5 million claim against TRU.  Ng relied entirely on documents and information provided by the Principals regarding Manley's financial affairs, which did not disclose the sales made by Manley while it was using Manley's "Toy Quest Ltd." name.  Relying on financial information supplied by the Principals, Ng failed to identify the millions of dollars owed to Manley by retailers such as Dollar Empire, Dollar General, Target, Bed Bath & Beyond, and Costco.

d)  In a supplemental declaration dated April 25, 2016, Ng identified "realizable assets" in the United States of less than US$100,000.  In truth, Dollar Empire alone owed more than 40 times that amount to Manley.

e)  Ng's supplemental declaration also attached a "Statement of Affairs" prepared by Manley that set forth the company's liabilities.  That Statement of Affairs was false and misleading because it failed to accurately reflect the nature of Manley's dealings with its affiliates.

f)  Ng testified on May 12, 2016, before the Bankruptcy Court, that he believed that Manley and Toy Quest Ltd were separate companies that had conducted business independently.  That statement was false.

g)  The minutes of a meeting between Chan and the Liquidators stated that Chan became aware on March 11, 2016, that Manley was insolvent.  Ng testified on May 13, 2016, that those minutes were false, and that Chan knew much earlier than that date that Manley was insolvent.

h)  The Liquidators' petition for recognition stated that Manley's corporate parent was Teng Yue Holdings.  But Manley's corporate disclosure

statements filed in United States District Courts in 2015 claimed that the company had no corporate parent; Ng admitted that those statements were inconsistent.

522.    The Sham Bankruptcy Conspirators' efforts to take assets, documents, and information owed to Manley, such as the retailer payments and Manley's books and records, also constituted the knowing and fraudulent transfer of property of a debtor in a case under Title 11.

523.    In addition, the Sham Bankruptcy Conspirators' failure to disclose those assets, documents and information—including Manley books and records held by Aquawood in California—to Manley's Liquidators constituted the knowing and fraudulent concealment of property of a debtor in a case under Title 11.

**h.      The Sham Bankruptcy Conspirators Fraudulently Concealed and Withheld Information.**

524.    Finally, the Sham Bankruptcy Conspirators concealed and withheld information in violation of 18 U.S.C. § 152(8) and (9).

525.    The Liquidators testified on May 12, 2016 that "Manley's related companies currently have custody of the server or servers used" to store Manley's emails electronically." The Liquidators further testified that the Liquidators were not granted "access to the underlying general server." By refusing to grant access to the Liquidators, the Principals and certain Corporate Shell Defendants withheld critical information relating to Manley's financial affairs.

526.    At Aviva's insistence, the Liquidators requested documents relating to bank loans extended to Manley and its affiliates that were secured by the proceeds of the sales of Manley products from the Principals and the banks. But the Liquidators could not obtain Manley's bank loan documents because other borrowers on the loans—including Toy Quest Ltd.—would not consent to the documents' production.

527.    The Liquidators also have been able to take possession of only a small subset of Manley's books and records.  At Aviva's request, the Liquidators sent three letters on May 9, 2016 about obtaining Manley's books and records, one to Manley's board of directors, one to Teng Yue, and one to Chan.  To Aviva's knowledge, there has been no response to these letters.

**3.    The SLB Enterprise Has Illegally Concealed Evidence and Assets.**

**a.    The RICO Defendants Obstructed Justice by Concealing Evidence.**

528.    As described above, in order to unlawfully deprive Aviva of the value of the Minnesota and Iowa judgments, the RICO Defendants corruptly concealed evidence with the intent to prevent Aviva and others from being able to use this evidence in official proceedings in the District of New Jersey, the Central District of California, and elsewhere, in violation of 18 U.S.C. § 1512(c)(1).

529.    Because they concealed this evidence in order to obstruct, influence, or impede official proceedings before those courts, the RICO Defendants acted in violation  of 18 U.S.C. § 1512(c)(2) as well.

**b.    RICO Defendants Concealed Assets by Falsely Listing MTD and Dollar Empire as Consignees of Other SLB Companies.**

530.    Since at least 2014, the Principals, the Executives, Aquawood, Banzai International, Park Lane, and Dollar Empire have violated 18 U.S.C. § 542 in that they have imported merchandise into the United States by submitting false and fraudulent invoices, declarations, affidavits, letters, papers, and statements to U.S. Customs and others as follows:

a)    From at least 2014 through 2015, SLB Enterprise members, including but not limited to the Principals, Toth, Toy Quest Ltd., and MTD, falsely listed MTD as the importer of record and/or consignee for "Toy Quest

223

Ltd." in order to conceal assets from Aviva and other independent creditors.

b) Since at least March 2016 to the present, SLB Enterprise members, including but not limited to the Principals, Wu, Dollar Empire, and Banzai International, have falsely listed Dollar Empire as the importer of record and/or consignee for Banzai International in order to conceal assets from Aviva and other independent creditors.

531. By importing merchandise in this way, the above-mentioned Defendants have enabled the SLB Enterprise to continue importing SLB Products into the United States from Hong Kong while unlawfully depriving Aviva and other independent creditors of their ability to enforce judgments against SLB Companies.

**4. Defendants Have Transferred Millions of Dollars between the United States and Hong Kong, in Violation of Federal Criminal Laws.**

532. In violation of U.S. money laundering laws, Defendants also have engaged in numerous financial transactions that involved proceeds from and/or were intended to promote the carrying on of certain specified unlawful activity, as defined by 18 U.S.C. § 1956(c)(7), including the above-described violations of 18 U.S.C. §§ 542 (customs fraud), 1343 (wire fraud), and, for transactions occurring after March 23, 2016, 152 (bankruptcy offenses) (collectively the "Money Laundering Predicates").

533. The commission of the Money Laundering Predicates allowed the SLB Enterprise to keep and receive millions of dollars (the "criminal proceeds"), including money that was due to Aviva and other creditors.

224

534.   Each of the transactions described below occurred in whole or in part in the United States and/or was committed by one or more United States persons, as defined by 18 U.S.C.§ 3077(2)(A),(B),(C)(E), and/or (F).

a.   The RICO Defendants Illegally Transferred Money from the United States to Hong Kong.

535.   The following transactions in 2016 and 2017 constituted criminal money laundering in violation of 18 U.S.C. § 1956(a)(1)(a), § 1956(a)(2)(a), § 1956(a)(2)(b), and (for each transaction over $10,000), 18 U.S.C. § 1957.

536.   Exhibits F-H are charts of payments made to Toy Quest Ltd.

537.   Each transaction was a "monetary transaction" because each transaction involved the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument (as defined in 18 U.S.C. § 1956(c)(5)), by, through, or to a financial institution.

538.   Each transaction was a payment made from the United States to Hong Kong.

539.   Each transaction involved the proceeds of multiple crimes, including the Money Laundering Predicates.

540.   For example, each transaction represented the proceeds of violations of 18 U.S.C. § 542 because the products for which payment was made constituted imported merchandise that was introduced into the commerce of the United States by means of fraudulent or false invoices, declarations, affidavits, letters, papers, false statements, and/or false or fraudulent practices or appliances.

a)   In many instances, the RICO Defendants concealed the true source of the goods—Manley or MTD—behind the names of Toy Quest Ltd., Genesis, and other participants in the SLB Enterprise.

225

1.   Attached as Exhibit I is a table listing of invoices submitted to Dollar Empire in 2016.  Each shipment(s) of products reflected in an invoice was accompanied by fraudulent or false invoices, declarations, affidavits, letters, or papers because each shipment failed to identify Manley or MTD as the true seller of the goods.

2.   Attached as Exhibit J is a table listing purchase orders placed by Bed Bath and Beyond between 2013 and 2016.  Each resulting shipment was accompanied by fraudulent or false invoices, declarations, affidavits, letters, or papers because each shipment failed to identify Manley or MTD as the true seller of the goods.

3.   Attached as Exhibit K is a table listing the dates and ports of entries of shipments to Target in 2015 and 2016.  Each shipment was accompanied by fraudulent or false invoices, declarations, affidavits, letters, or papers because each shipment failed to identify Manley or MTD as the true seller of the goods.

b)   In other instances, the RICO Defendants concealed the true destination of the goods by designating an SLB Enterprise company as the recipient or consignee.

541.   Each transaction also violated 18 U.S.C. § 1343 because it was transmitted via interstate and/or international wire transmission, in furtherance of the fraudulent scheme.

542.   Each transaction occurring after March 24, 2016, also violated 18 U.S.C. § 152 because it was a fraudulent transfer or concealment of property that would have belonged to Manley's estate. Each such transaction was made, or caused to be made, by the Defendants with

.

the knowledge that it was fraudulent and with the intent to conceal the property of Manley in violation of 18 U.S.C. § 152(1) and receive material amounts of property owed to Manley in violation of 18 U.S.C. § 152(5). For example, as seen in Exhibit I, Dollar Empire helped the SLB Enterprise conceal millions of dollars of Manley assets through dozens of transactions in the two and a half months leading up to Manley's liquidation.

**b.    The RICO Defendants Transferred Money from Hong Kong to the United States.**

543.    In addition, the RICO Defendants committed other violations of 18 U.S.C. § 1956(a)(2)(A) by sending money from Hong Kong to Aquawood, MGS, and the SLB Enterprise's attorneys in the United States, because those payments were used to fund the SLB Enterprise's ongoing efforts to defraud creditors and carry out the Money Laundering Predicates

544.    The U.S. operations of Aquawood and MGS have been funded by the SLB Enterprise from Hong Kong.

545.    As part of those operations, Aquawood and MGS personnel coordinated the shipments of products to U.S. retailers in conjunction with Manley/Park Lane employees in Hong Kong.  Those personnel claimed to be acting on behalf of Toy Quest Ltd. or, later, Banzai.

546.    Aquawood and MGS personnel also have colluded in the purported "consignee" relationship between Dollar Empire and the SLB Enterprise and have assisted the SLB Enterprise in sending "consigned" goods to U.S. retailers.

547.    Likewise, the SLB Enterprise's counsel in the United States—including attorneys at Archer & Greiner P.C., Goodwin Procter LLP, Reuben, and Novack, as well as others in Texas, Tennessee, and New Jersey (the "U.S. Counsel")—were paid with funds originating in Hong Kong.

227

548.    The U.S. Counsel were used to file pleadings, motions, and papers in the United States Courts and ensure that the SLB Enterprise could continue to carry out the Money Laundering Predicates.  Likewise, the U.S. Counsel were used to interfere with Aviva's efforts to curtail the Money Laundering Predicates.

549.    Thus, for each of the payments to Aquawood, MGS, and U.S. Counsel, the RICO Defendants knowingly transported, transmitted, or transferred the funds identified in each transaction, or caused the funds to be transported, transmitted or transferred, from Hong Kong to the United States.

550.    The RICO Defendants transported, transmitted, or transferred the funds identified in each transaction, or caused the funds to be transported, transmitted or transferred, with the intent to promote the carrying on of the Money Laundering Predicates.

c.    **The RICO Defendants Have Laundered Millions of Dollars by Transferring Criminal Proceeds Between the United States and Hong Kong.**

551.    The RICO Defendants' ongoing commission of the Money Laundering Predicates has resulted in substantial U.S. revenue accruing to the SLB Enterprise (the "criminal proceeds"), including money that was rightfully due to Aviva and other independent creditors.

552.    Knowing that the financial transactions, as defined in 18 U.S.C. § 1956(c)(4), represent the proceeds of some form of unlawful activity, RICO Defendants have transferred millions of dollars in criminal proceeds between the United States and Hong Kong as follows:

a)  RICO Defendants transferred criminal proceeds with the intent to promote the carrying on of one or more of the Money Laundering Predicates, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(a)(2)(A);

228

b)  RICO Defendants knowingly transferred criminal proceeds, knowing that the money involved the proceeds of some form of unlawful activity and that the transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the criminal proceeds, in violation of 18 U.S.C. § 1956(a)(2)(B)(i); and

c)  RICO Defendants knowingly engaged in money transactions involving criminal proceeds in amounts greater than $10,000, in violation of 18 U.S.C. § 1957.

553.    These money laundering offenses have harmed Aviva and other independent creditors by preventing them from being able to enforce their respective judgments against members of the SLB Enterprise.

B.    **The RICO Defendants Have Conducted the Affairs of an Enterprise Through a Pattern of Racketeering That Victimized Aviva.**

554.    As described in Section I, the RICO Defendants have conducted, and continue to conduct, the affairs of the SLB Enterprise through a pattern of related and continuous predicate acts as defined by 18 U.S.C. §1961(1), in that they committed violations of 18 U.S.C. §§ 152 (bankruptcy offenses), 1343 (wire fraud), 1512 (obstruction of justice), and 1956-57 (money laundering) (collectively "the Predicate Crimes").

555.    Through the commission of the Predicate Crimes, the RICO Defendants have conducted, and continue to conduct, the affairs of the SLB Enterprise through a pattern of related and continuous predicate acts as defined by 18 U.S.C. §1961(1).

556.    The Predicate Crimes committed or caused to be committed by the RICO Defendants constituted a variety of unlawful activities, each conducted with the common purpose of keeping money that rightfully belonged to independent creditors.

229

557. Each Predicate Crime was committed or caused to be committed by the RICO Defendants with the common purpose of generating and keeping money for the SLB Enterprise at the expense of the independent creditors.

558. Each instance of racketeering activity alleged above and herein was related, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Aviva.

559. The Predicate Crimes were related and not isolated events. The last racketeering incident occurred well within five years of the commission of a prior incident of racketeering.

560. Many of the precise dates of the RICO Defendants' criminal actions at issue here have been hidden and cannot be alleged without access to the books and records of the Defendants and the SLB Enterprise. An essential part of the successful operation of the pattern of racketeering alleged herein depended upon secrecy.

561. Indeed, RICO Defendants such as MGS and Dollar Empire have vigorously fought Aviva for years—defying court orders when necessary—as Aviva has attempted to obtain this information through proper legal channels. Despite courts agreeing to impose sanctions against such RICO Defendants as Chan, Alan Chan, Dubinsky, Toy Quest Ltd., and Aquawood, the RICO Defendants continue to obstruct and evade Aviva's efforts to uncover the truth.

562. Neither Aviva's RICO claims nor its state law claims are barred by any applicable statute of limitations.

563. Much of the racketeering activity, which is ongoing, has occurred in the last two years.

230

564.   Indeed, Aviva could not have learned that it had been injured by a pattern of racketeering that included bankruptcy offenses prior to March 23, 2016, when Manley first initiated the liquidation proceedings which prevented Aviva from collecting the judgment against Manley.

565.   Moreover, prior to this time—and until at least July 2015—Aviva, like other independent creditors, detrimentally relied on the materially false representations that the RICO Defendants made and caused to be made.

a)   Between November 6, 2014, when Aviva's judgment first became finalized, and March 23, 2016, when the Bankruptcy Court shut down all U.S. litigation, Aviva attempted to garnish funds from large retailers including Target, Fingerhut, Wal-Mart, and Kmart.

b)   Though the retailers had all conducted business with Manley, representatives from Target, Fingerhut, Wal-Mart, and Kmart reported that there were no garnishable funds available.

1.   For example, Kmart told Aviva that Kmart did not have any garnishable funds for Manley.

2.   Kmart stated that it ceased doing business with Manley and instead entered into a contract with a new entity called Toy Quest Ltd.

c)   The retailers made these statements due to Toy Quest Ltd.'s material false representations.

d)   Based on the statements by retailers, Aviva relied on Toy Quest Ltd.'s material misrepresentations and did not garnish funds that were listed as payable to Toy Quest Ltd.

566.    Indeed, Aviva did not discover (and reasonably could not have discovered) that the SLB Enterprise was conspiring to evade the Minnesota judgment illegally until July 2015.

567.    It was only in July 2015 that Aviva first gained access to critical emails and documents that provided sufficient evidence of the criminal judgment evasion scheme being carried out by the SLB Enterprise.

568.    The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future.

569.    Indeed, the RICO Defendants' racketeering has continued unabated and, without the intervention of the courts, is likely to continue because it now has become the SLB Enterprise's regular way of conducting certain business.

717.    The various statements by Wu and Dollar Empire conflict with numerous documents submitted to U.S. Customs and Border Protection by shipping companies.

718.    These documents list Dollar Empire as the consignee and importer of record for dozens of shipments, many of which were accompanied by Banzai International invoices that identify Dollar Empire as the "purchaser" of the goods and state that the goods would be sent to Des Moines, Iowa, to MGS or another SLB Company.

232

## CAUSES OF ACTION

## COUNT I

## : FRAUD

**(Against the Civil Fraud Defendants)**

719. ~~570. The allegations of the~~ Aviva re-alleges and incorporates by reference all preceding paragraphs ~~are incorporated herein by reference~~.

720. ~~571.~~ As set forth above, the Civil Fraud Defendants made or caused to be made materially false representations and omissions of material facts susceptible of knowledge, with the knowledge that the representations or omissions were false (or without knowing whether they were true or false), and with the intention to induce another to act in reliance thereon.  These false representations or omissions caused Aviva and other creditors to act in reliance thereon, causing Aviva to suffer pecuniary damages as a result of the reliance.

Misrepresentations to Manley's Retailers

721. ~~572.~~ The Principals, Toy Quest Ltd., Aquawood, and Magalhaes caused SLB Enterprise representatives to make material misrepresentations to at least ~~seven~~ nine different retailers between 2013 and 2015, falsely claiming that the business Manley conducted under its "Toy Quest" and "Toy Quest Ltd." trade names was actually conducted by a separate company, Defendant Toy Quest Ltd.

722.   In the paragraphs and tables above, and in the attached exhibits, Aviva has identified dozens of fraudulent communications that furthered the RICO Defendants' fraudulent scheme.  Every single line on a table or exhibit constitutes a fraudulent communication.  Many other fraudulent communications occurred, but the specific details of such communications are not known to Aviva because they are in the possession of the RICO Defendants, who have blocked Aviva from obtaining meaningful discovery.

723.   a) For example, on June 13, 2014, Anthony Cheng, a SLB Enterprise representative in Hong Kong, emailed Tina Taylor, a Big Lots representative in Columbus, Ohio, attaching a letter requesting a "change of vendor name."

724.   b) The email falsely claimed that the reason for the change was for "Toy Quest to be the face of the company," when in fact, as the Principals, Toy Quest Ltd., and Magalhaes well knew, the reason for the change was to allow the SLB Enterprise to evade independent creditors by creating a false and misleading paper trail.

725.   c) Cheng further requested that future purchase orders be issued under the Toy Quest Ltd. name, which would ensure that independent creditors like Aviva would be induced to rely on Manley's material misrepresentation.

726.   573. SLB Enterprise representatives made similar material misrepresentations to other retailers through emails and letters sent between June 2013 and November 2015, making the material misrepresentation that the retailers had been doing business with Toy Quest Ltd., and inducing retailers to create business records

documenting the material misrepresentation, including but not limited to the communications identified in paragraphs 458 through 464.

727. 574. The Principals, Toy Quest Ltd., Aquawood, and Magalhaes knew that those material misrepresentations caused by Toy Quest Ltd. were susceptible of knowledge and were clearlywere false as, because Manley employees continued to conduct business as Manley, selling the same Manley products to the same Manley customers.

728. a)On November 17, 2014, Gary Wong, a SLB Enterprise representative, emailed Kathy Gahm, a representative of Colony Brands, Inc., with a subject line that referred to a purchase order for "Toy Quest Ltd. (Manley Toys . . .)."  The sender of the email had a "manley.com.hkmanley.com.hk" email address and an email signature that identified himself as a Manley representative, but introduced himself as "Gary Wong from Toy Quest Ltd."

729. b)On July 8, 2016, Lynn Mitchell, as Costco representative, noted in an email to Peter Magalhaes, a SLB Enterprise representative, that Manley and Toy Quest Ltd. shared personnel, mailing addresses, and email addresses, all with email addresses ending in "manley.com.hkmanley.com.hk," and the same accounts payable address.

730. c)On August 8, 2014, months after SLB Enterprise representatives claimed Manley was doing business as Toy Quest Ltd., Toy Quest Ltd. stated in sworn court filings that it had "no employees."  In January 2016, Toy Quest Ltd. likewise represented in federal court that Toy Quest Ltd. "does not engage in sales in the United States" and "does not transact any business in the United States."

731.   ~~d)~~ Manley employees masquerading as "Toy Quest Ltd." sold Crayola products in the United States in 2013 and 2014, although only Manley and Aquawood were authorized to sell Crayola products in the United States.

732.   ~~e)~~ Until shortly before Manley's liquidation, Manley continued to fill "Toy Quest Ltd." orders.  For example, in November 2014, five invoices were issued on Manley letterhead for purchase orders from Michaels Stores, Inc.  The same invoices were subsequently reissued—with the same invoice numbers, purchase order numbers, and dates—on "Toy Quest" letterhead.

733.   ~~f)~~ Until shortly before Manley's liquidation, Manley continued to be listed as the ultimate payment beneficiary on purchase orders placed with "Toy Quest Ltd."

~~575.   As discussed above, Toy Quest Ltd. knew these misrepresentations were materially false and that Manley employees continued to conduct business as Manley, selling the same Manley products to the same Manley customers.~~

734.   ~~576.~~ The Principals, Toy Quest Ltd., Aquawood, and Magalhaes made or caused to be made the material false representations ~~to be made in order~~ to induce retailers and other third parties to create numerous records, including purchase orders, invoices, and import records that identified Manley assets as belonging to Toy Quest Ltd.

735.   The Principals, Toy Quest Ltd., Aquawood, and Magalhaes further intended for Aviva to act in reliance on the purchase orders and other records identifying Manley assets as belonging to Toy Quest Ltd. by causing Aviva to decline to garnish or otherwise

seize the Manley assets that Aviva was entitled to collect pursuant to its judgment against Manley.

736.   577. As discussed above, Aviva detrimentally relied on these materially false representations to retailers when it attempted to garnish funds from Manley's debtors.

737.   578. In instances where it obtained evidence disproving these materially false representations, Aviva pursued appropriate legal remedies.  On January 4, 2016, for example, Aviva successfully obtained a judgment in Texas for approximately $140,000 held by Michaels owed to Manley, as well as attorneys' fees.

738.   579. Once the Bankruptcy Court stayed all U.S. proceedings involving Manley, however, Aviva was unable to seek further enforcement of the Minnesota judgment, including garnishments to other retailers and a Tennessee motion for turnover of garnished funds that was pending at the time of Manley's bankruptcy filing.

739.   580.  As a direct and proximate result of Aviva's actions in reliance on these false representations to retailers, Aviva has been injured in its business and property in that Aviva has only collected approximately $140,000 of its $8,588,931.59 judgment against Manley and has expended substantial costs and expenses in its efforts to enforce and recover the judgment through garnishment and other litigation.

<u>Misrepresentations and Omissions in Litigation</u>

740.   581. Since 2018, theThe Principals, the Executives, Toy Quest Ltd., Banzai Internationalthe Hong Kong Entities, Aquawood, Dollar Empire, MTD, and Park LaneMTD made or caused to be made false statements and omissions during post-judgment

discovery and garnishment proceedings in federal courts, all ~~in order~~ to prevent Aviva from collecting on ~~the Minnesota and Iowa~~its judgments.

741. ~~582.~~ The Principals, the Executives, ~~Toy Quest Ltd., Banzai International~~the Hong Kong Entities, Aquawood, ~~Park Lane,~~ Dollar Empire, and MTD each have omitted or caused Aquawood, Manley, Dollar Empire, and/or MTD to omit material facts during post-judgment discovery and garnishment proceedings by withholding from Aviva and federal courts certain answers, information, and documents~~,~~ (the "judgment enforcement materials") as follows:

> a) ~~Since 2018, in~~In violation of the Federal Rules of Civil Procedure and the District of Minnesota ~~Federal Court~~'s ~~order~~orders, the Principals, Toy Quest Ltd., Banzai International, Aquawood, and Park Lane caused the withholding and concealment of information responsive to Aviva's post-judgment discovery ~~Interrogatories~~interrogatories, including information regarding the assets, debts, fiduciaries, personnel, shareholders, and business of Manley, Toy Quest Ltd., and related SLB Companies, including Manley's connections to Toy Quest Ltd.;
>
> b) ~~Since 2018, in~~In violation of the Federal Rules of Civil Procedure and the District of Minnesota ~~Federal Court~~'s ~~order~~orders, the Principals, Toy Quest Ltd., Banzai International, Aquawood, and Park Lane caused the withholding and concealment of documents and

communications responsive to Aviva's post-judgment discovery ~~Document Requests~~document requests, including documents and communications regarding the assets, judgments, debts, fiduciaries, personnel, shareholders, initial capitalization, products, plans, and business of Manley, Toy Quest Ltd., and related SLB Companies, including Manley's connections to other SLB Companies,;

c)   ~~Since 2017, in~~In violation of the Federal Rules of Civil Procedure, Dollar Empire and Wu caused the withholding and concealment of information regarding the nature and extent of Dollar Empire's relationship with the SLB Enterprise; and

d)   ~~Between December 2015 and June 2016, in~~In violation of ~~Fed. R. Civ. P.~~Federal Rule of Civil Procedure 69(a), Iowa Code § 642.6, and an order issued by ~~a United States District Court in~~the Southern District of Iowa ~~(the "Iowa Federal Court")~~, the Principals, Toth, and MTD caused the withholding and concealment of information about MTD's financial ties to Toy Quest Ltd. and Manley and MTD's knowledge about debts to those entities, all of which was responsive to Aviva's garnishment ~~Interrogatories~~interrogatories.

742.   ~~583.~~In omitting facts and information which were susceptible of knowledge, the Principals, Toy Quest Ltd., Banzai International, Aquawood, Toth, MTD, and Park Lane knew that they were creating a clearly false record when Aquawood,

MTD, and Manley deliberately and fraudulently withheld the judgment enforcement materials even though, as the Principals, Toy Quest Ltd., Banzai International, Aquawood, Toth, MTD, and Park Lane well knew, they had access to and control over the judgment enforcement materials as well as a legal duty to disclose them under the Federal Rules of Civil Procedure, the Iowa Code, and/or court orderorders.

743. 584. In addition to causing material omissions to be made, the Principals and others made material misrepresentations that compounded the impact of those omissions.

744. 585. For example, on April 20, 2018, the Principals, Toth, and MTD caused to be electronically filed with the Southern District of Iowa Federal Court a signed declaration of "Li Wong" (the "Corporate Secretary" of MTD's corporate owner), made under penalty of perjury, which was materially false with respect to one or more alleged facts as follows.

> a) The declaration falsely stated that MTD had "never done business at the address of 700 New York Avenue, Des Moines, Iowa," when in fact, as MTD and the Principals well knew, MTD had in fact done business at that address.

> b) The declaration falsely stated that MTD "has had no employees in the United States [sic] 2013" when in fact, as MTD and the Principals well knew, MTD had employees in the United States during and after 2013.

745. 586. On or about December 21, 2016, Samson Chan, Dubinsky, and Alan Chan each caused to be electronically filed with the District of Minnesota Federal Court a signed declaration, made under penalty of perjury, that was materially false with respect to one or more alleged facts, as follows.

a)   Chan falsely stated in his declaration that he "retired" from "day-to-day operation[s]" and being "CEO" of Manley in 2011 when in fact, as he well knew, Chan continued to play these roles as of the date of his false declaration.

b)   Chan also falsely stated in his declarations that he "was not aware of and made no decisions on behalf of Manley with respect to the post-judgment discovery at issue on this motion" when in fact, as Chan well knew, he was aware of and made decisions on behalf of Manley with respect to that post-judgment discovery.

c)   Dubinsky falsely stated in his declaration that "at no time did Aquawood or myself have any control over or decision-making authority" with respect to Manley when in fact, as Dubinsky well knew, he had possessed and exercised such authority, including but not limited to decisions with the pending post-judgment discovery.

d)   Alan Chan falsely stated in his declaration that making "decisions on behalf of Manley with respect to the post-judgment discovery at issue on this motion" was not part of his "job responsibilities" when

in fact, as he well knew, making such decisions was part of Alan Chan's job responsibilities.

746. ~~587.~~ On or about July 26, 2017, Dollar Empire and Wu each caused Dollar Empire's counsel to falsely represent to ~~the United States District Court for~~ the Central District of California that Dollar Empire kept and maintained import records for shipments from the SLB Enterprise.

747. ~~588.~~ On or about August 15, 2017, Dollar Empire and Wu each caused to be electronically filed with ~~United States District Court for~~ the Central District of California a signed declaration under penalty of perjury that was materially false with respect to the alleged fact that Dollar Empire was "just a customer" of Toy Quest Ltd. and Banzai International.

748. ~~589.~~ On or about October 3, 2017, Dollar Empire and Wu each caused Dollar Empire's counsel to falsely represent that Dollar Empire was a consignee of the SLB Enterprise.

749. ~~590.~~ On or about July 3, 2018, the Principals and Park Lane each caused to be electronically filed with the Minnesota Federal Court at least one signed declaration, made under penalty of perjury, that was materially false with respect to one or more alleged facts, as follows:

    a)      Chan falsely stated in his declaration that he "retired" from "day-to-day operation[s]" and being "CEO" of Manley in 2011 when

in fact, as he well knew, Chan continued to play these roles as of the date of his false declaration.

b)    Liu and Chan each falsely stated in their respective declarations that he or she "was not aware of and made no decisions on behalf of Manley with respect to the post-judgment discovery at issue on this motion" when in fact, as both Liu and Chan well knew, each of them was aware of and made decisions on behalf of Manley with respect to that post-judgment discovery.

c)    Dubinsky falsely stated in his declaration that "at no time did Aquawood or myself have any control over or decision-making authority" with respect to Manley when in fact, as Dubinsky well knew, he had possessed and exercised such authority, including but not limited to decisions with the pending post-judgment discovery.

d)    Alan Chan falsely stated in his declaration that making "decisions on behalf of Manley with respect to the post-judgment discovery at issue on this motion" was not part of his "job responsibilities" when in fact, as he well knew, making such decisions was part of Alan Chan's job responsibilities.

e)    Through its "Manager" Po Kin Lee, Park Lane falsely stated in a declaration that Park Lane "was not aware of and made no decisions on behalf of Manley with respect to the post-judgment discovery at

issue on this motion" when in fact, as Park Lane well knew, Park Lane was aware of and made decisions on behalf of Manley with respect to that post-judgment discovery.

750. ~~591.~~ Each of the above declarations in federal court filings was susceptible of knowledge, materially false, and made with the knowledge of the falsity of the representations.

751. ~~592.~~ The Principals, the Executives, Toy Quest Ltd., Banzai International, Aquawood, Dollar Empire, MTD, and Park Lane caused these false statements and omissions to be made ~~in order~~ to preclude Aviva from being able to enforce the Minnesota and Iowa judgments.

752. ~~593.~~ The Principals, the Executives, Toy Quest Ltd., Banzai International, Aquawood, Dollar Empire, MTD, and Park Lane also caused these false statements and omissions to be made ~~in order~~ to induce Aviva to pursue certain judgment enforcement efforts without the benefit of the judgment enforcement materials.

753. ~~594.~~ As a result of the omissions caused by the Principals, Toy Quest Ltd., Banzai International, Aquawood, Toth, and MTD, Aviva attempted to enforce ~~the Iowa~~its judgment against MTD without the benefit of the judgment enforcement materials.

754. ~~595.~~ As a result of the omissions caused by the Principals, Toy Quest Ltd., Banzai International, Aquawood, Toth, and MTD, Aviva attempted to enforce ~~the Minnesota~~its judgment against Manley—prior to the entry of the ~~Bankruptcy Stay~~bankruptcy stay—without the benefit of the judgment enforcement materials.

755. ~~596.~~ As a result of the omissions by the Principals, the Executives, Toy Quest Ltd., Banzai International, Aquawood, Dollar Empire, MTD, and Park Lane, Aviva was precluded from pursuing certain judgment enforcement efforts against MTD and Manley.

756. ~~597.~~ As a result of its reliance on the omissions caused by the Principals, the Executives, Toy Quest Ltd., Banzai International, Aquawood, Dollar Empire, and MTD, Aviva has been unable to collect more than $8.4 million of its ~~judgments~~judgment against ~~MTD and~~ Manley while expending substantial costs and expenses on those judgment enforcement efforts that Aviva has been permitted to take.

# COUNT II

## : ABUSE OF PROCESS

### (Against the Sham Litigation Defendants)

757.   ~~599. The allegations of the~~Aviva re-alleges and incorporates by reference all preceding paragraphs~~are incorporated herein by reference~~.

758.   ~~600.~~As set forth above, on at least three occasions the Sham Litigation Defendants used litigation in U.S. courts for ulterior motives in order to accomplish a result not within the scope of the proceedings.

### Wellmax and Toy Quest Ltd.

759.   ~~601.~~After Aviva filed a ~~Motion~~motion for ~~Judgment~~judgment in the Middle District of Tennessee to obtain funds owed by Dollar General to the SLB Enterprise, Wellmax contested the garnishment by asserting a security interest in the funds.

760.   ~~602.~~The Principals coordinated an attempt by Wellmax and Toy Quest Ltd. to interfere with Aviva's garnishments against Dollar General, which was holding money owed to Manley.

761.   ~~603.~~The purpose of asserting a good faith security interest is to protect the interest of valid creditors.

762.   ~~604.~~Wellmax provided no legal or factual basis for asserting its sham security interest.

763. ~~605.~~ Toy Quest Ltd., represented by Novack, filed its own frivolous opposition, demanding approximately $100,000 of the Dollar General funds.

764. ~~606.~~ Once Aviva demonstrated that Wellmax had no legitimate security interest in the funds, Wellmax withdrew from the Tennessee ~~Action~~action within a few hours of Toy Quest Ltd. entering an appearance.

765. ~~607.~~ Upon learning of Toy Quest Ltd.'s attempt to seize the Dollar General funds, which were also subject to the ~~Bankruptcy Stay~~bankruptcy stay, the Bankruptcy Court imposed sanctions against Toy Quest Ltd.

766. ~~608.~~ Wellmax and Toy Quest Ltd.'s coordinated back-to-back frivolous oppositions to Aviva's Motion for Judgment were made with the ulterior motive of further concealing Manley assets and evading its creditors, a purpose which is beyond the scope of the garnishment proceedings in the Tennessee ~~Action~~action.

<u>Jun Tai and Winning</u>

767. ~~609.~~ At the direction of the Principals, funded by Toy Quest Ltd., and with the assistance of Mann and Novack, Jun Tai and Winning filed a ~~Motion~~motion to ~~Intervene~~intervene in the ~~Minnesota Action~~case in which Aviva obtained its judgment against Manley, shortly after Aviva filed a sanctions motion against Manley.

768. ~~610.~~ A party may intervene in a case before a federal court if the party claims an interest relating to the property or transaction that is the subject of the action, and that interest is not being properly represented before the court.

769. ~~611.~~ The District of Minnesota ~~Federal Court~~ denied Jun Tai and Winning's motion to intervene as "grossly deficient," failing to set forth any factual support or comply with basic procedural requirements.

770. ~~612.~~ The sham motion to intervene was filed with the ulterior motive of delaying the sanctions proceedings ~~in order~~ to allow the Principals to begin Manley's liquidations proceedings and avoid an adverse ruling by the District of Minnesota ~~Federal Court~~.

771. ~~613.~~ Delaying the District of Minnesota ~~Federal Court~~ proceedings for these purposes was outside the proper scope of these proceedings.

Bankruptcy Proceedings

772. ~~614.~~ The Principals, assisted by Mann and Novack, caused Manley to initiate ~~Chapter~~chapter 15 liquidation proceedings in the ~~United States~~Bankruptcy Court in March 2016, days before the sanctions hearing was scheduled before the District of Minnesota ~~Federal Court~~.

773. ~~615.~~ The purpose of ~~Chapter~~chapter 15 liquidation proceedings is to encourage cooperation between the United States and foreign countries involved in cross-border insolvency cases, ensure greater legal certainty for trade and investment, protect the interests of all creditors and other interested entities, protect and maximize the value of the debtor's assets, and facilitate the rescue of financially troubled businesses.

774. ~~616.~~ Acknowledging the mountain of evidence against Manley and the Principals, the Bankruptcy Court acknowledged that it had "no doubt that Toy Quest and

248

other insiders have taken actions to avoid paying Aviva's claims," that Manley's "actions in various courts in the United States appears to have been improper," and that Manley's "decision to enter into liquidation may have been the latest step in an effort to avoid a day of reckoning in the United States."

775.   ~~617.~~ Although the Principals initiated ~~Chapter~~chapter 15 proceedings with the ulterior motive of evading Aviva's judgment, as well as debts owed to other creditors in the United States, ~~which is beyond the scope of Chapter 15 liquidation proceedings.,~~ the Bankruptcy Court ultimately found that the Principals' actions did not preclude recognition.

776.   ~~618.~~ Accordingly, Aviva was stayed from enforcing ~~the Minnesota Judgment~~its judgment against Manley and delayed in pursuing sanctions for the Principals' actions. As a direct and proximate result of the Sham Litigation Defendants' abuse of process, Aviva has been injured in its business and property in that~~.~~ Aviva has only collected approximately $140,000 of its $8,588,931.59 judgment and has incurred substantial costs and expenses in its efforts to enforce and recover the judgment through garnishment.

777.   The Liquidators have stated that the liquidation will conclude with no distribution to independent creditors, and the Liquidators will close the proceedings without pursuing any alter ego or fraudulent transfer claims.

# COUNT III

## : CIVIL CONSPIRACY

### (Against ~~the Civil Conspiracy~~All Defendants)

778. ~~619.~~Aviva re-alleges and incorporates by reference all ~~other~~preceding paragraphs ~~of this Complaint as if fully set forth here, and further alleges as follows~~.

779. ~~620.~~As set forth herein, each of the ~~Civil Conspiracy~~ Defendants engaged in a civil conspiracy to commit fraud, as alleged in Count I, and/or to abuse process, as alleged in Count II.

780. ~~a)~~The ~~Civil Fraud Defendants~~Principals, the Executives, Magalhaes, Manley, the Hong Kong Entities, Aquawood, the Iowa Entities, and Dollar Empire engaged in a civil conspiracy to commit fraud, as alleged in Count I.

781. ~~b)~~The ~~Sham Litigation Defendants~~Principals, Manley, Toy Quest Ltd., Jun Tai, Winning, and Wellmax engaged in a civil conspiracy to abuse process, as alleged in Count II.

782. ~~621.~~Each of the ~~Civil Conspiracy~~ Defendants worked together with one or more persons to accomplish an unlawful purpose and/or an unlawful act by unlawful means.

783. ~~622.~~Each of the conspiracies described in this count is a continuing conspiracy, and the overt acts performed in compliance with the conspiracy's objective(s) are ongoing and/or have occurred within the last year.

784.   623. Each Civil Conspiracy Defendant's actions and omissions in furtherance of the conspiracy, proximately caused and/or substantially contributed to Aviva's losses by depriving it of the money due from the Iowa and Minnesotaits judgments, as alleged in this Complaint.

785.   To the extent that Aviva obtains relief in this Action against Manley, the Liquidators are subject to such relief in the Liquidators' capacities as liquidators of and successors to Manley.

251

# COUNT IV
## : RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § ~~1961~~ 1962(~~c~~C)

### (Against the RICO Defendants)

~~624.    Aviva re-alleges and incorporates by reference all preceding paragraphs, and alleges as follows:~~

786. ~~625. Aviva brings this Count against the RICO Defendants.~~ Aviva re-alleges and incorporates by reference all preceding paragraphs.

787. ~~626.~~ At all relevant times, Aviva and all RICO Defendants were "persons" under 18 U.S.C. § 1961(3) because they were individuals or entities capable of holding "a legal or beneficial interest in property."

### Enterprise

788.    The SLB Enterprise was an ongoing and continuing association-in-fact consisting of legal individuals and entities, including each of the RICO Defendants and other SLB Companies.

789.    The existence of the SLB Enterprise is confirmed by the findings of numerous courts, Dubinsky's "one step ahead" confession, and SLB Product promotional materials, websites and manuals, which link almost all of the Defendants together in one way or another.

790.    The SLB Enterprise has an existence separate and distinct from each RICO Defendant.

252

791.    The individual RICO Defendants—Samson Chan, Alan Chan, Lisa Liu, Brian Dubinsky, Richard Toth, and Michael Wu—have had personal and business relationships for decades.  Those individual RICO Defendants control, operate, use, and (with the possible exception of Toth) are the beneficial owners of the entity RICO Defendants—Toy Quest Ltd., Banzai International, Park Lane, Aquawood, MTD, Toy Network, MGS, and Dollar Empire.

792.    The SLB Enterprise is engaged in, and its activities affect, interstate commerce.  The SLB Enterprise conducted commercial activities across state and international lines, including the manufacture, export, import, sale, distribution, and shipment of SLB Products from Hong Kong to and throughout the U.S., and the corresponding receipt of money from the sale of those products.

793.    The SLB Enterprise functions as a continuing unit that has pursued a common purpose for years—to make money in the United States through the sale of SLB Products while minimizing and evading judgments that members of the SLB Enterprise accrue in the United States, such as Aviva's judgment.

**Conduct**

794.    627. TheEach of the RICO Defendants areis employed by or associated with the SLB Enterprise, an association-in-fact enterprise engaged in, and whose activities affect, interstate commerce.  Each of the RICO Defendants also has directly and indirectly conducted and participated in the operation or management of the SLB Enterprise.

795.    Some of the individual Defendants are the SLB Enterprise's main beneficiaries.  Some are not the main beneficiaries.  The roles of the entity Defendants have varied over time, as a main feature of the SLB Enterprise is that SLB Companies can come and go as needed, but they all have been integral to the enterprise.

796.    Samson Chan, Liu, and Dubinsky have controlled the SLB Enterprise for years.  Their control was not limited to any one company, but instead spanned the entire enterprise.  Alan Chan also has a key leadership role in the enterprise's activities, including directing litigation on behalf of the enterprise.  Toth runs the day-to-day operations in Iowa.

797.    Toy Quest Ltd., Banzai International, and Park Lane in Hong Kong have worked with Aquawood, MTD, Toy Network, MGS, and Dollar Empire in the United States to sell, import, and distribute SLB Products, and to collect money from customers.  Those companies have swapped names, misled retailers, manipulated import documents, falsified financial records, and submitted fraudulent court papers to accomplish the SLB Enterprise's goal of evading U.S. judgments.

798.    Wu and Dollar Empire, in conjunction with the Hong Kong Entities, the Iowa Entities, and Aquawood, played a pivotal part in disguising the ultimate destination of SLB Products, making it appear as if SLB Products were no longer flowing through Iowa, and improperly transferring assets out of the U.S. that could have been used to satisfy judgments, including Aviva's judgment.

**Pattern of Predicate Acts**

254

799.   628. TheEach of the RICO Defendants agreed to and did conduct and participate in the conduct of the enterpriseSLB Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Aviva.

800.   Each RICO Defendant has committed at least two of the predicate acts discussed below.

**A.   Wire Fraud – 18 U.S.C. § 1343**

801.   Each of the RICO Defendants has committed wire fraud pursuant to 18 U.S.C. § 1343.

802.   Each of the RICO Defendants devised and intended to devise a scheme and artifice to defraud Aviva and other judgment creditors of SLB Companies, and to obtain money and property through false and fraudulent pretenses, representations, and promises.  Each of the RICO Defendants transmitted or caused to be transmitted, by means of wire, radio, or television communication in interstate or foreign commerce, writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

803.   In the paragraphs and tables above, and in the attached exhibits, Aviva has identified dozens of wire communications sent in interstate or foreign commerce that furthered the RICO Defendants' fraudulent scheme.  Every single line on a table or exhibit constitutes a fraudulent wire communication.  Many other fraudulent wire communications occurred, but the specific details of such communications are not known

to Aviva because they are in the possession of the RICO Defendants, who have blocked Aviva from obtaining meaningful discovery.

804.     Categories of wire communications that furthered the RICO Defendants' fraudulent scheme include the following:

805.     From about June 2013 to Manley's liquidation in March 2016, Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., Aquawood, and possibly other RICO Defendants knowingly sent or caused to be sent emails to retailers in other states and countries that made material omissions and misrepresentations about the operations and assets of Manley, Toy Quest Ltd., and the Iowa Judgment Debtors; the relationships among Manley, Toy Quest Ltd., and the Iowa Judgment Debtors; and whether the retailers were conducting business with Manley or Toy Quest Ltd.

806.     Each of those emails is a fraudulent wire communication.

807.     In the same time period, those same RICO Defendants knowingly sent or caused to be sent electronically invoices to multiple retailers that contained fraudulent demands to pay millions of dollars to Toy Quest Ltd., when in fact the retailers owed that money to Manley.  (See Exhibits A-D to Aviva's Complaint.)  While Aviva is aware of dozens of such invoices, there are likely hundreds more.

808.     Each of those invoices is a fraudulent wire communication.

809.     In addition to those RICO Defendants, Toth, MTD, Toy Network, and MGS knowingly sent or caused to be sent hundreds of emails to retailers and others that

furthered the fraudulent scheme by coordinating the shipping, receiving, processing, and distribution of the SLB Products associated with those invoices.

810.     Each of those emails is a fraudulent wire communication.

811.     After Manley's liquidation in March 2016, Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., Banzai International, Park Lane, Aquawood, and possibly other RICO Defendants knowingly continued to send or cause to be sent electronically invoices to retailers that contained fraudulent demands to pay money to Toy Quest Ltd., when in fact the retailers owed money to Manley.  (See Exhibits E & L to Aviva's Complaint.)  While Aviva is aware of dozens of such invoices, there are likely hundreds more.

812.     Each of those invoices is a fraudulent wire communication.

813.     In addition to those RICO Defendants, Toth, MTD, Toy Network, and MGS knowingly sent or caused to be sent hundreds of emails to retailers and others that furthered the fraudulent scheme by coordinating the shipping, receiving, processing, and distribution of the SLB Products associated with those invoices.

814.     Each of those emails is a fraudulent wire communication.

815.     Both before and after Manley's liquidation, the retailers, including Big Lots, Dollar General, Michaels, Target, Bed Bath & Beyond, and Target, relied on these fraudulent wire communications to make changes to their vendor systems and to pay millions of dollars to Toy Quest Ltd. that actually were owed to Manley.  (See Exhibits G & H to Aviva's Complaint.)

816.     At Wu's direction, Dollar Empire paid more than $3 million to Toy Quest Ltd. that Wu and Dollar Empire knew was actually owed to Manley.  (See Exhibit F to Aviva's Complaint.)

817.     Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., Banzai International, Park Lane, Aquawood, Wu, Dollar Empire, and possibly other RICO Defendants thus knowingly sent or caused to be sent the wire communications that effectuated these financial transactions in interstate or foreign commerce.

818.     The fraudulently induced payments to Toy Quest Ltd. in turn allowed Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., Banzai International, Park Lane, Aquawood, and possibly other RICO Defendants to falsify the sales and financial records of Manley, Toy Quest Ltd., Banzai International, Park Lane, Aquawood, and likely other SLB Companies in an effort to make it appear that Manley had no assets.

819.     Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., Banzai International, Park Lane, Aquawood, and possibly other RICO Defendants then sent or caused to be sent electronically those financial records to Manley's Liquidators, lawyers in the United States, the Bankruptcy Court, and creditors, who all relied on them.

820.     Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., Banzai International, Park Lane, Aquawood, and possibly other RICO Defendants also knowingly submitted or caused to be submitted electronic filings in courts across the United States that contained dozens of material omissions and misrepresentations about the operations and assets of Manley and Toy Quest Ltd., including false statements that

the companies kept separate accounts and did not comingle funds and that funds owed to Manley were owed to Toy Quest Ltd.

821.    Those RICO Defendants likewise knowingly made or caused to be made fraudulent submissions to courts about the RICO Defendants' roles and responsibilities with respect to Manley and other SLB Companies and the existence, location, and accessibility of documents and assets.

822.    Courts, retailers, creditors, and Manley's Liquidators relied on those fraudulent court submissions.

823.    The purpose of all of these thousands of fraudulent wire communications was to allow the SLB Enterprise to continue doing business in the United States while evading judgments entered against Manley and the Iowa Judgment Debtors and concealing documents and information relevant to the enforcement of those judgments.

824.    Aviva's ability to describe with more precision the assets that were hidden by the RICO Defendants is limited because of the RICO Defendants' hiding of, destruction of, and refusal to provide relevant information.

825.    In addition, starting in 2016 and continuing through at least 2018, Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., Banzai International, Park Lane, Aquawood, Toth, MTD, Toy Network, MGS, Wu, and Dollar Empire knowingly have sent or caused to be sent wire communications in furtherance of a fraudulent scheme to conceal the final destination of SLB Products and that those products were flowing through Iowa.

826.     Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., Banzai International, Park Lane, Aquawood, Wu, and Dollar Empire knowingly have transmitted or caused to be transmitted electronically customs documents that falsely identify Dollar Empire as the consignee or importer of record for hundreds of tons of SLB Products worth millions of dollars, stating that the products would end up with Dollar Empire in California.  (See Exhibit L to Aviva's Complaint.)

827.     Each of those customs documents is a fraudulent wire communication.

828.     In many instances, the customs documents should have listed the importer of record as an SLB Company, such as Aquawood, MTD, Toy Network, or MGS.

829.     In reality, some of those SLB Products were sent directly to retailers across the country at the direction of Toy Quest Ltd., Banzai International, Park Lane, Aquawood, MTD, Toy Network, or MGS.

830.     Other SLB Products were sent to MTD, Toy Network, and MGS in Iowa, and then distributed to retailers across the country.

831.     Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., Banzai International, Park Lane, Aquawood, Toth, MTD, Toy Network, MGS, Wu, and Dollar Empire also knowingly sent or caused to be sent hundreds of emails that furthered the sham consignment scheme by coordinating the movement of goods around the country, from California to Iowa to the retailers.

832.     Each of those emails is a fraudulent wire communication.

833.    Customs officials, retailers, and creditors relied on the fraudulent customs documents and emails.

834.    Had customs officials known that the customs documents contained false information, the SLB Products likely would not have been admitted into the United States.

**B.      Bankruptcy Crimes – 18 U.S.C. § 152**

835.    Each of the RICO Defendants has committed bankruptcy crimes pursuant to 18 U.S.C. § 152.

**1.      Fraudulent Concealment of Property – 18 U.S.C. § 152(1)**

836.    All of the RICO Defendants repeatedly violated 18 U.S.C. § 152(1) by knowingly and fraudulently concealing property belonging to the estate of a debtor (Manley) from both (a) officers of the court charged with the control or custody of property (Manley's Liquidators) and (b) independent creditors, in connection with a case under title 11.

837.    As described above, each RICO Defendant played a part in knowingly and fraudulently concealing millions of dollars of Manley's accounts receivable owed to Manley using its "Toy Quest" trade name.

838.    Those Manley assets were fraudulently concealed from Manley's Liquidators and creditors, including Aviva.

629.    Pursuant to and in furtherance of their fraudulent scheme, the RICO Defendants committed multiple related instances of the Predicate Crimes.

~~630.    The Predicate Crimes set forth in Section III constitute a pattern of racketeering activity pursuant to~~

839.    Many of the fraudulent wire communications discussed above served the purpose of concealing Manley assets.

840.    Each RICO Defendant helped to conceal Manley assets both before and after Manley's bankruptcy case was filed.

841.    As described above, after Manley's bankruptcy case was filed, all of the RICO Defendants participated in transferring Manley assets out of the country, in violation of the bankruptcy stay.

842.    In addition, Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., Banzai International, Park Lane, Aquawood, Toth, MTD, Toy Network, MGS, and possibly other RICO Defendants knowingly and fraudulently concealed from the Liquidators and creditors a substantial portion of Manley's books and records, including all of Manley's emails; documents related to bank loans made to Manley, Toy Quest Ltd., and other SLB Companies; and all of Manley's books and records in California and Iowa.

### 2.    Making False Oaths in Manley's Bankruptcy Case – 18 U.S.C. § 152(2)

843.    Dubinsky violated 18 U.S.C. § 152(2) by knowingly and fraudulently making false oaths or accounts in his September 26, 2017 deposition in Manley's bankruptcy case.

844.   Gary Chan, who was acting on behalf of Toy Quest Ltd., also violated 18 U.S.C. § 152(2) by knowingly and fraudulently making false oaths or accounts in his September 22, 2017 deposition in Manley's bankruptcy case.

### 3.   Making False Declarations in Manley's Bankruptcy Case – 18 U.S.C. § 152(3)

845.   Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., Park Lane, and possibly other RICO Defendants violated 18 U.S.C. § 152(3) by knowingly and fraudulently causing Manley's Liquidators to make false statements under penalty of perjury about Manley's financial condition.

846.   Samson Chan, Alan Chan, Liu, Dubinsky, and Toy Quest Ltd. also violated 18 U.S.C. § 152(3) by knowingly and fraudulently causing Gary Chan to make false statements under penalty of perjury on behalf of Toy Quest Ltd. in Manley's bankruptcy case.

847.   Toy Quest Ltd.'s original and amended interrogatory answers served in Manley's bankruptcy case, both of which were verified by Gary Chan, were contradictory.  Therefore, at least one of them was false.

### 4.   Presenting False Claims for Proof – 18 U.S.C. § 152(4)

848.   Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., and possibly other RICO Defendants violated 18 U.S.C. § 152(4) by knowingly and fraudulently causing Toy Quest Ltd. and other SLB Companies to present false claims for proof against Manley, and using those claims in Manley's bankruptcy case.

849. Those claims for proof falsely alleged that Toy Quest Ltd. and other SLB Companies such as Manley Fashion were creditors of Manley, when in fact they were debtors of Manley.

850. Without the false claims for proof, the Principals could not have authorized the Liquidators to file the petition for chapter 15 recognition because less than half of Manley's total liabilities would have been owed to SLB Companies under the Principals' control.

851. Without Toy Quest Ltd.'s false claim for proof, the Liquidators also could not have used money from Toy Quest Ltd. to fund Manley's bankruptcy case.

852. The Bankruptcy Court relied expressly on Toy Quest Ltd.'s purported status as a creditor, as reported in its claim for proof, in allowing multiple actions by Manley's Liquidators that were funded by Toy Quest Ltd. and, later, in recognizing Manley's liquidation pursuant to chapter 15.

853. The Liquidators continued to rely on the false claims for proof throughout Manley's bankruptcy case to oppose Aviva's efforts to obtain documents and information and in support of other forms of relief sought pursuant to chapter 15.

854. At the direction of Samson Chan, Alan Chan, Liu, and Dubinsky, Toy Quest Ltd. used its false claim for proof in Manley's bankruptcy proceeding for purposes of appearing in the bankruptcy case and asserting its status as a Manley creditor.

855. At the direction of Samson Chan, Alan Chan, Liu, and Dubinsky, Toy Quest Ltd. filed false statements in connection with a litigated dispute over the ownership

of property that arguably was property of Manley and Toy Quest Ltd.'s alleged violation of the bankruptcy stay.  The Bankruptcy Court eventually sanctioned Toy Quest Ltd. for violating the stay.

     5.   **Fraudulently Receiving Property –** 18 U.S.C. § ~~1961(5).~~

     ~~631.~~   ~~The RICO Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of~~**152(5)**

856.   Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., Banzai International, Park Lane, Aquawood, Toth, MTD, Toy Network, MGS, and possibly other RICO Defendants repeatedly violated 18 U.S.C. § 152(5) by knowingly and fraudulently receiving, or causing others knowingly and fraudulently to receive, a material amount of property belonging to Manley, including payments as well as books and records, after Manley's bankruptcy case was filed, with the intent to defeat the provisions of title 11.

857.   Since Manley's bankruptcy case was filed, Toy Quest Ltd. improperly has taken more than $7 million of Manley's money, including millions of dollars owed to Manley by Dollar Empire, and then (upon information and belief) passed those assets to Samson Chan, Alan Chan, Liu, Dubinsky, Banzai International, Park Lane, Aquawood, and possibly other RICO Defendants.

858.   Banzai International fraudulently received Manley assets through its purchase of purported Toy Quest Ltd. assets.

859. The RICO Defendants intended to defeat the provisions of title 11 by keeping Manley's assets within the SLB Enterprise instead of allowing them to be distributed to Manley's creditors.

860. In addition, Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., Banzai International, Park Lane, Aquawood, Toth, MTD, Toy Network, MGS, and possibly other RICO Defendants knowingly and fraudulently received a substantial portion of Manley's books and records that had been concealed from the Liquidators and creditors.

861. Those RICO Defendants intended to defeat the provisions of title 11 by taking and hiding information that would expose additional Manley assets that should be distributed to Manley's creditors.

### 6. Fraudulent Payments for Acting or Forbearing to Act in Manley's Bankruptcy Case – 18 U.S.C. § 152(6)

862. Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., Banzai International, Park Lane, Aquawood, and possibly other RICO Defendants repeatedly violated 18 U.S.C. § 152(6) by knowingly and fraudulently making payments or causing payments to be made to Manley's Liquidators, their lawyers and various creditors to act or not to act in Manley's bankruptcy case.

863. Those RICO Defendants did not intend for Manley's bankruptcy case to allow an orderly marshaling of assets and winding up of affairs.

864. Rather, those RICO Defendants funded or caused to be funded the bankruptcy case for the fraudulent purpose of preventing independent creditors from

seeking Manley assets or asserting claims based on Manley's alter-ego relationships with other companies or individuals while members of the SLB Enterprise continued to take Manley assets out of the U.S.

865.    The payments that the RICO Defendants made or caused to be made to Manley's Liquidators and their lawyers funded all actions taken by those professionals in Manley's bankruptcy case, including filing the initial chapter 15 recognition petition that triggered the bankruptcy stay, blocking Aviva's efforts to take discovery and to compel Toy Quest Ltd. to comply with the bankruptcy stay, and opposing Aviva's request for stay relief to allow independent creditors to assert alter ego or fraudulent transfer claims.

866.    At the same time, payments by Toy Quest Ltd. and other SLB Companies to various creditors with whom the SLB Companies have ongoing business relationships caused independent creditors not to assert rights they otherwise might have asserted in the chapter 15 case.

867.    Toy Quest Ltd. paid all professionals (including all lawyers) involved in all sides of the negotiation of the Liquidators' proposed settlement with the SLB Companies. Recipients of such payments included U.S. lawyers representing the Liquidators and the Liquidators themselves, who have received virtually no compensation for their efforts over the past three years from anyone other than Toy Quest Ltd.

868.    Toy Quest Ltd. paid all professionals involved in responding to and evaluating Aviva's proof of claim, even though the proof of claim includes many allegations against multiple SLB Companies, including not only Manley but also Toy

Quest Ltd. and other SLB Companies.  The primary points of contact for Aviva with respect to its proof of claim against Manley has been the Liquidators' U.S. counsel in the chapter 15 case.

869.   Toy Quest Ltd. paid the Liquidators to, among other things, refuse to turn over Manley documents, object to creditors' requests to obtain those documents, and attempt to destroy those documents.

### 7.   Fraudulent Transfer and Concealment of Property – 18 U.S.C. § 152(7)

870.   Each RICO Defendant repeatedly violated 18 U.S.C. § 152(7) by knowingly and fraudulently transferring and concealing Manley's property, including its receivables, physical assets, and books and records, in contemplation of Manley's bankruptcy case.

871.   As described above, each RICO Defendant played a part in knowingly and fraudulently transferring and concealing millions of dollars of Manley's accounts receivable owed to Manley using its "Toy Quest" name.

872.   Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., Banzai International, Park Lane, Aquawood, and possibly other RICO Defendants sent or caused to be sent fraudulent communications to retailers to transfer and conceal Manley's property, including communications falsely stating that the retailers were doing business with Toy Quest Ltd. and invoices demanding payment to Toy Quest Ltd. of money actually owed to Manley.

873.   Toth, MTD, Toy Network, and MGS helped knowingly and fraudulently conceal Manley's property by coordinating the shipping, receiving, processing, and distribution of the SLB Products associated with those invoices.

874.   Wu and Dollar Empire conducted dozens of transactions in the months leading up to and following the filing of Manley's bankruptcy case that helped the SLB Enterprise conceal millions of dollars of Manley assets.  (See Exhibits F & I to Aviva's Complaint.)

875.   Since Manley's bankruptcy case was filed, all of these fraudulent communications resulted in the transfer of millions of dollars of Manley assets out of the U.S., in violation of the bankruptcy stay.  Toy Quest Ltd., for example, improperly has taken more than $7 million of Manley's money, including millions of dollars owed to Manley by Dollar Empire, all in violation of the bankruptcy stay, and all facilitated by the fraudulent communications of the RICO Defendants.

876.   Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., Banzai International, Park Lane, Aquawood, and possibly other RICO Defendants accepted or caused Toy Quest Ltd. to accept money and other assets that they knew belonged to Manley.

877.   Banzai International also fraudulently received Manley assets through its purchase of purported Toy Quest Ltd. assets.

878.   In addition, Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., Banzai International, Park Lane, Aquawood, Toth, MTD, Toy Network, MGS, and

possibly other RICO Defendants knowingly and fraudulently transferred and concealed a substantial portion of Manley's books and records.

879.    All of these actions were taken in contemplation of Manley's bankruptcy case, to drain Manley of assets prior to the filing of the chapter 15 recognition petition, mislead Manley's liquidators and the court, and make it more difficult for creditors to trace or seize Manley's assets.

### 8. Fraudulently Concealment and Withholding of Recorded Information – 18 U.S.C. § 152(8) and (9)

880.    Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., Banzai International, Park Lane, Aquawood, Toth, MTD, Toy Network, MGS, and possibly other RICO Defendants repeatedly violated 18 U.S.C. § 152(8) and (9) by knowingly and fraudulently concealing, falsifying, and withholding recorded information relating to Manley's property and financial affairs after Manley's bankruptcy case was filed.

881.    Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., Banzai International, Park Lane, Aquawood, Toth, MTD, Toy Network, MGS, and possibly other RICO Defendants knowingly and fraudulently concealed and withheld from the Liquidators a substantial portion of Manley's books and records, including all of Manley's emails; documents related to bank loans made to Manley, Toy Quest Ltd., and other SLB Companies; and all of Manley's books and records in California and Iowa.

882.    Defendants concealed Manley's books and records by transferring them to Toy Quest Ltd. and Park Lane, and then by transferring them again from Toy Quest Ltd. to Banzai International.

883.    As described above, Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., Banzai International, Park Lane, Aquawood, and possibly other RICO Defendants also falsified the sales and financial records of Manley, Toy Quest Ltd., Banzai International, Park Lane, Aquawood, and likely other SLB Companies in an effort to make it appear that Manley had no assets.

884.    Based on these falsified records, the Liquidators incorrectly concluded that Manley had conducted little to no business in the United States in recent years and had less than $100,000 in realizable U.S. assets.

885.    Moreover, because the records reflecting the true state of Manley's assets and financial affairs had been withheld from the Liquidators, the Liquidators purportedly did not know that Manley had been operating as "Toy Quest Ltd." until the week before Manley's liquidation filing and failed to identify as Manley assets the millions of dollars that retailers owed to Manley for sales it made using its "Toy Quest Ltd." name.

886.    The Liquidators passed on much of the false or incomplete information they received to the Bankruptcy Court, which recognized the Hong Kong proceedings based in part on information that went from Defendants to the Liquidators to the Bankruptcy Court.

**C.    Money Laundering – 18 U.S.C. § 1956 and 18 U.S.C. § 1957**

887.    Each of the RICO Defendants repeatedly violated 18 U.S.C. § 1956 by conducting or attempting to conduct, or causing others to conduct or attempt to conduct, financial transactions involving property that they knew represented the proceeds of

specified unlawful activity. Such financial transactions were intended to promote the carrying on of the specified unlawful activity and/or were designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of proceeds of specified unlawful activity.

888. Each of the RICO Defendants also repeatedly violated 18 U.S.C. § 1957 by knowingly engaging or attempting to engage in a monetary transaction involving property derived from specified unlawful activity valued at more than $10,000.

889. The specified unlawful activity in question includes the wire fraud and bankruptcy crimes detailed above, as well as customs fraud pursuant to 18 U.S.C. § 542:

    a) Since at least 2013, Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., Banzai International, Park Lane, Aquawood, Toth, MTD, Toy Network, MGS, Dollar Empire, and Wu have imported or attempted to import SLB Products into the U.S., or caused others to import or attempt to import SLB Products into the U.S., by means of fraudulent and false invoices, customs documents, and other papers, and by means of false written or verbal statements.

    b) From at least 2014 to 2015, Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., Aquawood, Toth, MTD, Toy Network, MGS, and possibly other RICO Defendants falsely designated or caused to be falsely designated MTD on customs documents as the consignee or importer of record for SLB Products. That false designation concealed from customs officials and creditors the retailers that actually

received the goods, meaning that creditors were not aware that money owed by those retailers was available to be garnished.

c)  Subsequently, from 2016 to at least 2018, the RICO Defendants switched the sham designee from MTD to Dollar Empire.  In that time period, Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., Banzai International, Park Lane, Aquawood, Toth, MTD, Toy Network, MGS, Wu, and Dollar Empire falsely identified Dollar Empire, or caused Dollar Empire to be falsely identified, on customs documents as the consignee or importer of record for SLB Products.  (See Exhibit L to Aviva's Complaint.)

d)  These false statements not only concealed from customs officials and creditors the ultimate destination of the goods, thereby thwarting garnishment actions involving the retailers who actually received the goods, but also concealed from Aviva and the Iowa Claimants that SLB Products were flowing through Iowa as well as any payments made to the Iowa Judgment Debtors in connection with the shipments.

e)  In addition, the purchase prices reported to U.S. Customs in connection with the sham Dollar Empire shipments—which determined the fees and duties charged upon entry of those shipments into the U.S.—were far below the actual purchase prices paid by retailers for the products in those shipments, meaning that Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., Banzai International, Park Lane, Aquawood, Toth, MTD, Toy Network, MGS, Wu, and Dollar Empire defrauded

the U.S. government by paying lower fees and/or duties than they would have if they had reported the correct purchase prices.

   f) All of the false statements described above were material not only to judgment creditors but also to U.S. Customs in that the SLB Products likely would not have been admitted into the United States if customs officials had known that the customs documents contained false information, especially false information that resulted in the U.S. government being fraudulently deprived of fees and/or duties due to it.

   g) Another variant of the RICO Defendants' customs fraud was to misrepresent on shipping documents that Toy Quest Ltd. had sold certain products, when the products actually were sold by another SLB Company such as Manley or MTD. Those false statements caused retailers to pay money to Toy Quest Ltd. that really was owed to Manley, MTD, or another SLB Companies.

   h) Specifically, from 2013 until at least 2016, Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., Banzai International, Park Lane, Aquawood, Toth, MTD, Toy Network, MGS, and possibly other RICO Defendants shipped SLB Products to retailers accompanied by invoices and other documents falsely claiming that Toy Quest Ltd. was the seller of the goods when in fact the seller was Manley, MTD, Toy Network, MGS, or another SLB Company.  (See Exhibits A-E, I-K to Aviva's Complaint.)

  890. The millions of dollars of revenue generated from the sale of SLB Products constitutes the proceeds of the wire fraud, bankruptcy crimes, and customs fraud

described above, because the revenue is derived from or obtained or retained, directly or indirectly, through that unlawful activity.

891.    All of the RICO Defendants have laundered that revenue by conducting or attempting to conduct, or causing others to conduct or attempt to conduct, multiple financial transactions involving the revenue, usually involving amounts well over $10,000.  Each of the financial transactions occurred in whole or in part in the United States and/or was committed by one or more United States persons, as that term is defined by 18 U.S.C. § 3077(2).

892.    Exhibits F-H to Aviva's Complaint, for example, identify dozens of payments totaling many millions of dollars made by retailers in the United States—including Dollar Empire—to Toy Quest Ltd. in Hong Kong, when the payments should have been made to Manley.

893.    Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., Banzai International, Park Lane, Aquawood, Wu, Dollar Empire, and possibly other RICO Defendants caused these payments to be made.

894.    Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., Banzai International, Park Lane, Toth, and possibly other RICO Defendants also laundered the proceeds of their illegal activity by sending money or causing money to be sent from Hong Kong back to the United States.

895.   That money was used to fund the operations of Aquawood, MTD, Toy Network, and MGS in the United States, which were integral to the RICO Defendants' fraudulent scheme.

896.   The money also was used to pay attorneys in the United States, including Novack, RRB, Archer & Greiner, and Goodwin Procter, who filed pleadings, motions, declarations, and other papers across the country to prevent Aviva and other judgment creditors from enforcing their judgments, so that the RICO Defendants could proceed with their fraudulent scheme.

897.   Each transaction described above was a "monetary transaction" because it involved the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument by, through, or to a financial institution.

898.   Each transaction involved the proceeds of wire fraud, bankruptcy crimes, and/or customs fraud.

899.   The purpose of all of the financial transactions described above was to promote the carrying on of further wire fraud, bankruptcy crimes, and/or customs fraud by (a) ensuring that the SLB Enterprise continued to do business in the United States, and (b) helping the SLB Enterprise avoid paying judgments.

900.   The transactions also served to conceal or disguise the nature, location, source, ownership, or control of the millions of dollars of revenue generated from the sale of SLB Products.

### D.   Obstruction of Justice – 18 U.S.C. § ~~1962~~**1512**(c)~~.~~

901.   Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., Banzai International, Park Lane, Aquawood, Wu, Dollar Empire, and possibly other RICO Defendants altered, destroyed, mutilated, or concealed documents with the intent to impair the document's integrity or availability for use in an official proceeding, or caused others to do so.

902.   The same RICO Defendants likewise obstructed, influenced, and impeded an official proceeding.

903.   Aviva has alleged concealment of documents and obstruction in connection with multiple official proceedings.

904.   One official proceeding is the federal lawsuit in Minnesota in which Aviva obtained a judgment.  In connection with that lawsuit, Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., Banzai International, Park Lane, Aquawood, and possibly other RICO Defendants took and concealed documents subject to a post-judgment order to produce them to Aviva.

905.   Also in that lawsuit, Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., Park Lane, and possibly other RICO Defendants orchestrated the sham intervention of Jun Tai and Winning, which allowed those RICO Defendants to circumvent potentially catastrophic injunctive sanctions banning imports of SLB Products by causing the chapter 15 bankruptcy case to be initiated.  That sham intervention interfered with the litigation and the authority of the court.

906.    Another official proceeding is Manley's bankruptcy case.  Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., Banzai International, Park Lane, Aquawood, Toth, MTD, Toy Network, MGS, and possibly other RICO Defendants hid and manipulated Manley's books and records to mislead Manley's liquidators, creditors, and courts.  Toy Quest Ltd. also paid the Liquidators to, among other things, refuse to turn over Manley documents, object to creditors' requests to obtain those documents, and attempt to destroy those documents.

907.    Another official proceeding is the case in the Central District of California in which Wu submitted false statements about Dollar Empire's consignment relationship with Banzai International.  Wu and Dollar Empire impeded that proceeding by first representing that Dollar Empire possessed relevant import records, and then, when ordered to produce such documents, abruptly denying that Dollar Empire had any.  A reasonable inference is that the import records existed, but were destroyed or concealed.

**RICO Injury**

908.    ~~632.~~ As a direct and proximate result of the RICO Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Aviva has been injured in its ~~business and~~ property in that it has been unable to ~~fully~~ collect on ~~the Minnesota and Iowa judgments~~ its judgment against Manley ~~and MTD, and Aviva has incurred significant legal costs in its effort to enforce the judgments and uncover and resist the pattern of racketeering~~.

909.    As a result of Defendants' crimes and hiding of information, Aviva still lacks sufficient information to describe in detail precisely which assets were hidden from Aviva, when they were hidden, and how they were hidden.

910.    The RICO Defendants also are liable for certain post-judgment fees and expenses due to attorney time and related costs that would not have been necessary absent the RICO Defendants' crimes.

911.    In this lawsuit, Aviva is not seeking damages for the Lanham Act violations that resulted in its judgment.  Nor is Aviva seeking damages for the attorneys' fees and other litigation expenses it incurred to obtain its judgment.

912.    Aviva did not discover, and could not reasonably have discovered, that it had suffered a RICO injury until less than four years before the filing of its Complaint.

913.    The RICO Defendants prevented Aviva from discovering its RICO injury by fraudulently concealing documents and information, despite Aviva's diligent efforts to obtain such documents and information.

.

# COUNT V
## : RACKETEER INFLUENCED AND
## CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § ~~1961~~ 1962(~~d~~D)

### (Against the RICO Defendants)

914.   ~~633. The allegations of the~~Aviva re-alleges and incorporates by reference all

preceding paragraphs ~~are incorporated herein by reference~~.

915.   ~~634. This count is against~~All of the RICO Defendants~~.~~

~~635.   As set forth above, the RICO Defendants~~ have agreed and conspired to violate

18 U.S.C. § 1962(c).

916.   While Aviva contends that all of the RICO Defendants themselves

committed two or more predicate acts, if any RICO Defendant did not commit two or

more predicate acts, that RICO Defendant is still liable as a co-conspirator for the

damage caused by the SLB Enterprise.

917.   ~~636.~~ The RICO Defendants have intentionally conspired and agreed ~~to~~

~~directly and indirectly use or invest income that is derived from a pattern of racketeering activity~~

~~in an interstate enterprise, acquire or maintain interests in the enterprise through a pattern of~~

~~racketeering activity, and~~that they and/or other RICO Defendants would conduct and

participate in the conduct of the affairs of the ~~enterprise~~SLB Enterprise through ~~a~~the

pattern of racketeering activity~~. The~~ described above.

918.   Many of the RICO Defendants—Samson Chan, Alan Chan, Liu, Dubinsky,

Toy Quest Ltd., Aquawood, Toth, MTD, Toy Network, Wu, and Dollar Empire—have

been associated with the SLB Enterprise and one another for a decade or more. The other RICO Defendants—Banzai International, Park Lane, and MGS—have been associated with the SLB Enterprise since at least 2016, and were created to replace some of the other RICO Defendants or other SLB Companies as part of the RICO Defendants' corporate shell game.

919.    As detailed above, each of the RICO Defendants also knowingly engaged in and/or facilitated coordinated criminal activities, including wire fraud, bankruptcy crimes, customs fraud, and money laundering.

920.    Each of the RICO Defendants knew that their Predicate Crimes the RICO Defendants' own predicate acts and the predicate acts of other RICO Defendants were part of a pattern of racketeering activity, and agreed to the commission of those acts to further the schemes scheme described above.

921.    The RICO Defendants orchestrated such criminal activities to conceal assets of multiple judgment debtors from multiple judgment creditors, thereby benefiting Samson Chan, Alan Chan, Liu, Dubinsky, and their surviving companies and staying "one step ahead" of Aviva and other judgment creditors.

922.    That conduct constitutes a conspiracy to violate 18 U.S.C.A. § 1962(c), in violation of 18 U.S.C. § 1962(d).

637.    Each of the financial transactions and interstate or international communications, shipments, and acts of litigation described in Section III constituted an overt act in furtherance of the RICO Defendants' conspiracy.

281

923.   638. As a direct and proximate result of the RICO Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Aviva has been injured in its ~~business and~~ property in that it has been unable to ~~fully~~ collect on ~~the Minnesota and Iowa judgments~~its judgment against Manley ~~and MTD and has incurred significant legal costs in its effort to enforcement the judgments and uncover and resist the pattern of racketeering.~~  Aviva's damages as a result of the RICO Defendants' violations of 18 U.S.C. § 1962(d) are substantially the same as its damages as a result of the RICO Defendants' violations of 18 U.S.C. § 1962(c).

## ~~DAMAGES~~

~~639.   Aviva incorporates by reference all other paragraphs of this Complaint as if fully set forth here, and further alleges as follows.~~

~~640.   As a direct and proximate result of the RICO Defendants' violations of 18 U.S.C. § 1962(c), (d) and their pattern of racketeering activity and the Civil Conspiracy Defendants' tortious conduct, Aviva has been injured in its business and property in that: Aviva has only collected approximately $140,000 of an $8.5 million judgment and has incurred substantial costs and expenses in its efforts to enforce and recover the judgment through garnishment and other litigation.~~

~~641.   But for the Defendants' conduct, Aviva would not have incurred the monetary losses described above and expressly incorporated herein by reference.~~

## COUNT VI: ALTER EGO

### (Against the Alter Ego Defendants)

924.   Aviva re-alleges and incorporates by reference all preceding paragraphs, and alleges as follows against the Principals, the Hong Kong Entities, Aquawood, the Iowa Entities, Manley, and the Liquidators (collectively, the "Alter Ego Defendants"):

925.   Aviva seeks declarations against the Alter Ego Defendants named above that:

> a.   Manley is an alter ego of the Principals;
>
> b.   Manley is an alter ego of the Hong Kong Entities, Aquawood, and the Iowa Entities;

          c.      The Hong Kong Entities, Aquawood, and the Iowa Entities are alter egos of the Principals;

          d.      The Hong Kong Entities, Aquawood, and the Iowa Entities are alter egos of one another;

          e.      For purposes of enforcing judgments against the Alter Ego Defendants, Aviva is entitled to piercing of any corporate veils separating Manley, the Hong Kong Entities, Aquawood, and the Iowa Entities from one another and from the Principals; and

          f.      Aviva may enforce its judgments against the Alter Ego Defendants as judgment debtors.

926. The Principals have dominated, influenced, and controlled Manley, the Hong Kong Entities, Aquawood, and the Iowa Entities, as well as affiliates such as Toy Warehouse and Toy Box.

927. The Principals generally treat the assets of the SLB Companies as their own.

928. The Alter Ego Defendants move assets among themselves with little or no regard for which entity formally owns which assets.

929. Assets belonging to Manley became assets of Toy Quest Ltd. without any formal transfer of the assets and without Manley being paid for them, and those assets then became assets of Banzai International pursuant to a non-arms' length sale agreement.

930.     As shown by the fact that the SLB Companies come and go without any significant negative impact on the SLB Enterprise's business, Manley, the Hong Kong Entities, Aquawood, and the Iowa Entities generally function as mere shells that serve no legitimate business purposes and are used primarily as intermediaries to impair judgment enforcement, perpetrate fraud, and promote injustice and fundamental unfairness.

931.     As Dubinsky confessed, the Defendants invoke corporate formalities to stay "one step ahead" of judgment creditors.

932.     The Alter Ego Defendants and their named and unnamed co-conspirators systematically have abused the corporate form to evade judgments, including specifically the judgment Aviva obtained in the District of Minnesota, and for other illegitimate purposes.

933.     Manley and other SLB Companies used the trade names "Toy Quest Ltd.," "Toy Quest," and "ToyQuest" to, among other things, confuse business counterparties and creditors.

934.     Manley and other SLB Companies used the trade name "Banzai" to, among other things, confuse business counterparties and creditors.

935.     Manley and other SLB Companies used the trade name "Manley Toy Direct" to, among other things, confuse business counterparties and creditors.

936.     The Alter Ego Defendants have used one another's addresses interchangeably to, among other things, confuse business counterparties and creditors.

937.   The Alter Ego Defendants have used one another's addresses and identities interchangeably to, among other things, procure insurance that would cover most or all of the Alter Ego Defendants under insurance policies purchased from U.S. and Hong Kong insurers.

938.   The abuses of the corporate form by the Alter Ego Defendants have been described by multiple courts as games of "corporate entity three card monte."

939.   This Court already has determined that there is no "meaningful distinction" among Manley, Toy Quest Ltd., and Aquawood.

940.   For the ultimate benefit of the Principals and at their direction, the Principals and the Hong Kong Entities (a) established the following companies such that the companies were undercapitalized at the outset and/or (b) simply looted the companies, even if they initially were capitalized sufficiently: Manley, the Hong Kong Entities, Aquawood, and the Iowa Entities.

941.   For the ultimate benefit of the Principals and at their direction, the Principals and the Hong Kong Entities operated and controlled the following companies while failing to observe many corporate formalities, such as maintaining separate books and records: Manley, the Hong Kong Entities, Aquawood, and the Iowa Entities.

942.   For the ultimate benefit of the Principals and at their direction, the Principals and the Hong Kong Entities operated and controlled the following companies in a manner that resulted in the comingling of many business assets, including good will, product inventory, and the right to receive proceeds from various transactions: Manley,

the Hong Kong Entities, Aquawood, and the Iowa Entities.  When convenient, traditional rules concerning the separateness of corporate obligations (e.g., contractual obligations to supply particular SLB Products or to repay loans) also were ignored.

943.   Each of the Principals has misused the corporate form, and in particular abused the purported corporate separateness of Manley, the Hong Kong Entities, Aquawood, and the Iowa Entities, to deprive Aviva of its ability to collect judgments.

944.   Each of the Hong Kong Entities has misused the corporate form, and in particular abused the purported corporate separateness of Manley, the Hong Kong Entities, Aquawood, and the Iowa Entities, to deprive Aviva of its ability to collect judgments.

945.   Manley has misused the corporate form, and in particular the purported corporate separateness of Manley, the Hong Kong Entities, Aquawood, and the Iowa Entities, to deprive Aviva of its ability to collect judgments.

946.   Manley has not been a separate company whose separateness serves legitimate business purposes.  Rather, Manley has done the bidding of its beneficial owners, the Principals.  The corporate separateness of Manley has been used to perpetuate fraud and promote injustice and fundamental unfairness.

947.   Each of Aquawood, the Hong Kong Entities, and the Iowa Entities is not a separate company whose separateness serves legitimate business purposes.  Rather, each does the bidding of its beneficial owners, the Principals.  The corporate separateness of

each of the Hong Kong Entities has been used to perpetuate fraud and promote injustice and fundamental unfairness.

948.    Aviva did not elect to play the Alter Ego Defendants' shell game and is not a voluntary creditor of Manley or any of the other Defendants.  Rather, Aviva became an involuntary judgment creditor because it was injured by misconduct for which Manley was found liable.

949.    As an involuntary judgment creditor, Aviva has more equities in favor of enforcing the equitable remedy of piercing the corporate veil than would a voluntary judgment creditor in a contract case.

950.    When Aviva was a competitor of Manley, Aviva had no reason to know that in the future it would become a judgment creditor of Manley.  Aviva had no reason to conduct any due diligence on the corporate organization and capitalization of Manley, to obtain guarantees from other persons or entities, or collateralize any debt or promise, because Aviva did not know that it would later be damaged by a Lanham Act violation.

951.    Unlike a voluntary creditor with a breach-of-contract judgment, Aviva had no reason to know that Manley might be undercapitalized or later looted and therefore unable to pay judgments in the future, and Aviva had no ability to protect itself from the Alter Ego Defendants' abuses of the corporate form.

952.    The Principals, Manley, the Hong Kong Entities, Aquawood, and the Iowa Entities have such unity of interest and ownership that the individuality of the corporations and their owners have ceased and the facts demonstrate that observance of

the fiction of separate existence would, under the circumstances of this case, promote an injustice and fundamental unfairness.  The Principals, Manley, the Hong Kong Entities, Aquawood, and the Iowa Entities are functioning as a single entity.

953.   In some instances, the Principals and their co-conspirators have purported to establish multiple corporate layers within the structure of their business.  This has been done not for legitimate business purposes but to try to hide the Principals' dominant roles, hide the true economic and practical relationships among the individuals and entities, and make it more difficult to collect judgments against disposable entities.

954.   Similarly, for many SLB Companies, the Alter Ego Defendants have hidden the Principals' dominant roles and the Principals' status as beneficial owners by using corporate fronts.  Again, this has been done not for legitimate business purposes but to try to obfuscate the true economic and practical relationships among the individuals and entities and to make it more difficult to collect judgments against disposable entities.

955.   Aviva is entitled to the declaratory relief requested against the Alter Ego Defendants under applicable common law based on the equitable powers of courts in Minnesota to secure complete justice.

956.   To the extent that Aviva obtains relief in this Action against Manley, the Liquidators are subject to such relief in the Liquidators' capacities as liquidators of and successors to Manley.

## COUNT VII: FRAUDULENT TRANSFER

### (Against the Fraudulent Transfer Defendants)

957.    Aviva re-alleges and incorporates by reference all preceding paragraphs and alleges as follows against the Principals, the Executives, the Hong Kong Entities, Aquawood, Wellmax, the Iowa Entities, Dollar Empire, Manley, and the Liquidators (collectively, the "Fraudulent Transfer Defendants"):

958.    To evade Aviva's judgments, the Fraudulent Transfer Defendants have made or caused to be made a massive number of fraudulent transfers to divert assets away from Manley to the Hong Kong Entities, Aquawood and, ultimately, the Principals.

959.    Each of those fraudulent transfers was made or caused to be made with the actual intent to hinder, delay, or defraud Aviva after it became a judgment creditor of Manley and MTD.

960.    As described in more detail below, each of those fraudulent transfers bears multiple badges of fraud.

961.    None of the fraudulent transfers was made in good faith or for a reasonably equivalent value.

962.    Samson Chan, Alan Chan, Liu, Dubinsky, Magalhaes, Manley, Toy Quest Ltd., and Aquawood played their corporate shell game fraudulently to transfer Manley's and MTD's business relationships, good will, product inventory, intellectual property,

rights to receive proceeds from various transactions, employees, documents, and other assets to Toy Quest Ltd. and Park Lane.

963. Samson Chan, Alan Chan, Liu, Dubinsky, Magalhaes, Manley, Toy Quest Ltd., and Aquawood accomplished this goal by drastically reducing Manley's use of its own name, abruptly shifting almost exclusively to the trade name "Toy Quest Ltd."

964. The company Toy Quest Ltd. then started demanding and collecting payment of money that was actually owed to Manley using its "Toy Quest Ltd." trade name.

965. Meanwhile, Park Lane and Toy Quest Ltd. drained Manley of its other resources and took possession of Manley's documents, thereby keeping those resources and documents away from Aviva.

966. In 2016, when Manley was facing import sanctions in this Court, the Principals ultimately liquidated Manley and began doing business with Toy Quest Ltd.

967. There is no purchase agreement between Manley and Toy Quest Ltd.

968. Toy Quest Ltd. and Park Lane never paid for Manley's business assets, including business relationships, good will, product inventory, intellectual property, rights to receive proceeds from various transactions, employees, documents, and other assets

969. To lay the groundwork for the fraudulent transfers to Toy Quest Ltd., Samson Chan, Alan Chan, Liu, Dubinsky, Magalhaes, Toy Quest Ltd., and Aquawood knowingly sent or caused to be sent emails to retailers that made material omissions and

misrepresentations about the operations and assets of Manley and Toy Quest Ltd.; the relationships between Manley and Toy Quest Ltd.; and whether the retailers were conducting business with Manley or Toy Quest Ltd.

970.    Then those same Defendants knowingly sent or caused to be sent electronically invoices to multiple retailers that contained fraudulent demands to pay millions of dollars to Toy Quest Ltd., when in fact the retailers owed that money to Manley.  (See Exhibits A-E, I-K to Aviva's Complaint.)  Such invoices were sent both before and after Manley's liquidation.

971.    In addition, Toth, MTD, Toy Network, and MGS knowingly sent or caused to be sent hundreds of emails to retailers and others that furthered and effectuated the fraudulent transfers by coordinating the shipping, receiving, processing, and distribution of the SLB Products associated with the fraudulent invoices.

972.    While Aviva is aware of dozens of such invoices, there are likely hundreds or thousands more.

973.    Retailers, including Big Lots, Dollar General, Michaels, Target, Bed Bath & Beyond, and Target, relied on the fraudulent invoices and other fraudulent communications to make changes to their vendor systems and to pay millions of dollars to Toy Quest Ltd. that actually were owed to Manley.  (See Exhibits G & H to Aviva's Complaint.)

974.    Each payment to Toy Quest Ltd. as a result of the fraudulent invoices and other fraudulent communications is a fraudulent transfer.

975.     While Aviva is aware of dozens of such payments, there are likely hundreds or thousands more.

976.     Moreover, at Wu's direction, Dollar Empire paid more than $3 million to Toy Quest Ltd. that Wu and Dollar Empire knew was actually owed to Manley.  (See Exhibit F to Aviva's Complaint.)

977.     The fraudulently induced payments to Toy Quest Ltd. in turn allowed Samson Chan, Alan Chan, Liu, Dubinsky, Toy Quest Ltd., Banzai International, Park Lane, and Aquawood to falsify the sales and financial records of Manley, Toy Quest Ltd., Banzai International, Park Lane, Aquawood, and likely other SLB Companies in an effort to make it appear that Manley had no assets.

978.     The purpose of all of these hundreds of fraudulent transfers was to allow the SLB Enterprise to continue doing business in the United States while evading judgments entered against Manley and concealing documents and information relevant to the enforcement of those judgments.

979.     In July 2016, the Principals and the Hong Kong Entities continued their corporate shell games by selling Toy Quest Ltd.'s purported assets—comprised primarily of the assets fraudulently transferred from Manley—to Banzai International.

980.     The Principals and Hong Kong Entities arranged this sale to further disguise and hide Manley assets and make them more difficult for Aviva to trace.

981.     Toy Quest Ltd. did not receive reasonably equivalent value in the sale, which was for less than $2 million (US).

982.     The sale agreement between Toy Quest Ltd. and Banzai International was not an arm's length transaction.  While the sale agreement was written to appear legitimate, both the agreement's low purchase price and its recitation of numerous obviously false representations and warranties make plain that the agreement was a sham and was not the result of a fair negotiation.

983.     By now, Manley's assets likely have been passed to additional SLB Companies for the purpose of continuing to evade Aviva's judgments.

984.     All of the intermediate and ultimate fraudulent transfers should be unwound and voided.  None of the SLB Companies that are or were the intermediate or ultimate transferees of Manley's assets are good faith transferees.

985.     The asset transfers described above bear numerous badges of fraud:

      a)     Virtually all of Manley's assets ended up in the hands of Manley insiders, including the Principals and the Hong Kong Entities.

      b)     The Principals—who dominated, influenced, and controlled Manley, the Hong Kong Entities, and Aquawood and were or are the actual and/or beneficial owners of those companies—retained possession or control of Manley's assets at all times, both before and after the transfers.

      c)     All of the Fraudulent Transfer Defendants went to great lengths to conceal the fraudulent transfers and Manley's assets, by lying to retailers, courts, and creditors; falsifying invoices, customs

documents, and financial records; creating false agreements; and hiding documents.

d) The fraudulent transfers began shortly before Aviva obtained its $8.5 million judgment against Aviva and accelerated while Aviva actively was attempting to enforce that judgment, obtaining incriminating documents from third parties, and on the brink of obtaining import sanctions from this Court.

e) The fraudulent transfers from Manley to Toy Quest Ltd. and Park Lane were of substantially all of Manley's assets. The fraudulent transfers from Toy Quest Ltd. to Banzai International were of substantially all of Toy Quest Ltd.'s assets.

f) Neither Manley nor Toy Quest Ltd. received consideration even remotely equivalent to the value of the assets being transferred. Indeed, Manley was simply looted and received no consideration at all.

g) Manley was rendered insolvent and entered liquidation shortly after it had been thoroughly looted and its role in the fraudulent transfer scheme was complete.

986. Aviva is entitled to recover judgment for the value of all assets fraudulently transferred until its judgment is fully paid.

987.    To the extent that Aviva obtains relief in this Action against Manley, the Liquidators are subject to such relief in the Liquidators' capacities as liquidators of and successors to Manley.

## COUNT VIII: AIDING AND ABETTING FRAUDULENT TRANSFER

### (Against the Fraudulent Transfer Defendants)

988.   Aviva re-alleges and incorporates by reference all preceding paragraphs.

989.   To the extent that any Fraudulent Transfer Defendant is not a transferor, intermediate transferee, or ultimate transferee of assets that were fraudulently transferred from Manley for the purpose of evading Aviva's judgments, that Fraudulent Transfer Defendant should be held liable for aiding and abetting the fraudulent transfer.

990.   The fraudulent transfers are torts that caused injury to Aviva, the Fraudulent Transfer Defendants knew that the fraudulent transfers were torts, and the Fraudulent Transfer Defendants substantially assisted or encouraged the fraudulent transfers.

991.   Even if they did not actually receive any Manley assets, the Fraudulent Transfer Defendants knew that the fraudulent transfers were wrongful, and furthered the fraud through their conduct.

992.   For example, Toy Quest Ltd., Samson Chan, Alan Chan, Liu, Dubinsky, Magalhaes, Toy Quest Ltd., and Aquawood knowingly sent or caused to be sent emails to retailers that made material omissions and misrepresentations about the operations and assets of Manley and Toy Quest Ltd.; the relationships between Manley and Toy Quest Ltd.; and whether the retailers were conducting business with Manley or Toy Quest Ltd.

993.     Those same Defendants also knowingly sent or caused to be sent electronically invoices to multiple retailers that contained fraudulent demands to pay millions of dollars to Toy Quest Ltd., when in fact the retailers owed that money to Manley.  (See Exhibits A-E, I-K to Aviva's Complaint.)

994.     In addition, Toth, MTD, Toy Network, and MGS knowingly sent or caused to be sent hundreds of emails to retailers and others that furthered and effectuated the fraudulent transfers by coordinating the shipping, receiving, processing, and distribution of the SLB Products associated with the fraudulent invoices.

995.     Moreover, at Wu's direction, Dollar Empire paid more than $3 million to Toy Quest Ltd. that Wu and Dollar Empire knew was actually owed to Manley.

996.     Each of the Fraudulent Transfer Defendants should be held liable for the damages that Aviva suffered as a result of the fraudulent transfers.

997.     To the extent that Aviva obtains relief in this Action against Manley, the Liquidators are subject to such relief in the Liquidators' capacities as liquidators of and successors to Manley.

**REQUEST FOR RELIEF**

WHEREFORE, Aviva requests that, subject to any applicable stay orders entered by a United States Bankruptcy Court, as such orders may be modified, this Court enter judgment against the Defendants for:

1.    Damages of not less than $10 million, in an amount to be determined by the trier of fact;

2.    Treble damages as provided by law;

3.    Exemplary or punitive damages in an amount to be determined by the trier of fact as allowed by law;

4.    All legal and equitable relief as allowed by law, except as expressly disavowed herein, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants.

    a.    In particular, Aviva seeks an injunction preventing ~~all~~the Defendants from selling, importing, distributing, or shipping SLB ~~Enterprise products~~Products into the United States, or causing such products to be sold, imported, distributed, or shipped in the United States, through agents or otherwise; and

b.   Aviva seeks an injunction preventing ~~all~~the Defendants from sending money or assets outside the United States or causing money or assets to be sent outside of the United States;

5.   Declarations against the Alter Ego Defendants named above that:

a.   Manley is an alter ego of the Principals;

b.   Manley is an alter ego of the Hong Kong Entities, Aquawood, and the Iowa Entities;

c.   The Hong Kong Entities, Aquawood, and the Iowa Entities are alter egos of the Principals;

d.   The Hong Kong Entities, Aquawood, and the Iowa Entities are alter egos of one another;

e.   For purposes of enforcing judgments against the Alter Ego Defendants, Aviva is entitled to piercing of any corporate veils separating Manley, the Hong Kong Entities, Aquawood, and the Iowa Entities from one another and from the Principals; and

f.   Aviva may enforce its judgments against the Alter Ego Defendants as judgment debtors.

6.   A declaration against the Liquidators that to the extent that Aviva obtains relief in this Action against Manley, the Liquidators are subject to such relief in the Liquidators' capacities as liquidators of and successors to Manley.

.

7.    ~~5. Attorney~~Attorneys' fees and costs; and

8.    ~~6.~~ Pre- and post-judgment interest, in amounts to be determined ~~by the finder of fact~~.


~~PLAINTIFFS DEMAND~~PLAINTIFF DEMANDS TRIAL BY JURY

Dated: ~~March 19, 2019~~        ~~Respectfully submitted,~~
May 17, 2021                    By:       */s/ Shelli L. Calland*

> Stephen A. Weisbrod (admitted *pro hac vice*)
> Shelli L. Calland (admitted *pro hac vice*)
> WEISBROD MATTEIS & COPLEY PLLC
> 1200 New Hampshire Avenue, NW, 4th Floor
> Washington, DC 20036
> Tel: (202) 499-7900
> sweisbrod@wmclaw.com
> scalland@wmclaw.com

> ~~/s/~~ Keith M. Sorge__  (MN Bar No. 0326665)
> ~~August J. Matteis, Jr. (*pro hac vice* to be filed)~~   ~~Keith M. Sorge (MN Bar No. 0326665)~~
> ~~Stephen A. Weisbrod (*pro hac vice* to be filed)~~
> ~~Shelli L. Calland (*pro hac vice* to be filed)~~   ~~ARTHUR, CHAPMAN, KETTERING,~~
> ~~Joseph J. Khan  (*pro hac vice* to be filed)~~   ~~SMETAK & PIKALA, P.A.~~
> ~~500 Young Quinlan Building~~
> ~~WEISBROD MATTEIS & COPLEY PLLC~~   ~~81 South Ninth Street~~
> ~~1200 New Hampshire Avenue, NW, Suite 600~~   ~~Minneapolis, Minnesota 55402-3214~~
> ~~Washington, DC 20036~~   ~~Tel:  (612) 339-3500~~
> ~~(202) 499-7900~~

> ~~*Attorneys*~~

> ARTHUR, CHAPMAN, KETTERING,
> SMETAK & PIKALA, P.A.
> 500 Young Quinlan Building
> 81 South Ninth Street
> Minneapolis, MN  55402
> Phone: (612) 339-3500

> *Counsel* for Plaintiff ASI, Inc.